<pre>
1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF TENNESSEE
2                    NASHVILLE DIVISION

3

4   EDWARD JAMES BEYER            )
                                  )
5   VS                           )   No. 3:16-2736
                                  )
6   VESTAGEN PROTECTIVE           )
    TECHNOLOGIES, INC.            )
7   _____

8    BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

9                 TRANSCRIPT OF PROCEEDINGS

10                   November 28, 2017

11  _____

12  APPEARANCES:

13  For the Plaintiff:      MATTHEW R. ZENNER
                            McCune Zenner Happell
14                          5200 Maryland Way
                            Suite 120
15                          Brentwood, TN 37027

16
    For the Defendant:      WILLIAM S. RUTCHOW
17                          Ogletree, Deakins, Nash &
                              Smoak
18                          401 Commerce Street
                            Suite 1200
19                          Nashville, TN 37219

20

21  _____

22
    Roxann Harkins, RPR, CRR
23  Official Court Reporter
    801 Broadway, Suite A837
24  Nashville, TN 37203
    615.403.8314
25  roxann_harkins@tnmd.uscourts.gov
</pre>

# I N D E X

Plaintiff Witnesses

**JIM BEYER**

Direct Examination By Mr. Zenner ....................7
Cross-Examination By Mr. Rutchow ..................82

**TONY PRUNA**

Direct Examination By Mr. Zenner .................125
Cross-Examination By Mr. Rutchow .................137
Redirect Examination By Mr. Zenner ...............141

Plaintiff rests.................................142

Defendant witness

**BILL BOLD**

Direct Examination By Mr. Rutchow ................142
Cross-Examination By Mr. Zenner ..................192

Defendant rests.................................219

# E X H I B I T S

Plaintiff No. 1....Beyer resume ....................9
Plaintiff No. 2....11-23-15 Pfost letter with .....14
        employment offer
Plaintiff No. 3....Vestagen employee handbook .....27
Plaintiff No. 4....Funnel - 12-16-2015 ...........27
Plaintiff No. 5....Sales by salesperson YTD Jan 1 .29
        - May 9, 2016
Plaintiff No. 6....Bill Text 4-28-2016 ...........33
Plaintiff No. 7....Baker email 6-15-2016 ..........34
Plaintiff No. 8....Booking and Sales YTD June .....41
        2016
Plaintiff No. 9....Sales goals ....................50
Plaintiff No. 10....Email to Bold, Excel Funnel ...56
        8-23-2016

1    Plaintiff No. 11....Email from Pruna, Sales by ....58
              salesperson YTD 1-1-2016 to 9-19-2016
2    Plaintiff No. 12....Email re: board meeting at ....59
              Bold home
3    Plaintiff No. 13....Email from Bold 9-16-2016 re: .61
              VNOW
4    Plaintiff No. 14....Email from Bold 9-20-2016 .....62
              asking for plaintiff's thoughts
5    Plaintiff No. 15....Bold/plaintiff email re .......64
              presentation
6    Plaintiff No. 16....Letter from health insurance ..68
              company terminating plaintiff's coverage
7

8    Defense No. 4....Plaintiff's email to Susan Dolan 115
              at Children's Hospital 3-10-2016
9    Defense No. 4b...."Vestagen Literature Library" ..118
     Defense No. 5....Email from plaintiff to Lessem ..114
10             (sales lead) 6-30-2016
     Defense No. 6....Bold email, 8-1-2016 ...........157
11   Defense No. 7....Bold email 8-3-2016 to plaintiff 162
     Defense No. 8....Bold email 8-5-2016 ............164
12   Defense No. 9....Bold 8-8-2016 email ............165
     Defense No. 10....Bold email 8-17-2016 re: ......167
13             another funnel thing
     Defense No. 11....Bold email 8-17-2016 summary ...168
14   Defense No. 12....Bold email 8-21-2016 re: funnel 169
              criteria
15   Defense No. 13....Bold email 8-22-2016 re: funnel 171
              criteria
16   Defense No. 16....Email between plaintiff to ......90
              Holmes at Dallas Children's Hospital
17   Defense No. 17....Plaintiff's email apologizing ..113
              to Holmes
18   Defense No. 18....Plaintiff's email to Favret ....113
              (company founder) 3-22-2016
19   Defense No. 20....Bold 9-20-2016 email, Board ....124
              slides
20

21

22

23

24

25

1

2          The above-styled cause came to be heard

3    on November 28, 2017, before the Hon. Aleta A.

4    Trauger, District Judge, when the following

5    proceedings were had at 9:28 a.m. to-wit:

6

7          THE COURT:  Good morning.  We're here for

8    a bench trial in *Edward James Beyer versus Vestagen*

9    *Protective Technologies, Inc.*  We have Matthew

10   Zenner --

11          MR. ZENNER:  Yes, Your Honor.

12          THE COURT:  -- for the plaintiff.  And

13   this is the plaintiff.  And he goes by Jim Beyer; is

14   that right?  It's not Bayer (phonetic), it's Beyer.

15          MR. BEYER:  Beyer.

16          THE COURT:  And we have William Rutchow

17   for the defendant.

18          MR. RUTCHOW:  Yes, Your Honor.

19          THE COURT:  And your company

20   representative is CEO William Bold.

21          MR. BOLD:  Correct, Your Honor.

22          THE COURT:  Very good.  All right.  I

23   don't think we need any opening statements.  If you

24   feel strongly you want to make one, I'll listen, but I

25   think --

1              MR. ZENNER:  I don't, Your Honor.

2              THE COURT:  Okay, good.

3              MR. RUTCHOW:  After that, Your Honor, no.

4              THE COURT:  All right.  Well, why don't

5      we just get right into the testimony, then.

6      Mr. Zenner, you want to call your first witness?

7              MR. ZENNER:  Thank you, Your Honor.

8              MR. RUTCHOW:  Your Honor, I don't see him

9      in the courtroom, but plaintiffs did have listed

10     another witness who's a nonparty, and we would invoke

11     the rule to sequester that witness if he's showing up.

12             MR. ZENNER:  Yes, he'll be here about

13     11 o'clock.

14             THE COURT:  Okay.  Is that Tony Pruna?

15             MR. ZENNER:  Yes.

16             THE COURT:  Okay.  You're going to start

17     with the plaintiff?

18             MR. ZENNER:  Yes, Your Honor.

19             THE COURT:  Very good.

20             MR. ZENNER:  Call Jim Beyer to the stand.

21                         **JIM BEYER**

22     called as a witness, after having been first duly

23     sworn, testified as follows:

24             MR. ZENNER:  Your Honor, if I may

25     approach, I have a copy of some of the exhibits that

1    I'll be referencing, one for the witness and one for

2    the Court.

3                    THE COURT:  Okay.

4                    MR. RUTCHOW:  Just for clarification,

5    this is shrunk down --

6                    MR. ZENNER:  It is a shrunk-down list.

7                    MR. RUTCHOW:  Just want to make sure.

8                    THE COURT:  Is there agreement on all

9    these exhibits?  You want to just move them in right

10   now or do you want to do it one at a time?

11                   MR. ZENNER:  I think we'll do it one at a

12   time.

13                   THE COURT:  That's fine.

14                   MR. ZENNER:  And then if we have a

15   disagreement, we can speak about them.

16                   THE COURT:  To the extent you have extra

17   copies -- do you?

18                   MR. ZENNER:  I've got a copy for counsel,

19   for the witness and for the judge.

20                   THE COURT:  Okay.  I was going to have

21   you give my law clerk an extra copy if you had an

22   extra copy.

23                   MR. ZENNER:  I apologize, Your Honor.  We

24   can certainly make a copy.

25                   THE COURT:  If you don't have an extra

1    copy, that's all right.

2              MR. ZENNER:  I can have my assistant

3    email them, if you want.

4              THE COURT:  Are the originals with the

5    witness?  Where's the original?

6              MR. ZENNER:  With the witness.

7              THE COURT:  With the witness, okay.

8              MR. ZENNER:  To the extent there are any

9    originals.  They're all copies of documents.

10             THE COURT:  Okay.

11                  **DIRECT EXAMINATION**

12   BY MR. ZENNER:

13        Q.    Mr. Beyer, why don't you just introduce

14   yourself to the Court, please.

15        A.    My name is Jim Beyer.

16        Q.    Mr. Beyer, where do you live right now?

17        A.    Franklin, Tennessee.

18        Q.    How long have you lived there?

19        A.    Two and a half years.

20        Q.    Tell the Court a little bit about your

21   educational background.

22        A.    I have a business degree from Linfield

23   College.  And a Navy veteran as well.

24        Q.    Okay.  Now, if you will turn to what has

25   been previously marked as Plaintiff's Exhibit 1 -- do

1   you need your glasses?

2         A.    I do.  Would you mind?  I didn't think

3   I'd be needing them.

4               MR. ZENNER:  Your Honor, may I approach?

5               THE COURT:  Yeah, that'd be fine.

6               THE WITNESS:  Thank you.

7   BY MR. ZENNER:

8         Q.    Do you recognize Exhibit 1?

9         A.    Yes, that's my résumé.

10              MR. ZENNER:  Okay.  Why don't we go ahead

11  and move exhibit -- plaintiff's résumé in as

12  Plaintiff's Exhibit 1.

13              THE COURT:  Any objection?

14              MR. RUTCHOW:  No objection, Your Honor.

15              THE COURT:  Received.

16              So, now, your exhibit list that you have

17  filed with the Court -- do you have an exhibit list?

18              MR. ZENNER:  On the front of the book

19  there is an exhibit list.  Like Mr. Rutchow pointed

20  out, it is pared down from the one we filed.

21              THE COURT:  Do you have an extra copy of

22  that for the courtroom deputy?

23              MR. ZENNER:  I can get one.  Again,

24  there's one in each book.

25              THE COURT:  Here, let me just give you

1    mine, Katheryn.  If you can run a copy of it because I

2    think you'll probably need it.

3                    COURTROOM DEPUTY:  Yes.

4                    THE COURT:  Okay.  Yeah, just go do it

5    right now, that's fine.

6                    Any objection to Exhibit 1?

7                    MR. RUTCHOW:  No, Your Honor.

8                    THE COURT:  All right.  Received.

9                    (Plaintiff Exhibit No. 1 was admitted.)

10                   MR. ZENNER:  Should I wait?

11                   THE COURT:  No, that's fine.

12   BY MR. ZENNER:

13        Q.    Now, Mr. Beyer, tell me a little bit

14   about your background in the medical device industry.

15   Tell me what your work history is.

16        A.    So I began my career in hospitals after

17   the military and college.  I started off in hospitals,

18   worked my way up.  And then I worked for the GPOs,

19   group purchasing organizations, for a number of years

20   as a director.

21                   I left there, became VP of marketing for

22   a medical device company in Colorado.  From that point

23   I left and started with Masimo -- we were a small

24   $25 million medical device company -- as an executive

25   there.  I spent 11 years and we grew that organically

1    to over $700 million in sales.

2        Q.    Okay.  You said you worked for Masimo, it

3    looks like from your résumé, from 2004 until you took

4    the position with Vestagen; is that right?

5        A.    That is correct, yes.

6        Q.    Now, when you were at Masimo, what were

7    your job responsibilities?

8        A.    I had numerous.  I was really more a

9    business development role.  So I started our corporate

10    accounts program, I led the sales team.  And then I

11    backfilled, hired a leader for the sales team, and I

12    went to develop alternate care markets, our EMS

13    markets, inside sales.  What else.  I know I'm missing

14    something.

15        Q.    How many people did you have direct

16    management control over?

17        A.    So by 2014 I had about 125 people on my

18    team.  I had 13 direct reports.

19        Q.    How much were you being paid when you

20    were at Masimo in 2014 and '15?

21        A.    About 400,000 a year.

22        Q.    Now, at some point you began to be

23    recruited by the defendant in this action, Vestagen;

24    is that right?

25        A.    That is correct.

1          Q.      Tell me how that process came about.

2      What happened?

3          A.      A gentleman by the name of Tom Callaway

4      reached out to me and asked me if I'd be interested.

5      I reviewed the technology.  And, frankly, in my

6      25-year-plus industry, I was fascinated with the

7      technology, the opportunity with this technology.

8          Q.      Let me stop you.  I want to ask one

9      question going back.  Have you ever been fired from a

10     job before?

11         A.      Never.

12         Q.      Okay.  Sorry, go ahead.  Go into the

13     recruitment process.

14         A.      So I did -- I did my due diligence on the

15     technology.  And I believed in its efficacy in the

16     healthcare market.

17         Q.      Explain the technology briefly.

18         A.      It's scrub, basically, the clinicians

19     wear, but it's fluid repellent and antimicrobial.

20         Q.      And what does Vestagen do exactly?

21         A.      That's what they did.  They had the

22     fabric --

23         Q.      Manufacturing?

24         A.      -- that was antimicrobial and fluid

25     repellent.  I knew there was a number of them out in

1    the market, but they had a business model that I was

2    interested in.

3         Q.    Okay.  And did you have conversations

4    with people?  Who did you interview with?

5         A.    I entered with -- or interviewed with

6    Dale Pfost.

7         Q.    Who is Dale Pfost?

8         A.    He was on the board of directors.  He was

9    the acting CEO at the time.  Randy Scott.

10        Q.    Who is Randy Scott?

11        A.    He's another board remember.  Ben Favret,

12   who was the founder of the company.  Marc Lessem, who

13   was the marketing lead.  Tony Pruna, who was the CFO.

14   I think that was the extent.

15        Q.    Okay.  What time period did this

16   interview process take place?  I'll give you a point

17   of reference.  You began your employment on January 4

18   of 2016.

19        A.    Correct.  I think the interviews started

20   about September, maybe prior to, maybe August,

21   September time frame.

22        Q.    Okay.  And ultimately I take it you were

23   made an offer; is that right?

24        A.    Correct.

25        Q.    If you will turn to what's been marked as

1    Plaintiff's Exhibit 2.  That is a letter dated
2    November 23, 2015, addressed to you from Dale Pfost.
3    You recognize that document, I take it?
4          A.    Yes, I do.
5          Q.    Is that the offer that Vestagen made you
6    for employment?
7          A.    It appears so, yes.
8          Q.    And did you accept that offer?
9          A.    I did.
10          Q.    Okay.  And if you turn back to I guess
11    the second-to-the-last page there is a poorly copied
12    signature page, but is that your signature on it?
13          A.    Yes, it is.
14          Q.    And did you sign that essentially the day
15    it was sent to you?
16          A.    I -- there was many variations of this,
17    but yes, I believe that was -- I signed it that day.
18                MR. ZENNER:  Okay.  Why don't we move
19    Exhibit 2 in.
20                THE COURT:  Any objection?
21                MR. RUTCHOW:  No, Your Honor.
22                THE COURT:  My copy, the one that was
23    attached to the complaint has Mr. Beyer's signature --
24    oh, wait a minute.  Okay.  I see it.  All right, never
25    mind.

1          MR. RUTCHOW:  Your Honor --

2          THE COURT:  It's just a bad copy.

3          MR. RUTCHOW:  Once he testified that was

4    his signature, that's about as good as we're going to

5    get --

6          THE COURT:  That's fine.

7          MR. RUTCHOW:  -- because I think my copy

8    has a poor signature.

9          THE COURT:  That's fine.  Any objection

10   to Exhibit 2?

11         MR. RUTCHOW:  No, Your Honor.

12         THE COURT:  Received.

13         (Plaintiff Exhibit No. 2 was admitted.)

14   BY MR. ZENNER:

15        Q.    Looking at Exhibit 2, who drafted this

16   agreement?

17        A.    I would assume Dale Pfost drafted it.

18        Q.    Did you draft it?

19        A.    I did not.

20        Q.    Okay.  So in any event it was someone, as

21   far as you were concerned, from Vestagen or a

22   representative of theirs?

23        A.    Correct.

24        Q.    Okay.  Let's just go through some of

25   these terms quickly.  On the second page, what was the

1    position that you were being hired?

2           A.    Senior vice-president of sales.

3           Q.    And it says in paragraph 2 that you were

4    to report to work no later than Monday, January 4 of

5    2015.  That's probably a typo?

6           A.    Yes, it is a typo.

7           Q.    Probably means 2016.

8           A.    Correct.

9           Q.    Okay.  And what was your compensation?

10          A.    225,000 base, plus a 40 percent

11   commission.  Or bonus, rather.

12          Q.    Okay.  Were there any type of stock

13   options?

14          A.    Yes, there was stock options.

15          Q.    Okay.

16          A.    Yes, which was really the driving

17   catalyst.

18          Q.    When were those stock options to vest?

19          A.    I don't recall.  Certainly when there's

20   an exit or an event.  If we sold the company, they

21   would vest.  I don't recall the term.

22          Q.    I'm looking at the last paragraph on the

23   first page of this long-term compensation.  Says

24   25 percent to be option shares will vest on the first

25   anniversary of the commencement of your employment.

1    That was your understanding?

2           A.    That is correct.  That is correct.  It

3    was a little bit more complicated than the normal

4    vesting period, but it was -- that's what it was.

5           Q.    And we never made it to one year, did we?

6           A.    No, sir.

7           Q.    Now, was there a severance provision?

8           A.    There was.

9           Q.    How was it that the severance provision

10   was included and negotiated into your agreement?

11          A.    It wasn't the original offer letter, and

12   I was waffling a bit just because I was tempted to

13   leave the company I'd been with for a long time.

14   That's when Bill Bold entered the picture.

15          Q.    Tell the Court who Bill Bold is.

16          A.    Bill Bold at the time was the candidate

17   for the CEO position.

18          Q.    Okay.  And what -- what was his

19   involvement?

20          A.    He was -- in my opinion, well, pushing to

21   recruit me.  I was not waffling --

22                MR. RUTCHOW:  Your Honor, I'm going to

23   object as to offering of opinions of Mr. Bold's

24   motivations.

25                THE COURT:  Well, he can certainly say

1    anything Mr. Bold said or that you heard Mr. Bold say

2    that might indicate what you have concluded.

3              THE WITNESS:  He was very complimentary

4    of my contacts, skills, experience in this market.

5    And he was convinced, the way he phrased it to me,

6    that together we can really make this a market.  And

7    he came back with this language -- his position was,

8    you know, my opinion, was trying to sweeten the pot

9    effectively, because there was some risk with this

10   company at that point.

11   BY MR. ZENNER:

12        Q.    How old was this company at that point?

13        A.    It had been in operation since 2009, but

14   they haven't -- they really didn't sell anything or

15   not much.  And they've gone through a lot of investor

16   money.  So there was a risk with this company.

17        Q.    Would you describe it as a startup?

18        A.    Well, they'd been operating since 2009,

19   so a startup is not what I would clarify, but they

20   were risky.

21        Q.    Okay.  Why would you take this position?

22        A.    I believed in the technology, frankly.

23   And I -- 25 years in this market, healthcare scrubs is

24   sort of the last piece of the puzzle for healthcare

25   workers for their safety, as well as the protection of

1   their patients.  That's how I felt.

2          Q.    Now, let's just look at the severance

3   language on page 2 of the agreement.  Will you read

4   that, please.

5          A.    In the event you are subject to an

6   involuntary termination, you will be eligible for

7   severance pay, including a lump sum in cash equal to

8   six months of your base salary and three months

9   continued payment of your medical premium.

10         Q.    There is language referencing an

11  involuntary termination.  If you look down the page,

12  is there a definition for involuntary termination?

13         A.    There is.

14         Q.    Will you read that, please.

15         A.    Involuntary termination means either, A,

16  your termination without cause or, B, your resignation

17  for good reason.

18         Q.    And then, of course, in the definition

19  section, cause is defined.  You see that?

20         A.    I do.

21         Q.    Could you read over those provisions?

22               THE COURT:  We don't --

23               MR. ZENNER:  We don't need to read it,

24  okay.

25

1    BY MR. ZENNER:

2         Q.    At the time, though, you read over these

3    provisions; right?

4         A.    Yes, I did.

5         Q.    All right.  Now, this was signed late

6    November.  When did you -- and you actually started in

7    early January.  What did you do in the meantime with

8    respect to Vestagen, if anything?

9         A.    A number of things.  So my official start

10   date was January 4, but I attended, at their request,

11   a sales meeting in early December for a couple of

12   days.  And then at Bill Bold's request I got

13   immediately engaged in some customers in December,

14   particularly an HCA hospital division in Tampa.  He

15   didn't have faith in the current folks that were there

16   and asked me to fly out there and meet with that

17   customer.

18        Q.    Okay.  When was your last day at Masimo?

19        A.    Officially, December 30.

20        Q.    So, for example, while you were attending

21   this two-day sales meeting, which was in early

22   December; is that right?

23        A.    Correct.

24        Q.    Were you still employed with Masimo?

25        A.    Yes, I was.

1          Q.     Inside the employment agreement,

2     Exhibit 2, there's reference to an employee handbook.

3     I want you to look at what's been marked as

4     Plaintiff's Exhibit 3.  Is that a copy of Vestagen's

5     employee handbook?

6          A.     I assume so, yes.

7          Q.     And towards the back of this, there is

8     Vestagen 103.  There is a page, I guess, where you

9     signed and acknowledged receipt of it?

10         A.     I'm sorry, I don't see the signature.

11              THE COURT:  The very last page.

12    BY MR. ZENNER:

13         Q.     The very last page, Bates stamp 103 on

14    the bottom.

15         A.     Yes.  February 8?

16         Q.     Yes.

17         A.     Yes.

18         Q.     How is it that you ended up signing this

19    February 8?  Just explain what happened.

20         A.     It was part of the original offer -- not

21    the document itself, but reference to the noncompete

22    document, but it was not sent to me.  And so I was

23    actually in a meeting in Orlando at the headquarters

24    when Tony Pruna brought this in to have me sign it.

25         Q.     And Tony Pruna is who?

```
 1          A.    He was chief marketing officer in HR --
 2    or, excuse me, chief financial officer, Human
 3    Resources.
 4          Q.    When you began your employment in
 5    January 2016, what was your compensation structor?
 6    How often -- compensation structure.  How often were
 7    you being paid?
 8          A.    It was once a month.
 9          Q.    Okay.  And do you recall what that was?
10    Do you recall the amount?
11          A.    I don't recall.
12          Q.    Okay.  Whatever your annual salary is
13    divided by 12, I guess?
14          A.    Divided by 12.
15          Q.    At some point that changed; is that
16    right?
17          A.    It did.
18          Q.    It just went from being paid every month
19    to being paid twice a month?
20          A.    That's correct.
21          Q.    But the figure, the total compensation
22    package stayed the same?
23          A.    Correct.
24          Q.    Okay.  As the senior vice-president of
25    sales of Vestagen, what were your job
```

1    responsibilities?

2            A.    To grow the company commercially.

3            Q.    How?

4            A.    Build a sales team, train the sales team,

5    get into hospitals and educate clinical leaders on the

6    efficacy of this technology.

7            Q.    How many salespeople did you have when

8    they started -- when you started?

9            A.    Well, one -- four direct reports.

10           Q.    And who was your direct report?  Who did

11   you report to?

12           A.    Bill Bolds.

13           Q.    Were you provided at the time revenue and

14   performance goals that you were to meet?

15           A.    We had a revenue goal of 2.2 million for

16   that year.

17           Q.    Okay.  Before you started, so this would

18   be January of 2015 --

19           A.    '16.

20                 THE COURT:  '16; right?  January of 2016.

21                 MR. ZENNER:  Correct.  I was thinking

22   December of 2015, and I got my numbers mixed up.

23   BY MR. ZENNER:

24           Q.    So December 2015, what's your knowledge

25   of Vestagen's sales, annual sales at the time you

1  started?

2        A.    They were small.  I think the company did

3  about 700,000 in sales, but I was not aware at that

4  point of what their sales were.

5        Q.    So $700,000 in sales in 2015?

6        A.    Correct.

7        Q.    Okay.  How were you spending time as the

8  senior sales rep?  Were you managing other sales

9  representatives?

10        A.    I was.

11        Q.    What were you doing?

12        A.    There was four at the time.  And my

13  immediately -- my immediate goal was to right-size the

14  organization, put everybody in the right regional

15  territories, train them and start bringing on

16  additional sales folks.  That was the plan.  The plan

17  was to build a sales team of about 18 individuals.

18        Q.    What about the sales process that was in

19  place at Vestagen?

20        A.    They had an overengineered, what they

21  called a sales road map.  They had hired consultants

22  last year, I think they spent nearly a million dollars

23  from people that were outside the medical device

24  industry, and it was an very overengineered sales

25  process.  And so Bill Bold and I both agreed that we

1    were going to revise that quickly to make it easier

2    for a sales rep to be successful.

3         Q.    Were you responsible for traveling around

4    and meeting with customers?

5         A.    Yes, that was -- yes.

6         Q.    Okay.  And tell me what a sales funnel

7    is.

8         A.    A sales funnel is a tool for a sales

9    leader to track and manage the progress of the sales

10   process for your reps.

11        Q.    Was there a sales funnel in place at the

12   time you started in 2016?

13        A.    There was.

14        Q.    So if you'd turn to what's been marked as

15   Plaintiff's Exhibit 4.  Do you recognize that

16   document?

17        A.    Yes, I do.

18        Q.    What is it?

19        A.    This is the funnel that was in existence

20   when I started.

21        Q.    Well, explain what some of this means.

22        A.    So the way that their sales road map is

23   what they called it was to take a customer from the

24   onramp on the left side to basically closing the

25   business.  And you go along various steps in the sales

```
 1    process.  And so as an example -- and I don't even
 2    remember what the 1A, 1B, 1C is, but it was
 3    overcomplicated.  There was a way to determine taking
 4    East Alabama Medical Center from initial sales calls
 5    to the point where you're doing clinical evaluations,
 6    negotiating the contracts, et cetera.
 7                    THE COURT:  I'm very confused.  You're
 8    looking at Exhibit 5?
 9                    MR. ZENNER:  4.
10                    THE COURT:  I'm sorry.  No wonder I'm
11    confused.  Exhibit 4.
12                    MR. RUTCHOW:  It's just one page,
13    Your Honor.
14                    MR. ZENNER:  It's just one page.
15                    THE COURT:  Oh, it's one page, I'm sorry.
16    Okay, got it.
17    BY MR. ZENNER:
18        Q.    So these names that I see in these
19    columns and rows, are those potential customers?
20        A.    They were.  And that was what was given
21    to me as potential customers, but very quickly
22    afterwards, I would say three-quarters of these
23    customers disappeared.  They were not legitimate.
24        Q.    How so?
25        A.    So, as an example, in Metroplex or
```

```
1   Children's Dallas, Spectrum Health, these were not
2   that far along the process.  As an example, Spectrum
3   Health appears to be close to closing.  They hadn't
4   spoken to the customer in over nine months, but yet it
5   was indicated that it was close to closing.
6          Q.    Okay.  How many actual customers did
7   Vestagen have at the time you started?
8          A.    One.
9          Q.    Who?
10         A.    Baptist Jacksonville.
11         Q.    How would you describe this sales funnel?
12  Based upon your experience --
13         A.    Very elementary.
14         Q.    -- is it robust?
15         A.    No, not at all.
16         Q.    Is this -- would you consider this to be
17  a large sales funnel, a small sales funnel?
18         A.    No, very, very small.  It was even more
19  concerning because once I did the due diligence on
20  these, three-quarters of these were not viable
21  opportunities.
22         Q.    So you started in January, just tell me,
23  how did you spend the first four or five months of
24  your position as vice-president of sales?  What kinds
25  of things were you doing?
```

1          A.    I was on the road constantly, meeting

2    with customers, leveraging my relationships and

3    contacts in the industry, working with -- we had one

4    consultant at that point that was helping us get

5    audiences at the SEE Suite.  I built the training

6    program, the sales funnel, the call point strategy and

7    I began the recruiting process, just in the first

8    month, I would say.

9          Q.    Was it working?

10         A.    It was.

11         Q.    Well, let's look at Plaintiff's Exhibit

12   No. 5.

13              THE COURT:  Did you move in 3 and 4?

14              MR. ZENNER:  I'm sorry.

15              THE COURT:  Did you intend to move in 3

16   and 4?

17              MR. ZENNER:  Yes, I did.

18              THE COURT:  Any objection to 3 and 4?

19              MR. RUTCHOW:  No, Your Honor.

20              THE COURT:  Received.

21              MR. ZENNER:  Thank you, Your Honor.

22              (Plaintiff Exhibits Nos. 3 and 4 were

23   admitted.)

24   BY MR. ZENNER:

25         Q.    What is what's been marked as Plaintiff's

1   No. 5?

2          A.    I'm sorry, is that a question?

3          Q.    Yes.  Tell me what it is.

4          A.    This was an email from the CFO on or

5   about May 9.  It was a sales report.

6          Q.    And what is contained in this report?

7          A.    Just customer sales.

8          Q.    And is that report attached to the email?

9          A.    Yes.

10         Q.    And if you look at the last page, what

11  does that show as the total sales through the first

12  four months, I guess, of the year?

13         A.    390,000.

14         Q.    Okay.  And all of these different items

15  that are recorded on this sales report, are those the

16  different customers and what they bought?

17         A.    Yes.

18         Q.    And then each salesperson is identified

19  as well?

20         A.    Correct.

21                THE COURT:  You said that there was one

22  customer when you started in January?

23                THE WITNESS:  One large customer.  So

24  there were -- people were buying onesy, twosies, but

25  from what we were focusing on which is the

```
 1    institutional sales, we only had one customer.
 2                  THE COURT:  But these are a bunch more
 3    customers.
 4                  THE WITNESS:  It's just -- some of those
 5    are results of our efforts initially the first several
 6    months, I'd say the majority of those.  But there were
 7    also onesy, twosies, people that bought online, things
 8    of that nature.  That wasn't our focus.  Our focus was
 9    institutional purchases.
10                  MR. ZENNER:  Okay.  Move that in as the
11    next exhibit.
12                  THE COURT:  Any objection to 5?
13                  MR. RUTCHOW:  No, Your Honor.
14                  THE COURT:  Received.
15                  (Plaintiff Exhibit No. 5 was admitted.)
16    BY MR. ZENNER:
17         Q.    If you will turn to
18    Plaintiff's Exhibit 6, looks like a text message
19    exchange.  Who is that text message exchange with?
20         A.    With Bill Bold.
21         Q.    The one that's dated April 28 that starts
22    with Shh, is that you writing?
23         A.    Yes, that's me writing.
24         Q.    And what are you -- what are you telling
25    Mr. Bold?
```

1          A.    I wanted to keep it under wraps a little

2    bit until I further explored that opportunity, but I

3    wanted to let him know that the CNO of that division

4    was moving forward with us.

5          Q.    And that's his response to you --

6          A.    Yes.

7          Q.    -- on the bottom?

8          A.    Yes.

9          Q.    Through this time period, end of April,

10   had you had any complaints about your performance?

11         A.    No.

12         Q.    None at all?

13         A.    No.

14         Q.    Had you had any issues with any employees

15   through that point?

16         A.    Well, certainly.  It was -- in the

17   context, when I showed up, the company was virtually

18   bankrupt.  And even the board had indicated to me that

19   they've got about a year's left of funding.  You know,

20   go make this successful, you've got a year.

21         Q.    When you say funding, were they being

22   funded by an equity group?

23         A.    They had gone through about $36 million

24   in funding.  So this was the last hope for them.

25         Q.    So did you have any issues with

1  employees?

2       A.    There were certainly -- issues, yes,

3  absolutely.  I mean, I had -- I inherited an elderly

4  gentleman who had never been a salesperson.  So trying

5  to get him to cooperate on some of the basic sales

6  process, file management, call point strategy was

7  difficult.

8            Another gentleman, Brian Crawford, who

9  had been there from the beginning, his title was chief

10  business development officer, he felt that reporting

11  to me was a bit beneath him.  So it was trying to herd

12  cats a little bit.

13       Q.    Did you have any conversations with Bill

14  Bolds about these personality conflicts?

15       A.    Yes, absolutely.

16       Q.    Tell me about those conversations.

17       A.    Bill was in agreement that we needed to

18  let Gene go and Brian Crawford initially.

19            THE COURT:  Gene is the elder man you

20  were --

21            THE WITNESS:  Yes, ma'am.

22            THE COURT:  -- talking about?  Gene what?

23            THE WITNESS:  Gene Deutscher.

24  BY MR. ZENNER:

25       Q.    Did that ever happen?

```
 1          A.   No.  He -- no.
 2          Q.   Did you have authority to fire him?
 3          A.   I did.  That was my initial
 4   understanding, that I would manage everything
 5   commercial within the organization, but unfortunately
 6   that wasn't the case.
 7          Q.   As a result of these personality
 8   conflicts with Mr. Deutscher and Mr. Crawford, did
 9   Mr. Bolds ever indicate to you that your job was at
10   stake?
11          A.   Never.
12          Q.   Did you ever have a meeting along those
13   lines?
14          A.   Not one.
15          Q.   Did he ever mention to you that these
16   personality conflicts were cause for termination?
17          A.   No.
18          Q.   Did he ever tell you that you had ten
19   business days to cure?
20          A.   No.
21               MR. ZENNER:  If I can move in
22   Plaintiff's Exhibit 6.
23               THE COURT:  Any objection?
24               MR. RUTCHOW:  No, Your Honor.
25               THE COURT:  Received.
```

1          (Plaintiff Exhibit No. 6 was admitted.)

2     BY MR. ZENNER:

3          Q.    Moving to -- I guess we're now in May

4     going into June there's an email marked as

5     Plaintiff's Exhibit 7.  It's from Bill Bold to it

6     looks like -- is that the sales team?

7          A.    Correct.

8          Q.    Well, just tell me -- you don't have to

9     read it, but tell me what's going on in this email

10    exchange.

11         A.    We had secured a meeting at Children's

12    Hospital in Dallas, and we showed up at the meeting,

13    we expected one person, and there was a group of

14    clinicians in the meeting.  And we articulated the

15    value proposition, the solution in these scrubs,

16    et cetera.  And they were very excited about the

17    technology once we left.

18         Q.    And it looks like you sent an email to

19    everyone giving an update on those meetings; is that

20    right?

21         A.    I did.  It was a good week, and so I gave

22    everybody just an update on my activities with my

23    team.  And these are all very notable health systems.

24         Q.    And then there's an email from Chelle

25    Barker.  And you don't need to read it, but it looks

1    like she was complimentary of you?

2         A.    Correct.

3         Q.    And then the final email is from

4    Mr. Bolds, saying great message, thanks, Chelle and

5    Jim.

6         A.    Correct.

7         Q.    During this time period, did you have any

8    complaints about your job performance from Mr. Bolds

9    or anyone else?

10        A.    No.

11             MR. ZENNER:  I'll going to mark it --

12   move in Plaintiff's Exhibit 7.

13             THE COURT:  Any objection?

14             MR. RUTCHOW:  No, Your Honor.

15             THE COURT:  Received.

16             (Plaintiff Exhibit No. 7 was admitted.)

17   BY MR. ZENNER:

18        Q.    Now, moving into the end of July, how are

19   things going in July?  Things moving forward?

20        A.    They are, yes.

21        Q.    How was the sales process taking hold?

22        A.    It was taking hold very well.  It was

23   longer than anybody had hoped for in terms of the

24   sales process.

25        Q.    What do you mean by that?

           A.    Well, from the time you meet a customer
1

to the time they close the business, every product
2

solution technology takes a little bit -- takes
3

different times.  If it's highly technical, it could
4

be an 18-month sales process.  If it's commodity
5

product, it may take three to six months.  At this
6

point we figured that the sales process was about a
7

year.  Some earlier successes, but typically about a
8

year.
9

           Q.    That's from start to finish?
10

           A.    Yes.  Correct.
11

           Q.    So if you stepped in and some of these
12

introductions had already been made and they were
13

already in the funnel, that time period may or may not
14

be shorter?
15

           A.    I shortened it, certainly.
16

           Q.    Can you give examples?
17

           A.    HCA.  Northwell is a good example.
18

Northwell is a -- Brain Crawford had been calling on
19

that hospital for some time.  I don't know how long,
20

but certainly greater than a year.  And the best way
21

to describe it is it was -- his process was very
22

ineffective.  He was getting to the wrong folks.
23

           And I got immediately engaged in
24

Northwell, traveled there, wrote all the
25

1     communications to the key leaders there and percolated

2     the sales process.

3          Q.    What was the result of that?

4          A.    Northwell ended up moving towards

5     Vestagen.

6          Q.    If you will look at what's been marked as

7     Plaintiff's Exhibit 8.  Tell me what this document is.

8          A.    So this is a summary of the bookings for

9     Vestagen.  And I think this is mid year, so June 2016.

10     So it's about halfway through the year.  Our budget to

11     that point was $651,000.

12          Q.    So this is an email from Tony Pruna --

13          A.    That's correct.

14          Q.    -- who is the CFO?

15          A.    Correct.

16          Q.    It's dated January -- or July 26, 2016.

17     And it's year to date through June; is that right?

18          A.    Yes.

19          Q.    And it's giving the bookings and sales

20     year to date through June 2016.  And that's attached

21     to it?

22          A.    Yes.

23          Q.    So if I'm looking at that attachment,

24     there is a table that talks about bookings.  You see

25     where it says direct?

1        A.      Yes.

2        Q.      What's a direct booking?

3        A.      Just a direct sale to the customer.

4        Q.      Okay.

5        A.      And then the wholesaler may be to a

6    distributor.

7        Q.      And under the actual column, is that the

8    actual sales that are taking place during that

9    six-month period?

10       A.      Correct.

11       Q.      Okay.  And that's what?

12       A.      1,070,000.

13       Q.      And the second figure is the budget.  Do

14   you know what that means?

15       A.      That was what we were budgeted for

16   through that period of time.

17       Q.      So in the variance, is that just how much

18   over the budget the actual number was?

19       A.      That is correct.

20       Q.      Okay.  So the sales at that point, at

21   least the direct sales, had exceeded the budgeted

22   amount by $526,000?

23       A.      Yes.  Yes, yes, yes.

24       Q.      Now, there's also something that talks

25   about wholesalers.  What does that mean?

1      A.    Distributor.  It could be an online

2  retailer.  Could be a retail store.

3      Q.    Okay.  And those it looked like it was

4  budgeted 107, but none of those had taken place?

5      A.    Zero.

6      Q.    Do you have an explanation for that?

7      A.    The model that we had adopted was

8  directed to the hospitals.  So our focus was

9  institutional sales into the hospitals, not retail.

10     Q.    There is a item called backlog.  Do you

11  see that?

12     A.    I do.

13     Q.    The backlog number was $362,038.  Do you

14  know what that means?

15     A.    My assumption is --

16         MR. RUTCHOW:  Your Honor, I'm going to

17  object to the extent he's assuming.  That's

18  speculating.

19         THE COURT:  Did Mr. Bold tell you what

20  this meant?

21         THE WITNESS:  No.  Just from my

22  experience, Your Honor.

23         THE COURT:  I would think that you would

24  know what this chart means.  Overruled.  What is that?

25         THE WITNESS:  Back orders.  The inability

1    to provide the product.

2    BY MR. ZENNER:

3         Q.    Was there an ongoing problem at Vestagen

4    with delivering product?

5         A.    Absolutely.

6         Q.    Tell the Court about that.  What was

7    happening and why?

8         A.    They -- that was the biggest problem with

9    the company is they could not manufacture and provide

10   the product.  So it was a handicap for myself, my

11   sales team getting customers engaged and then telling

12   them that they had to wait six months for the product

13   to show up.  The same is applicable to Northwell as

14   well.

15        Q.    What do you mean?

16        A.    That was a large customer.  They spend

17   about $8 million a year on scrubs.  The hospital

18   actually purchases the scrubs for their employees.

19   And so once all the excitement, we got them to sign,

20   there was a -- nothing but back orders.

21        Q.    Did that impact the total sales?

22        A.    Absolutely.

23        Q.    How?

24        A.    Well, you can't book a sale until the

25   customer receives it.  So you may have great

1    excitement, signature from the hospital system, but

2    until you ship it and the customer receives it, you

3    can't book it as a sale.

4         Q.   Just to make sure I understand this,

5    about a backlog figure, does that represent sales that

6    had been made but not delivered?

7         A.   That is correct.  That is the difference

8    between booking and sales.  Bookings are -- we got the

9    customer to agree to buy.  And then sales is when they

10   actually receive the product.

11        Q.   And look at the revenue column or the

12   row.  Do you see that?

13        A.   I do.

14        Q.   Actual revenue at that point was

15   $708,000; is that right?

16        A.   Correct.

17        Q.   And what was the budgeted figure?

18        A.   651,000.

19        Q.   No, the budgeted.  Under the -- under the

20   revenue, do you see --

21        A.   543,000.

22        Q.   Is that 543?

23        A.   Yes.

24        Q.   And what was the variance?

25        A.   164,000.

1          Q.    So read the total revenue figures.

2          A.    Actual 708,000, budgeted 651,000, with a

3    variance of 57,000.

4                I may point out that in the past Vestagen

5    never once made their revenue numbers in the history

6    of the company.

7          Q.    And that was my next question.  This

8    document, does it indicate to you that you're meeting

9    the revenue goals?

10         A.    Absolutely.  We're on the right track.

11               MR. ZENNER:  I'd like to move that in as

12   the next exhibit.

13               THE COURT:  Any objection?

14               MR. RUTCHOW:  No objection, Your Honor.

15               THE COURT:  8 is received.

16               (Plaintiff Exhibit No. 8 was admitted.)

17   BY MR. ZENNER:

18         Q.    How often did the board of directors meet

19   at Vestagen?

20         A.    Quarterly.

21         Q.    And did you participate in these

22   meetings?

23         A.    Yes.

24         Q.    What was your role?

25         A.    I was the commercial leader, the VP of

1    sales.

2         Q.    Were you -- did you give them an update

3    on how things were going, I guess?

4         A.    I did.

5         Q.    Why don't you look at

6    Plaintiff's Exhibit 9 and tell me what -- they look

7    like PowerPoint slides; is that right?

8         A.    That is correct.

9         Q.    Tell me what these are.  What's the first

10   page?

11        A.    Yes.  This is the sales Q1 goals.  So I

12   was measured from a performance standpoint both on my

13   MBOs, quarterly MBOs, as well as revenue.

14        Q.    MBO?

15        A.    Manage By Objectives.  So basically tasks

16   in which to accomplish goals or objectives to

17   accomplish.

18        Q.    Okay.  There's a date on the bottom,

19   May 10, 2016.  Does that indicate the date of the

20   board meeting?

21        A.    It could.  I don't recall specifically

22   the date of that board meeting, but it was typically

23   after the quarter.  So as an example, January,

24   February, March, you may have a board meeting a month

25   later.

1          Q.    So what is the second item?  It says

2     initial phase of sales process.  Reengineered to

3     reflect urgency and guaranteed success.  All

4     information will be managed initially through

5     spreadsheets and all accurate accounts will be

6     included in the funnel.  This will be followed by

7     implementing the new cloud-based CRM to manage the

8     funnel progress.

9               Now, that probably means something to

10    you, but can you explain to the Court what that

11    actually means?

12         A.    Yes.  So we went from the initial funnel

13    that you had presented earlier to an Excel

14    spreadsheet.  And then the end goal was to take the

15    funnel, put it on a cloud-based CRN, which is a

16    customer -- it was a way to manage your customer base.

17              That way when it's cloud-based, you have

18    access on the road, everybody does.  And part of the

19    challenges in our spreadsheet was we had to send it

20    around to everybody.  Everybody put their input, save

21    it, sent it to the next rep, put their input, save it,

22    et cetera.  Cloud-based eliminates that.

23         Q.    So that had been completed as of Q1?

24         A.    That is correct.

25         Q.    Okay.  And next item is four new accounts

1   placing orders for VESTEX?

2          A.     Correct.

3          Q.     Had that been completed?

4          A.     Yes.

5          Q.     Hire agreed upon number of sales reps,

6   three most likely.  Looks like at that point two had

7   been hired?

8          A.     Yes.

9          Q.     Who were the two that were hired?

10         A.     John Black and Chelle Barker.

11         Q.     Now, the rest of these slides, looks like

12  there's a slide for Q2 and there's a slide for Q3.

13  Does that mean second quarter and third quarter?

14         A.     Yes.

15         Q.     And, again, were these all slides that

16  you presented to the board of directors?

17         A.     That is correct.

18         Q.     And tell me about the process that you

19  used to complete and get the information on these

20  slides approved.

21         A.     So everybody was responsible for their

22  functions, marketing, sales, operations, et cetera.

23  And we would build our slide for the board

24  presentation and we would send it to Bill Bold to

25  compile and to present to the board.

1          Q.     Did he approve the accuracy of these

2     slides?

3          A.     Yes.

4          Q.     And these were, in fact, presented to the

5     board?

6          A.     That is correct.

7          Q.     And he was probably sitting right there

8     while they were being presented to the board; is that

9     true?

10         A.     That's correct.

11         Q.     He's a member of the board?

12         A.     That's correct.

13         Q.     Well, let's look at your second quarter

14    goals.  First one is 15 VNOWs with dates set for the

15    awareness event.  Tell me what that means.

16         A.     The strategy was, because this was such

17    an innovative new technology, that it was difficult

18    for a clinician to wrap their head around the

19    technology.  So we deployed a strategy by doing these

20    VNOWs where we would show up at the hospital.  We

21    would articulate the scrubs in a board room or

22    cafeteria, et cetera.

23              And that way the clinicians can filter

24    in, take a look at the technology, the scrubs, touch,

25    feel, et cetera.  It's clothing, like anything else.

1    Clinicians want to touch it and so forth.  So it was
2    really an awareness event.  And that was the first
3    step in our sales process.
4                    THE COURT:  What does VNOW stand for?
5                    THE WITNESS:  It was VESTEX now.  That
6    was the acronym.  So VESTEX being the brand technology
7    and then now was, you know, VESTEX now.
8                    THE COURT:  Okay.
9    BY MR. ZENNER:
10        Q.    So this was part of a way to generate
11   sales, I guess; right?
12        A.    Absolutely.
13        Q.    And there had been 15 of these VNOWs set;
14   is that right?
15        A.    That is correct.
16        Q.    Okay.  And that was complete?
17        A.    That's correct.
18        Q.    And the next goal was five VNOW web
19   stores built with orders placed.  Tell me what that
20   is.
21        A.    So part of our deployment strategy was to
22   build a micro site at the hospital so the clinicians
23   can go on and buy these scrubs.  We didn't really have
24   a mechanism to sell.  The margins were not appropriate
25   for retail.  So we built these micro sites to where

1    the clinicians can purchase.

2           Q.    And this slide indicates that five VNOW

3    web stores had been built and orders had actually been

4    placed; is that right?

5           A.    That is correct.

6           Q.    And that was completed?

7           A.    Correct.

8           Q.    Next goal was ten new hospitals buying

9    VESTEX compared to quarter 1.  Was that completed?

10          A.    Yes.

11          Q.    Next goal is build and implement metrics

12   to design a forecasting model based on rep targeting

13   and productivity.

14                Now, that's noted to be complete, but

15   tell the Court what that means.

16          A.    So one of the challenges that -- and,

17   again, this was the delineation of our roles and

18   responsibilities.  Bill Bolds' responsibility was to

19   go out and get additional funding.  And part of that

20   funding process is to build some predictability in our

21   revenue models.

22                So I was tasked with building and

23   implementing metrics.  In other words, if you hire a

24   rep, how long does it take for them to start becoming

25   productive, start appreciating sales.  So that was

1   part of that metrics that I built.

2          Q.    Next goal was execute one GPO strategic

3   partner agreement.  GPO is, again, a group purchasing

4   organization?

5          A.    That is correct.  And that's where I

6   worked for many years earlier on in my career, is a

7   GPO.

8          Q.    Tell me what a GPO does.

9          A.    A GPO does all the RFPs for hospitals,

10  they do all the due diligence on technologies.  Once

11  you get an award, then the hospitals can purchase all

12  the terms and conditions of a negotiated pricing,

13  et cetera.  All hospitals belong to a GPO.

14         Q.    Okay.  And that's listed as pending?

15         A.    Yes.

16         Q.    Do you know if that was ever completed?

17         A.    It was completed.

18         Q.    With who?

19         A.    Premier.

20         Q.    The third quarter goal -- this slide is

21  dated, I guess, August 10 of 2016 down in the bottom.

22  First goal was to achieve Q3 revenue target of

23  $717,000, and that's listed as completed?

24         A.    Correct.

25         Q.    And that's accurate?

1          A.     Yes, that's per the revenue projections.

2          Q.     Next goal was to have 15 new hospitals

3   placing orders for VESTEX.  Was that completed?

4          A.     Yes.

5          Q.     Next goal was launch GPO agreement, and

6   work with partners for marketing and lead generation.

7   What was the status of that?

8          A.     Completed.

9          Q.     Next goal was to successfully implement

10  minimum of one successful channel partner health

11  system integration, AllHeart, ACW.

12         A.     All Custom Wear, yes.

13         Q.     Tell me what that means.

14         A.     Those are online retailers.  So we -- I,

15  got the agreement with All Custom Wear.

16         Q.     And they sell the product online?

17         A.     That is correct.

18         Q.     Okay.  Final one is have each territory

19  manager begin the implementation/ordering at one large

20  health system in their territory.  And that had been

21  completed?

22         A.     Yes, it has.

23         Q.     Now, again, was this slide approved by

24  Mr. Bold?

25         A.     That is correct.

1        Q.    And it was presented to Mr. Bold?

2        A.    Yes.

3        Q.    It was presented to the rest of the

4   board?

5        A.    Yes.

6        Q.    And did anyone in the board -- did

7   Mr. Bold say, hey, wait a minute, that's not accurate?

8        A.    Never.

9        Q.    Did anyone in the board question its

10  validity?

11       A.    No.

12             MR. ZENNER:  I'd like to move those

13  exhibits in.

14             THE COURT:  Any objection to P9?

15             MR. RUTCHOW:  No, Your Honor.

16             THE COURT:  Received.

17             (Plaintiff Exhibit No. 9 was admitted.)

18  BY MR. ZENNER:

19       Q.    We spoke some earlier, Mr. Beyer, about a

20  sales funnel.  And one of your jobs was to further

21  develop the sales funnel and -- is it fair to say that

22  part of that is to get more hospitals into the sales

23  funnel?

24       A.    Excuse me, pardon me.  That is the goal.

25       Q.    If you will look at

1    Plaintiff's Exhibit 10.  Tell me what that is.  Tell

2    the Court what that is.  It's an email dated 8-23.

3         A.    This is the email from Bill Bold?

4         Q.    Yes.

5         A.    Just an email from him asking everybody

6    if it was accurate, the information.

7         Q.    As of 8-23-2016, is it your understanding

8    that this was the status of the sales funnel at that

9    point?

10        A.    Yes.

11        Q.    Okay.  And the sales funnel is the

12   spreadsheet that's attached?

13        A.    Yes, exactly.  So this was the Excel --

14   so we moved from that elementary sales funnel when I

15   started to this Excel spreadsheet.  And you can --

16        Q.    So this shows -- just walk through what

17   these mean.  I'm looking at the spreadsheet.  There's

18   a column for sales rep.  So that's just the sales rep

19   who was assigned to that particular hospital; is that

20   right?

21        A.    That is correct.

22        Q.    Okay.  And John Black was one of your

23   sales reps?

24        A.    That is correct.

25        Q.    And that was someone that you had

```
 1   actually worked with at Masimo?
 2          A.    That is correct.
 3          Q.    The account name, is that the name of the
 4   hospital?
 5          A.    Yes.  Would you like me to walk through
 6   those?
 7          Q.    Yes, walk through one --
 8          A.    So this is --
 9          Q.    -- and what this document shows.  I'm
10   sorry.  We got to not talk over one another --
11          A.    I apologize.
12          Q.    -- because it makes the court reporter's
13   job impossible.
14          A.    I got the look.
15          Q.    I've gotten that plenty of times too.
16          A.    So the first column is the sales rep.
17   Then the account name.  And then the opportunity type.
18   And HCW's healthcare worker.  OR is in the OR.  And
19   then we had five buckets, discovery, qualifying,
20   et cetera, and they all had metrics.  So you had to
21   sort of check off the metrics to move on to the next
22   level.
23                That's how we trained sales folks to
24   ensure that they're moving through an articulated
25   sales process.  The product, SS stands for signature
```

1    stretch.  The department that we were selling to,

2    nursing.  And then the number of sets.  And this

3    was -- this was really a metrics that we came up with,

4    how many sets.

5                    It's difficult to say how many sets is a

6    nurse going to order in a year, so we had a metric.

7    The ASP is average sales price, $50 per set.  And then

8    if you take how many sets we believe they're going to

9    be ordering times the average sales price, that gives

10   you an opportunity value.

11                   Then we have the forecast close.  When do

12   we expect this business to close and they start

13   purchasing.  And then we have a confidence indicater.

14   This one is, yeah, we're 50 percent confident this is

15   going to close on this date.  And then the next column

16   is the revenue opportunity.

17        Q.    And this document is three pages long.

18   It's got a total on the end of it.  Do you see the

19   last page?

20                   Actually, if you -- let me back up a

21   little bit.  If you look at this document about

22   halfway down on the first page of it, there's a

23   $626,000 figure.  Do you see that?

24        A.    Yes.

25        Q.    Okay.  And is that the total of the

1  numbers that appear before it?

2        A.    Yes.

3        Q.    So then if you went down to the next

4  page, there is a number 587,211?

5        A.    Yes.

6        Q.    Is that the total of that next set of

7  numbers?

8        A.    That is correct.  So if you look at what

9  we have in discovery, it's easy for us to look, we

10  have $626,000 currently in the first stage of the

11  sales process.  And then the same thing with

12  qualifying the second phase of the sales process,

13  that's how much we have opportunity in that sales

14  process.

15        Q.    Okay.  And on the second page there are a

16  number of numbers and then an $886,000 figure.  What

17  stage of the sales process were those accounts in?

18        A.    Those were when we were doing those VNOW

19  onsite demonstrations.

20        Q.    So there's a 90 percent confidence at

21  that point that that sale is actually going to take

22  place?

23        A.    Yes.

24        Q.    And then the final figure --

25              THE COURT:  Well, there's also 90 percent

1    that the sales's not going to take place; right?

2                    THE WITNESS:  There is that, yes.  But

3    this was our confidence, Your Honor.  This is our

4    confidence level in that.  So, in other words, if

5    we're doing VNOWs, there's a high probability that

6    we're going to close.

7                    THE COURT:  Well, then why do more than

8    half of them say 90 percent no?

9                    THE WITNESS:  These are -- if you look at

10   the column above it, says PO, purchase order, and a

11   question mark.  There was -- we were really seeking

12   the purchase orders from the hospitals, those

13   hospitals that purchase for their employees.

14                   But by and large, most of it was, once we

15   did the VNOW demonstrations, the healthcare workers

16   themselves would buy it.  So you'll see here, if it's

17   a PO, that means no, it's not an institutional

18   purchase, which means that the healthcare workers have

19   to buy it.  As opposed to yes, that could be an

20   institutional purchase.

21   BY MR. ZENNER:

22        Q.    So the yes or no doesn't mean the sale is

23   not -- it's 90 percent --

24        A.    No, it's just where the money's coming

25   from.

1          Q.    Okay, that clarifies.

2                So if I'm reading this accurately, all of

3     the potential business in the sales funnel as of this

4     date totals -- and I added these up myself,

5     $2,718,133; does that sound about right?

6          A.    That sounds about right.

7          Q.    Now, compare this sales funnel to

8     Exhibit 4, if you would.  How would you compare the

9     sales funnel as it existed when you started versus the

10    sales funnel as it existed at the end of August?

11         A.    Remarkably different.

12         Q.    Which is better?

13         A.    Much better, yes.

14               MR. ZENNER:  I'll go ahead and move that

15    in as the next exhibit.

16               THE COURT:  Any objection to P10?

17               MR. RUTCHOW:  No objection, Your Honor.

18               THE COURT:  Received.

19               (Plaintiff Exhibit No. 10 was admitted.)

20    BY MR. ZENNER:

21         Q.    Let's turn to Plaintiff's Exhibit 11.

22    This is an email from Tony Pruna, and we had seen an

23    earlier one of these back in May.  Have you turned to

24    that tab yet, sir?

25         A.    Yes.  Yes.  Sorry.

1       Q.   Okay.  And this is a weekly sales report

2   from Tony Pruna as of 9-19-2016?  Or actually it's

3   through September 19, 2016, I guess.

4       A.   Yes.

5       Q.   Okay.  That was addressed to you and all

6   of the others on the executive team?

7       A.   Yes.

8       Q.   On the sales team and the --

9       A.   Yes, the entire sales team.

10      Q.   As of this date, if you turn to the last

11  page, what were the total sales on that date as of

12  that point?

13      A.   1,060,000.

14      Q.   Once again, Exhibit 8, which was a

15  similar report sent about -- sorry, not Exhibit 8.

16  Exhibit 5 sent in May.

17      A.   Yes.

18      Q.   Again, what were the total sales in that

19  report in May?

20      A.   390,000.

21      Q.   Over a four-and-a-half-month period those

22  sales had increased over a million?

23      A.   Yes.

24      Q.   What day were you terminated?

25      A.   September 22.

          1          Q.     And we'll get into that conversation in a

          2     minute.  But let's talk about the days leading up to

          3     your termination.

          4                    MR. ZENNER:  If I haven't done so, could

          5     I move in Plaintiff's 11?

          6                    THE COURT:  Any objection?

          7                    MR. RUTCHOW:  No objection, Your Honor.

          8                    THE COURT:  Received.

          9                    (Plaintiff Exhibit No. 11 was admitted.)

         10     BY MR. ZENNER:

         11          Q.     If you will look to

         12     Plaintiff's Exhibit 12.  This is an email dated

         13     9-14-2016, so eight days before you were terminated.

         14     And it's from Bill Bold.  What is it pertaining to?

         15          A.     He had set up a board meeting presumably

         16     at his home in Florida.  And this was the logistics of

         17     that meeting.

         18          Q.     For example, telling you what hotel to go

         19     to?

         20          A.     Yes.

         21          Q.     Did you book your travel arrangements for

         22     this?

         23          A.     I did.

         24          Q.     Was there any indication in this email

         25     that they had cause to terminate you?

```
1           A.    No.

2           Q.    And had there been any mention of

3   termination?

4           A.    No.

5           Q.    And then you were told you had ten days

6   to cure any type of condition with your employment

7   performance?

8           A.    No.

9           Q.    Did you fully expect to go to this

10  meeting?

11          A.    Absolutely.

12                MR. ZENNER:  Move that in as the next

13  exhibit.

14                THE COURT:  Any objection to P12?

15                MR. RUTCHOW:  No objection, Your Honor.

16                THE COURT:  Received.

17                (Plaintiff Exhibit No. 12 was admitted.)

18  BY MR. ZENNER:

19          Q.    If you turn to Plaintiff's Exhibit 13,

20  this is an email from Bill Bold dated 9-16-2016, and

21  this is, I guess, six days before you were terminated.

22  Tell me what this email is about.

23          A.    So the one hospital system that I

24  resurrected was Spectrum Health.  That was the one I'd

25  indicated earlier that they hadn't spoken to anybody
```

1  at that hospital for nine months, yet it was -- they'd

2  indicated it was soon to close.  That week I happened

3  to be conducting those VNOWs with my team at Spectrum

4  Health.  It's a 45-hospital system up there.

5           So the conversation Bill Bold and I had,

6  it was a little frustrating that the hospital had put

7  us up on the fourth floor in a wing that was never

8  used.  So the traffic was minimal.  And so it was part

9  of our discussion that we need to not do this again.

10          In fact, John Black led this development,

11 he did a really nice job, but he left the company.  So

12 I -- at the last minute I had to engage this customer

13 and participate in the VNOW.

14      Q.   And this email starts, Jim, thanks for

15 the chat just now.  So the two of you had had a

16 conversation?

17      A.   Uh-huh (affirmative).

18      Q.   Is there anything in this email that

19 would indicate to you that you're in danger of losing

20 your job?

21      A.   No.

22      Q.   Is there anything that mentions cause for

23 termination?

24      A.   No.

25      Q.   Was there anything in the conversation

1    that mentioned cause for termination?

2          A.    No.

3          Q.    Is there anything in this email that

4    talks about having ten days to cure some deficiency in

5    your performance?

6          A.    No.

7          Q.    Do you have any conversations -- or

8    during the conversation you had with him, did he talk

9    to you about having ten days to cure anything?

10         A.    No.

11               MR. ZENNER:  Move that in as the next

12   exhibit.

13               MR. RUTCHOW:  No objection, Your Honor.

14               THE COURT:  P13 is received.

15               (Plaintiff Exhibit No. 13 was admitted.)

16   BY MR. ZENNER:

17         Q.    Turn to P14.  This is an email from Bill

18   Bold dated September 20, 2016, to the team regarding

19   thoughts.  So this is just two days before your

20   termination?

21         A.    Correct.

22         Q.    What is this email about?

23         A.    It was just an email based on our

24   experiences.  We were still building the plane as we

25   were flying and trying to figure out how to improve

 1    the process.  So that's just an assumption I'd make on
 2    this email.
 3        Q.    He's asking for your thoughts on this
 4    process?
 5        A.    Yes.
 6        Q.    When someone's asking for your thoughts
 7    on a process going forward, does that tell you that
 8    you're about to be terminated?
 9        A.    No.
10        Q.    At this point did you have any reason to
11    believe you were --
12        A.    No.
13        Q.    -- going to be terminated?
14        A.    No.
15            MR. ZENNER:  Move that in as the next
16    exhibit.
17            MR. RUTCHOW:  No objection, Your Honor.
18            THE COURT:  P14 is received.
19            (Plaintiff Exhibit No. 14 was admitted.)
20    BY MR. ZENNER:
21        Q.    Turn to P15.  What were you doing on
22    September 20, September 21 and September 22?
23        A.    Well, I believe it was on the 20th, maybe
24    the 21st I was flying back.
25        Q.    From where?

1          A.     From Spectrum Health in Grand Rapids,

2    Michigan, after spending I think four days onsite at

3    that hospital system.

4          Q.     And look at P15.  Tell me what this email

5    is about.  That's an email exchange between you and

6    Bill Bold dated September 20 and then September 21.

7          A.     Yes, these emails were in preparation for

8    the board meeting.  And so we were trying to land on

9    revenue goals and also the upcoming Q4 goals.

10          Q.     It looks like you write, I've got

11    communication in to Tony for clarification on Q3

12    goals.  So is it fair to say that you were waiting for

13    some information to complete those --

14          A.     Yes, I was waiting for the revenue from

15    our CFO, as well as the number of new orders.

16          Q.     Now, to be fair, apparently Mr. Bold had

17    suggested -- some suggestions to you about how to

18    include more information or more detailed information?

19          A.     Yes, he wanted some of this detail.  I

20    didn't have it.  They were finance, so I had to go

21    back to our finance department and get that

22    information pulled.

23          Q.     Did you have any telephone conversation

24    with him about these slides?

25          A.     I don't believe so.  I think everything

1    was on email at that point.

2           Q.    Did you read anything in this email that

3    would indicate to you that your job was in jeopardy?

4           A.    No.  He's asking for my Q4 goals.

5                 MR. ZENNER:  Move that in as the next

6    exhibit.

7                 THE COURT:  Objection?

8                 MR. RUTCHOW:  No objection, Your Honor.

9                 THE COURT:  Received, P15 is received.

10                (Plaintiff Exhibit No. 15 was admitted.)

11   BY MR. ZENNER:

12          Q.    How would you describe Bill Bold's

13   temperament?

14          A.    Chaotic.

15          Q.    How do you mean?

16          A.    He -- unpredictable.  So one day he was

17   very complimentary, things were great, and the next

18   day he would go on rampages with whomever.  He was

19   just a very chaotic individual.

20          Q.    So tell me what happened on September 22,

21   2016.

22          A.    He called me and --

23          Q.    Where were you?

24          A.    I was in my home office.

25          Q.    Okay.

1          A.    Now, again, I just flew in the day

2    before, having spent four days in Grand Rapids.  And

3    he was frustrated, I think, at Spectrum, the lack of

4    sales, and I don't know what else.  But at which point

5    he said he wanted to take over the sales team.

6          Q.    What did you say?

7          A.    What can I say?  I said, I don't think

8    that's a good idea.  And that's when he said, I'm --

9    he wanted to move me into a regional sales role,

10   stripping me of VP of sales position while he takes

11   over.

12         Q.    Did he talk about what would happen to

13   your salary?

14         A.    Nope.  He just indicated that he wanted

15   to move me into a regional position.

16         Q.    What was your response?

17         A.    I -- no.

18         Q.    When you say into a regional position, he

19   wanted to make you -- take you from vice-president

20   of -- senior vice-president of sales to sales rep?

21         A.    Pretty much, yes.

22         Q.    And you said -- I'm sorry, you said what?

23   Just tell --

24         A.    I -- I was flabbergasted by this.

25   He's -- it was very challenging in dealing with

1    Mr. Bold, and so this didn't come to me as a surprise.

2    He had been really overstepping into my role and

3    responsibility and becoming increasingly more on a

4    day-to-day basis.  It's -- he would talk over me.  He

5    would talk louder.

6              So at that point I just said, no, I'm not

7    interested in that particular role.  And then I said,

8    let's just talk about a severance.  You know, let's

9    just part ways amicably.  He said, I'm not going to

10   give you severance.  How about three months.

11             I said, no, I -- my performance speaks

12   for itself.  You have no cause.  I deserve severance.

13   And that -- at which point he said, okay, let me talk

14   to the board and I'll get back to you.

15        Q.   Did he tell you that he had cause to

16   terminate you?

17        A.   No.

18        Q.   Did he tell you why you were terminated?

19        A.   No.  He just wanted to take over sales.

20        Q.   So he told you, I'm going to take over

21   the sales?

22        A.   That's it.

23        Q.   And no other reason for the termination?

24        A.   None.

25        Q.   That was the 22nd.  Did you have any

1  conversation with Mr. Bold or anyone at Vestagen after

2  that?

3        A.    Just via text --

4        Q.    What was that text?

5        A.    -- with Mr. Bold.  He encouraged me to

6  take his offer.  And I responded no, I stand by my

7  performance.  I'm not going to accept your offer.

8        Q.    And did you ever hear back from him after

9  that?

10       A.    Yes.  He had -- he'd indicated to me that

11 he was working with the board, and that he'll get back

12 to me shortly.  And then he asked me how I was doing.

13       Q.    Did Vestagen ever pay your six-month

14 severance?

15       A.    No.

16       Q.    Part of that severance provision also is

17 a continuation of your medical coverage.  What

18 happened with your medical coverage?

19       A.    They terminated that immediately.

20       Q.    And if you look to P16, is that a letter

21 you got from United Healthcare telling you that your

22 coverage had been terminated?

23       A.    Yes.

24             MR. ZENNER:  Go ahead and move that in as

25 the next exhibit.

1          THE COURT:  Any objection?

2          MR. RUTCHOW:  Your Honor, I –– I'm not

3   sure where Mr. Zenner's going with this.  I would

4   object to the extent that my understanding is the

5   plaintiff is not seeking any damages with regard to

6   healthcare premiums.  So I'm not sure the relevancy of

7   this exhibit.

8          MR. ZENNER:  The only reason this ––

9   there appeared to be some dispute on the part of

10  Vestagen whether or not there was any breach by them

11  at all because there wasn't any time frame to pay the

12  severance agreement, other than it had to be paid

13  immediately.

14          And that seemed to be an issue at some

15  point so I wanted to establish that, look, they

16  terminated his health insurance immediately.

17  That's –– there was no question that this breach

18  occurred right then and there.

19          THE COURT:  Overruled.  I'll receive it.

20          MR. RUTCHOW:  That's fine, Your Honor.

21          THE COURT:  Exhibit 16 is in.

22          (Plaintiff Exhibit No. 16 was admitted.)

23          MR. ZENNER:  I'm sorry.  Was 15 moved in?

24          THE COURT:  Yes.

25

```
1    BY MR. ZENNER:
2         Q.    Just so we're clear, you never did
3    receive payment of your severance up to six months of
4    your salary or 112,500?
5         A.    No, the only thing I received from them
6    two months later, they finally paid -- after we filed
7    lawsuit, they finally paid my expenses of 12,000 and
8    shorted me 2,000.  It was about two months after.
9         Q.    I want you to turn back to Exhibit 2, if
10   you would.  And turn to the for cause definition on
11   page 2.  If I'm looking at A, it reads, cause means,
12   A, your unauthorized use or disclosure of Vestagen's
13   confidential information or trade secrets which use or
14   disclosure cause material harm to Vestagen.
15              Did I read that correctly?
16        A.    Yes.
17        Q.    Have you ever knowingly engaged in the
18   unauthorized use or disclosure of Vestagen's
19   confidential information or trade secrets?
20        A.    No.
21        Q.    There was reference or has been some
22   reference in this case to an email I believe dated
23   March 30.  Do you recall that email?
24        A.    I do.
25        Q.    And who was that to?
```

1          A.    Her name was Lisa Doland.  She was the

2     president of APIC, which is the Association for

3     Prevention Infection Control.

4          Q.    What did you attach to that email?

5          A.    I attached Vestagen clinical literature.

6     And so what happened prior to that is the chief

7     marketing officer -- all the literature, clinical

8     literature, white papers, those are all the most

9     important tools to a salesperson in the medical device

10    business -- was fragmented.

11              And the marketing person put everything

12    into a folder, that's part of his project.  But he put

13    it into one folder and there was no distinction

14    between anything.  It was just named, you know, white

15    papers, et cetera.

16              So when I was sending her this

17    information, what I sent her said Vestagen Clinical

18    Literature.  So I just attached it as part of my

19    sending her -- you know, white papers information on

20    Vestagen.

21         Q.    Did you forward a copy of that email to

22    someone?

23         A.    Yes, I sent it to our marketing lead.

24         Q.    So it's fair to say you weren't trying to

25    hide this from anyone?

1          A.     No, of course not.

2          Q.     Did you ever hear anything back about

3    that, any complaints from Vestagen about that?

4          A.     No.

5          Q.     Did Mr. Lessem send you an email

6    chastising you or anything?

7          A.     No.  I -- I recall a -- just a side bar

8    conversation, and we agreed that we shouldn't put

9    anything of confidential nature or anything you deem

10   confidential in the same sort of folder with

11   everything else.  And he agreed.

12         Q.     Was there any -- did you ever have a

13   conversation with Bill Bold about that email?

14         A.     No.

15         Q.     Did you ever get an email or anything

16   from Mr. Bold regarding that email?

17         A.     Never heard anything from Bill Bold on

18   this.

19         Q.     And I gather you weren't terminated until

20   six months later?

21         A.     Yes.

22         Q.     Was this mentioned as a reason for your

23   termination by Mr. Bold?

24         A.     At the time?  No.

25         Q.     Yeah.

1          A.     No.

2          Q.     Do you have any reason to believe that

3     even if this was confidential information, that it

4     caused any harm?

5          A.     Absolutely not.

6          Q.     Are you aware of any financial harm this

7     this caused?

8          A.     Zero.

9          Q.     Any harm to Vestagen's reputation?

10         A.     Nothing, no.

11         Q.     Did you ever disclose any other

12    information that could be considered confidential

13    information of Vestagen's during presentations to

14    customers?

15         A.     No.

16         Q.     Did anyone ever mention to you that you

17    had?

18         A.     No.

19         Q.     Anyone at Vestagen ever warn you about

20    doing that?

21         A.     No.

22         Q.     I'm going to move you back to the cause

23    definition.  And that is -- but let's go to C because

24    I think we have agreed during the pretrial conference

25    that B isn't an issue.

1                THE COURT:  Is that right?

2                MR. RUTCHOW:  Yes, Your Honor.

3                THE COURT:  Okay.

4     BY MR. ZENNER:

5          Q.    So C reads, your material failure to

6     comply with Vestagen's written policies or rules that

7     can reasonably be expected to result in material harm

8     to Vestagen.  Do you see that?

9          A.    I do.

10         Q.    Before your termination, did you ever

11    fail to comply with Vestagen's written policies or

12    rules knowingly?

13         A.    No.  No.

14         Q.    Before you were terminated, did Vestagen

15    ever provide you written notice that you failed to

16    comply with Vestagen's written policies or rules and

17    that it considered it cause for termination?

18         A.    No.

19         Q.    Anything like that in a communication?

20         A.    No.

21         Q.    Before you were terminated, did Vestagen

22    ever provide you with oral notice that you failed to

23    comply with Vestagen written policies or rules that it

24    considered cause for termination?

25         A.    No.

1    Q.    Before you were terminated, did Vestagen

2    ever provide you written notice that you failed to

3    comply with Vestagen's written policies or rules that

4    it considered cause for termination and that you had

5    ten business days to cure that condition?

6    A.    No.

7    Q.    Before you were terminated, did Vestagen

8    ever provide you oral notice that you failed to comply

9    with Vestagen's written policies or rules that it

10   considered cause for termination and that you had ten

11   business days to cure that condition?

12   A.    No.

13   Q.    If you look to sub part E, because I

14   think we have agreed that D is not applicable --

15          THE COURT:  That's correct?

16          MR. RUTCHOW:  Correct, Your Honor.

17   BY MR. ZENNER:

18   Q.    Let's go to E.  E reads, your gross

19   negligence in the scope of your employment that could

20   reasonably be expected to result in material harm to

21   Vestagen.

22          Did I read that correctly?

23   A.    You did, yes.

24   Q.    Before you were terminated, were you ever

25   grossly negligent in the scope of your employment with

1    Vestagen?

2           A.    No.

3           Q.    Before you were terminated, did Vestagen

4    ever provide you written notice that you were grossly

5    negligent in the scope of your employment that it

6    considered cause for termination?

7           A.    No.

8           Q.    Before you were terminated, did Vestagen

9    ever provide you oral notice that you were grossly

10   negligent and that it considered it cause for

11   termination?

12          A.    No.

13          Q.    Before you were terminated, did Vestagen

14   ever provide you written notice that you were grossly

15   negligent in the scope of your employment that it

16   considered cause for termination and that you had ten

17   business days to cure that condition?

18          A.    No.

19          Q.    Before you were terminated did Vestagen

20   ever provide you oral notice that you were grossly

21   negligent in the scope of your employment that it

22   considered cause for termination and that you had ten

23   business days to cure that?

24          A.    No.

25          Q.    In your experience, have you ever fired

1    an employee before?

2          A.    Yes.

3          Q.    If they were grossly negligent in their

4    performance of their duties, would you offer them

5    another position?

6          A.    No.

7          Q.    What about if they engaged in willful

8    misconduct?

9          A.    No.

10         Q.    Let's go to F.  F is your willful

11   misconduct in the scope of your employment.  I'll do

12   the same laundry list of questions to make sure we've

13   touched all of our bases.  Before your termination,

14   did you ever engage in willful misconduct in the scope

15   of your employment at Vestagen?

16         A.    No.

17         Q.    Before you were terminated, did Vestagen

18   ever provide you written notice that you engaged in

19   willful misconduct in the scope of your employment and

20   that it considered cause for termination?

21         A.    No.

22         Q.    Before you were terminated, did Vestagen

23   ever provide you oral notice that you engaged in

24   willful misconduct in the scope of your employment

25   that it considered cause for termination?

1       A.     No.

2       Q.     Before you were terminated, did Vestagen

3  ever provide you written notice that you engaged in

4  willful misconduct in the scope of your employment

5  that it considered cause for termination and that you

6  had ten business days to cure it?

7       A.     No.

8       Q.     Before you were terminated did Vestagen

9  ever provide you oral notice that you engaged in

10  willful misconduct in the scope of your employment

11  that it considered cause for termination and that you

12  had ten business days to cure it?

13       A.     No.

14       Q.     Subsection G of the cause definition

15  reads, your continuing failure to perform assigned

16  duties after receiving written notification of the

17  failure from the board.  Did you fail to perform your

18  assigned duties at Vestagen?

19       A.     No.

20       Q.     Did the Vestagen board of directors ever

21  provide you written notification of a continuing

22  failure to perform assigned duties?

23       A.     No.

24       Q.     Did the Vestagen board of directors ever

25  provide you written notification of a continuing

```
1    failure to perform assigned duties and that you had

2    ten business days to cure it?

3          A.    No.

4                MR. ZENNER:  And I believe we agree that

5    H is not applicable?

6                MR. RUTCHOW:  That's correct.

7    BY MR. ZENNER:

8          Q.    What have you done since your

9    termination?

10         A.    I'm currently the COO of a medical device

11   company.

12         Q.    And what's the name of that?

13         A.    SourceMark.

14         Q.    When did you start that position?

15         A.    In September of this year.

16         Q.    I don't want to get into issues that are

17   too pertinent to our Florida litigation, but there was

18   a period of time that you were a consultant for SPI

19   and also an employee of theirs; is that right?

20         A.    That is correct.

21         Q.    And a lawsuit was filed by Vestagen down

22   in Florida?

23         A.    That is correct.

24         Q.    Seeking injunction?

25         A.    Correct.
```

1          Q.    And so what happened to your role at SPI

2     during that time period?

3               THE COURT:  Are we talking about

4     SourceMark?  SPI, is that a different company?

5               MR. ZENNER:  SPI is Strategic Partners,

6     Incorporated.

7               THE COURT:  It's a different company.

8               THE WITNESS:  Yes, ma'am.

9               MR. RUTCHOW:  Your Honor, I'm not sure.

10    I guess I'm going to object to the extent that we had

11    agreed long ago that -- including in discovery that we

12    weren't going to go into issues post termination

13    because this was a breach of contract case.  So the

14    extent we're getting into what he did after he was

15    terminated, I'm not sure the relevancy to what we've

16    got before us.

17              THE COURT:  Relevance?

18              MR. ZENNER:  Well, relevance is they

19    described him as this abomination of an employee and

20    now they have sued him in Florida for violating a

21    noncomplete, enjoined him, and did -- in fact, his

22    company put him on ice for 12 months.  Now they've

23    kind of had their cake and eating it too.  And I

24    wanted to make sure he --

25              MR. RUTCHOW:  That case is in Florida.

1          THE COURT:  I don't -- I don't hear any

2    relevance.

3          MR. ZENNER:  If that's the case, why

4    would they even bother.

5          THE COURT:  I don't hear any relevance.

6    Sustained.

7    BY MR. ZENNER:

8          Q.    What are you seeking in this lawsuit?

9          A.    My severance.  And a breach of contract.

10         Q.    Do you have any reason to believe that

11   Vestagen at the time it entered into the agreement did

12   not intend to pay the severance?

13         A.    I do.

14         Q.    What is that?

15         A.    So Bill Bold in hindsight oversold --

16         MR. RUTCHOW:  Your Honor, I'm going to

17   object to this line of questioning.  The question was

18   what -- as nonresponsive.  The question was what

19   information did he have at the time, and he just said

20   in hindsight.  That seems to be -- that's not an

21   answer to the question.

22         MR. ZENNER:  The question is, do you have

23   any information now that would lead you to believe

24   that at that time --

25         THE COURT:  That's the question.  That's

1   a relevant question.  Overruled.

2              MR. RUTCHOW:  That's fine, Your Honor.

3              THE WITNESS:  I do.  I think he saw me --

4   my contacts in this industry, my skills and expertise

5   in the health system sales process, that he provided

6   me the termination language -- or, excuse me, the

7   severance language.  He also helped me with the stock.

8              He was sort of sweetening the pot to get

9   me to join the company.  I believe he wanted me to do

10  all the heavy lifting in building the sales team,

11  sales infrastructure.  All the heavy lifting that goes

12  into building the sales infrastructure.  Once he felt

13  that he could take over, he just fired me so he could

14  take over the sales.

15             And he did this throughout our term

16  there.  Once there was some momentum in a sales

17  process, he would remove me and then interject

18  himself, and so -- in order to take credit for the

19  opportunity.  And he did that not just to me, but

20  other folks within the organization.

21             MR. ZENNER:  I believe that's all I have.

22  Thank you.

23             THE COURT:  Okay.  I think we'll take a

24  15-minute recess at this time.  We're in recess.

25             (Whereupon, a break was taken from

1    11:02 a.m. to 11:26 a.m.)

2                THE COURT:  All right.  We're ready for

3    cross.  Let me ask a minute.  You have not put in 17,

4    18 and 19 yet; right?

5                MR. ZENNER:  We didn't.

6                MR. RUTCHOW:  I don't think so,

7    Your Honor.  We didn't discuss them at all.

8                THE COURT:  Okay.  All right.

9    Cross-examination, go ahead.

10               MR. RUTCHOW:  Thank you, Your Honor.

11                    **CROSS-EXAMINATION**

12   BY MR. RUTCHOW:

13        Q.    Mr. Beyer, I want to start from the end

14   here.  The testimony you gave at the end, if I recall

15   your original testimony at the very beginning, at the

16   time that you were interviewing being recruited by

17   Vestagen, Mr. Bold was also interviewing and being

18   recruited by Vestagen; is that right?

19        A.    Correct.

20        Q.    So you two were the -- you were the ones

21   being recruited and Vestagen was the one doing the

22   recruiting?

23        A.    Yes, but Bill Bold took an active role

24   towards the end.

25        Q.    Had he been hired by Vestagen?

1          A.     I would -- yes.  He had.

2          Q.     At the time that --

3          A.     He had made a verbal commitment to

4    Vestagen at that point.

5          Q.     He had made a verbal commitment to

6    Vestagen at that point.  At what point did he make the

7    verbal commitment?

8          A.     It was prior to him providing me this

9    information, the severance package and the stock

10   information.

11         Q.     Okay.  Now, earlier in your testimony

12   when we were talking -- when you were talking with

13   Mr. Zenner about Plaintiff's Exhibit 7, which was the

14   email string regarding activities that had occurred on

15   June 14, could you look at that email for me?  And I

16   think it starts with an email from you; is that right?

17         A.     That is correct.

18         Q.     And you're talking about having a very

19   good couple of days in Texas; correct?

20         A.     Correct.

21         Q.     Okay.  And the first -- these are all --

22   if I'm correct, these three numbered paragraphs deal

23   with prospective customers; correct?

24         A.     That is correct.

25         Q.     And the first one is Memorial Herman?

1          A.     Correct.

2          Q.     While you were with Vestagen, did

3     Memorial Herman ever become a customer?

4          A.     No.

5          Q.     Okay.  Next one is Texas Health Dallas.

6     While you were with Vestagen, did Texas Health Dallas

7     ever become a customer?

8          A.     Not that I'm aware of.

9          Q.     And Children's Dallas, while you were

10    employed by Vestagen, did Children's Dallas ever

11    become a customer?

12         A.     Not that I'm aware of.

13         Q.     And then the last paragraph you've got in

14    here is finally I just got final word that the Merit

15    Health System going forward.  Did Merit Health System

16    ever become a customer?

17         A.     They purchased product.

18         Q.     How much?

19         A.     I'm not sure of the total number.

20         Q.     Was that to test the product?

21         A.     It was individual healthcare workers

22    purchased as opposed to an institutional.

23         Q.     So as an institutional customer, Merit

24    Health Systems never became an institutional customer;

25    is that correct?

1       A.      As far as I know, that's correct.

2       Q.      I think you testified on direct, that was

3  your primary job responsibility was to drive the

4  institutional sales; correct?

5       A.      That is correct.

6       Q.      So while this June 14 day sounded like a

7  very good day, in the end none of these prospects

8  turned into institutional customers, did they?

9       A.      It's a lengthy sales process, as

10  testified earlier.  But these were in the process.

11      Q.      And I think when you were being asked

12  about this email, this time period of mid June 2014,

13  another question that Mr. Zenner asked you about was

14  whether or not in this time frame any concerns had

15  been raised about your job performance.  Do you

16  remember that?

17      A.      I remember him asking the question, yes.

18      Q.      And your answer was, no, no concerns had

19  been raised about your job performance; correct?

20      A.      That's correct.

21      Q.      Okay.  Well, isn't it true that two days

22  after your email trumpeting the horn on how good a day

23  you and Chelle had in Texas, you sent an email to a

24  representative of Children's Dallas that she took as

25  insulting to her intelligence?

1           A.      That's correct.

2           Q.      And ultimately you had to apologize to

3    that individual?

4           A.      No, I didn't have to.

5           Q.      You didn't have to, but you did send an

6    apology?

7           A.      I did.

8           Q.      Why did you send that apology?

9           A.      I think the tone was a little passionate.

10   And I sent an apology letter saying -- I apologized

11   for my tone, and that was it.  That was it.

12          Q.      And you don't think that your email that

13   someone at Dallas Children's took as insulting their

14   intelligence had anything to do with Vestagen never

15   getting work from Dallas Children's Hospital?

16          A.      It had nothing to do with it.  She was

17   subsequently fired from her role.  And she was

18   being -- she was not being supportive of the clinical

19   science, and that was my passion was certainly to get

20   her to review the clinical literature.  But it was one

21   individual out of I think that was eight in the

22   meeting.

23          Q.      Okay.  Are you aware of Michelle Barker

24   sending -- forwarding your apology on to other people

25   at Dallas Children's?

1       A.      Yes.

2       Q.      And the response she got was, wait and

3   see?

4       A.      I don't recall that specific term.

5       Q.      Well, what -- do you recall anything

6   about what Dallas Children's response was when

7   Ms. Barker, one of your sales reps, forwarded your

8   apology on to other people at Dallas Children's?

9       A.      As I recall, she sent it to one person,

10  because that person was upset.  We were trying to

11  neutralize the circumstance, frankly.

12      Q.      Did you decide on your own to send the

13  apology or did somebody suggest you do that?

14      A.      I sent it on my own.

15      Q.      So nobody at Vestagen told you you should

16  apologize to this woman?

17      A.      Absolutely not.

18              MR. RUTCHOW:  Your Honor, if I may pass

19  the witness and Your Honor a copy of an exhibit.  This

20  is on defendant's original exhibit list, Exhibit 16.

21              THE COURT:  Exhibit 16?

22              MR. RUTCHOW:  Yes.  And I've got a copy

23  for both the witness and the Court.

24  BY MR. RUTCHOW:

25      Q.      And Mr. Beyer, what you've been handed is

1    Defendant's Exhibit 16.  Is this the email exchange
2    between you and Sharon Holmes at Dallas Children's we
3    were just talking about?
4           A.    Yes, it is.
5           Q.    Okay.  And her email to you was with all
6    due respect I need -- I read and comprehended the
7    literature.  Please do not feign insult of my
8    intelligence.  At this point I'd like to be left out
9    of future correspondence.
10                Do you see that?
11                THE COURT:  Folks, I'm sorry, I have to
12   take a five-minute break.  I have an emergency.  I'll
13   be right back.  Five minutes.
14                (Whereupon, a break was taken from
15   11:34 a.m. to 11:36 a.m.)
16                THE COURT:  Sorry about that.
17                MR. RUTCHOW:  That's fine, Your Honor.
18                THE COURT:  All right.  I need you to go
19   back and tell me which exhibit this is.
20                MR. RUTCHOW:  This is from defendant's
21   exhibit list.  It's Defendant's Exhibit 16.
22                THE COURT:  16, all right.  And let's
23   start the testimony again.
24                MR. RUTCHOW:  Sure.
25

1    BY MR. RUTCHOW:

2         Q.    And just so it's clear for the record,

3    Mr. Beyer, Defendant's Exhibit 16 is a copy of the

4    email exchange between you and Ms. Holmes at Dallas

5    Children's that you ultimately apologized to her

6    about; correct?

7         A.    I apologized for the tone.

8         Q.    Okay.  And you said she was fired.  How

9    do you know that?

10        A.    I heard through the grapevine.

11        Q.    So you don't have any personal knowledge

12   that she was terminated, just what somebody told you?

13        A.    I talked to somebody at the hospital.

14   She was terminated several months after that.  She was

15   just a contentious individual.

16             MR. RUTCHOW:  Your Honor, I'm handing up

17   what is Defendant's Exhibit 17 from our original

18   exhibit list.

19             THE COURT:  Did you move 16 in?

20             MR. RUTCHOW:  I did not, but I will.

21             THE COURT:  All right.  Any objection to

22   16?

23             MR. ZENNER:  No, Your Honor.

24             THE COURT:  Received.

25

1          (Defense Exhibit No. 16 was admitted.)

2     BY MR. RUTCHOW:

3          Q.    Mr. Beyer, you've been handed what is

4     Defendant's Exhibit 17.  Is this a copy of your

5     apology to Ms. Holmes?

6          A.    Yes, sir.

7          Q.    And, again, ultimately Vestagen did not

8     receive any business from Dallas Children's Hospital;

9     correct?

10         A.    I'm not aware.

11         Q.    If you could, turn to

12    Plaintiff's Exhibit -- I think you've still got the

13    notebook up there.  Plaintiff's Exhibit -- let's see

14    if I get the right one.  Exhibit 10.  This was an

15    email -- I believe you testified this was an email

16    from Mr. Bold to you and your team attaching the

17    funnel; is that right?

18         A.    Yes.

19         Q.    And it's dated August 23, 2016.  And if

20    I'm reading Mr. Bold's original email correctly, what

21    he says is, just do a gut check to ensure you still

22    believe the numbers in the current year revenue column

23    next to your accounts are still accurate.

24               Do you see that?

25         A.    I do.

1          Q.     Did you review and determine whether or

2     not these numbers were still accurate?

3          A.     Most likely, yes.

4          Q.     But you don't recall whether you did or

5     not?

6          A.     Not specifically.

7          Q.     If you'd turn over to the Quick Base --

8     he called it the Quick Base funnel.  Is that what it

9     was known as?

10         A.     That's the Cloud Base funnel, yes.

11         Q.     So this is the Quick Base funnel.  What

12    developed this Quick Base funnel?

13         A.     Software engineers.

14         Q.     I mean in terms of within Vestagen.  Do

15    you know who developed and put in the various -- for

16    example, the various columns that are in here and the

17    volumes?

18         A.     It was -- it was a challenge because that

19    was part of the problem is we had lots of cooks in the

20    kitchen.  Bill Bold would make manipulations on the

21    funnel, not tell anybody, Milton Bugg would make

22    revisions to the funnel, not tell anybody.  That was

23    part of the challenge that we had there.

24         Q.     That was not my question, Mr. Beyer.

25         A.     I misunderstood.

1      Q.     The question was:  Who developed --
2  because you've got columns across here, sales rep
3  account name, opportunity type, all of those things.
4  In terms of the framework to apply it to Vestagen, who
5  did that?
6      A.     I did.
7      Q.     Okay.  When did you do that?
8      A.     It was ongoing.  I started in January,
9  and so from January through mid year, it was a
10 constant manipulation of the funnel.
11     Q.     Okay.  And make sure I understand, you
12 were the one primarily responsible for putting
13 together this Quick Base funnel for use at Vestagen;
14 is that right?
15     A.     That's not accurate.  I led, but Milton
16 Bugg, who was our VP on the west, did a good share of
17 the work on the funnel, and that was as directed by
18 Bill Bold.
19     Q.     And then the information that is placed
20 into the funnel, the individual sales reps would put
21 that information in?
22     A.     That is correct.
23     Q.     Would you ever modify the information
24 that they put in there?
25     A.     In collaboration with the sales rep.

1    Q.    Okay.  Well, for example, I'm looking at

2  the first set of numbers that is -- the status says

3  discovery.  What does that mean, discovery?

4    A.    Discovery, you're just -- you're

5  validating it that it's an opportunity.

6    Q.    So is that the earliest stage?

7    A.    It is the earliest stage.

8    Q.    Okay.  And did you have any parameters on

9  what confidence level you would put for opportunities

10  that were in the discovery phase?

11    A.    Yes.

12    Q.    What was that?

13    A.    Well, it's right here, 50 percent.

14    Q.    Okay.  And then can you tell me why the

15  last six in the discovery phase with Milton Bugg are

16  all listed as 90 percent?

17    A.    Because we had already been selling into

18  Kindred.  So this was Kindred corporate, but we'd

19  already started selling into various divisions within

20  Kindred.

21    Q.    So should this even be in the discovery

22  phase if it's got a 90 percent confidence?

23    A.    No, and this was such a breathable

24  document.  I mean, I can't tell you for sure if this

25  was accurate on this particular date.  This was a big

1    contention at Vestagen.

2         Q.    So you may or may not have reviewed this

3    to determine whether it's accurate.  As we sit here

4    today you're telling me that at least this part on the

5    discovery is not accurate?

6         A.    I didn't say that.  I just said I can't

7    verify two years later, year and a half later if this

8    was the actual final funnel.  I don't know if it's

9    been manipulated.

10        Q.    By who?

11        A.    I can't answer that.

12        Q.    Who would manipulate it, Mr. Beyer?

13        A.    I don't -- I can't answer that.  I don't

14   know who would manipulate it.

15        Q.    Well, can you tell me where this document

16   came from?  Isn't it true that this is a document that

17   came from your computer that you had kept after -- of

18   Vestagen information that you kept after you left

19   Vestagen?

20        A.    I don't understand the point of that

21   question.

22             THE COURT:  You're talking about the

23   discovery process, where did this document come from.

24             MR. RUTCHOW:  Yes, I am, Your Honor.

25             THE COURT:  He may or may not know that.

1          Mr. Zenner, do you know where this

2    document came from?

3          MR. ZENNER:  Yeah, this was a list of --

4    thousands and thousands of emails that he had from --

5    while he was at Vestagen.  We produced whatever we

6    had.

7          THE COURT:  So this came from his

8    computer.

9          MR. ZENNER:  Yeah.  His email account

10   that was a Vestagen account.

11         THE COURT:  Okay.

12   BY MR. RUTCHOW:

13        Q.   So if this document had been in your

14   possession on your computer ever since you left

15   Vestagen, who would have manipulated this document in

16   the last two years?  Or year and a half.

17        A.   I can't answer that.  I don't know.

18        Q.   Did you manipulate it?

19        A.   I didn't, no.

20        Q.   Okay.  Well, regardless of whether it was

21   manipulated or not, I want to make sure I understand

22   your testimony.  The 90 percent confidence level

23   should not be for any discovery-related opportunities;

24   correct?

25        A.   Not entirely true.  So you're splitting

1    hairs and I'll tell you why.  So 90 percent confident

2    that we're going to continue the discovery process

3    with Kindred because we'd already sold into multiple

4    divisions.  Our goal was to get the entire institution

5    of Kindred.

6              So if you look at some of the others, 50

7    percent, those were -- we were just starting the sales

8    process, but with Kindred, we had some history.  We

9    knew that they would do institutional purchases.

10        Q.    So now I need to go back since I'm not

11   sure I understand that answer.  What is the

12   90 percent?  I just heard you say the -- you were

13   90 percent confident you were going to continue the

14   discovery process.  I thought your original testimony

15   was that this was a 90 percent you were actually going

16   to make a sale?

17        A.    No.  90 percent probability it's going to

18   move into the next phase of sales process.

19        Q.    Okay.  All right.  Now, if you would move

20   over to the next page, and there's a long list of the

21   third -- the third phase of the sales process, the

22   VNOW process.  Do you see that?

23        A.    Uh-huh (affirmative).

24        Q.    And there's several of those listed.  And

25   then the confidence level for all of those is

1    90 percent; is that correct?

2           A.    That is correct.

3           Q.    That is 90 percent that you would -- you

4    would close that sale?

5           A.    90 percent chance that it would move into

6    the next phase of the sales process, which would be

7    the close.

8           Q.    And the next phase of the sales process

9    is closing the sale; correct?

10          A.    Correct.

11          Q.    So you're 90 percent confident you're

12   going to close these sales; correct?

13          A.    Yes.  And I'll point out that these

14   confidence levels came directly from Bill Bold.  He

15   wanted these in.  And it was 50 percent for the

16   discovery, 75 percent qualifying, 90 percent VNOW and

17   100 percent close.  So they were not a metric per

18   account, but more if they're in that sales process,

19   this should be the probability they move on to the

20   next phase.

21          Q.    Okay.  So if they're in the discovery

22   phase, the confidence level that should be there

23   should be 50 percent?

24          A.    If you're 50 percent confident that this

25   will move to the next sales process, yes.

1          Q.     Okay.  Well, I'm -- and so anything in

2     the discovery sales process should be 50 percent, is

3     that what you just said that Mr. Bold mandated?

4          A.     Yes.

5          Q.     So going back to what I said, those six

6     at the bottom that are 90 percent, that's not the

7     right number, is it?

8          A.     No, that's unique because Kindred,

9     although Kindred was a corporate, they're structured

10    differently, and so they have multiple divisions.  So

11    we had sold into several divisions -- at least two, I

12    should say.  And so that gave us probability the other

13    divisions, once we finished the discovery process,

14    would move into the next sales phase.

15         Q.     So who mandated this 90 percent for

16    Kindred?

17         A.     I would -- it would be Milton Bugg.

18         Q.     Well, would that be in defiance of

19    Mr. Bold's mandate that everything in the discovery

20    thing should be 50 percent?

21         A.     Yes.

22                THE COURT:  Does that mean that if it

23    wasn't 50 percent it should not be on this document?

24                THE WITNESS:  Yes, ma'am.

25                THE COURT:  Is that what you mean?

```
 1                    THE WITNESS:  Yes, Your Honor.
 2                    THE COURT:  When you say he mandated
 3      50 percent, it had to be at least 50 percent or it
 4      would not be on this list.
 5                    THE WITNESS:  Yes.
 6      BY MR. RUTCHOW:
 7           Q.    Going back to the VNOWs, Mr. Black has,
 8      from what I can see -- and you hired John Black;
 9      correct?
10           A.    Correct.
11           Q.    And John Black resigned in August; is
12      that right?
13           A.    That's about right.
14           Q.    2016?
15           A.    Correct.
16           Q.    About a month before you were terminated?
17           A.    Somewhere around there.
18           Q.    Do you know why Mr. Black left?
19           A.    Yes, I do.
20           Q.    Why?
21           A.    He -- it was a chaotic environment.  We
22      both come from a very disciplined medical device
23      technology environment, and the environment at
24      Vestagen was not conducive to this market.
25           Q.    Okay.  And Mr. Black's got one, two,
```

1   three, four, five opportunities listed in VNOW that

2   are identified as 90 percent confident of getting

3   closed.  Did any of those close?

4         A.    90 percent confidence that they're going

5   to move on to the next sales phase.

6         Q.    Which we've already established is the

7   closed phase.

8         A.    It could be, yes.

9         Q.    Is there another phase on here that's

10  missing --

11        A.    Well, there's that 10 percent that it

12  won't close.  90 percent probability that it will

13  close.

14        Q.    Okay.  Did any of Mr. Black's accounts

15  that are listed here in the VNOW stage of being

16  90 percent confident they're going to move to the next

17  stage, which is the close stage, did any of them ever

18  actually close?

19        A.    I was terminated a month later.  I don't

20  know.

21        Q.    In the month while you were still there,

22  did any of them close?

23        A.    They were in that process when I left, so

24  no.  They were in the VNOW stage of the sales process.

25        Q.    Would the same be true of the two listed

1    for Gerry Tighe, Christiana Hospital and St. Luke's

2    Hospital?  By the time you were terminated had any of

3    those closed?

4         A.    No.

5         Q.    And how about the Texas Health Dallas and

6    Texas Health Resource and Merit Health System that are

7    listed, is it Chelle or Chelle Barker?

8         A.    Chelle.

9         Q.    Chelle Barker.  Did any of those close?

10        A.    Institutionally, not that I'm aware of.

11        Q.    And then the ones for Northwell and

12   Kindred, did those actually close?

13        A.    So I know there was appreciated revenue

14   in Northwell.  I'm not sure about Kindred.

15        Q.    And I think I recall from earlier

16   testimony that Northwell was -- let me step back for a

17   second.

18              Isn't that true that the two major

19   institutional customers of Vestagen while you were

20   employed were Baptist Health System and Northwell?

21        A.    Northwell came on after I joined.

22        Q.    Right.  But while you were employed,

23   those were the two major institutional --

24        A.    Yes.

25        Q.    Right.  And you were not responsible for

1    any other institutional entity becoming a customer of

2    Vestagen, were you, besides Northwell?

3        A.    Well, that's an inaccurate

4    characterization.  This is a long sales process.  I

5    was there for nine months.  So if you look at what we

6    did in terms of getting customers into the sales

7    process, it was remarkable, but I wasn't there long

8    enough to close those hospitals.

9        Q.    And so while you were there, no other

10   hospitals closed besides Northwell; correct?

11       A.    From an institutional standpoint?  Now,

12   we had healthcare workers buying scrubs, but from an

13   institutional purchase, I'm -- no, I don't recall.

14       Q.    And Northwell was a -- Vestagen was

15   pursuing Northwell.  I believe you said it was Brian

16   Crawford who was pursuing Northwell before you were

17   ever hired; correct?

18       A.    Yes.

19       Q.    Your testimony was you got involved in

20   the Northwell process afterwards; is that right?

21       A.    Almost immediately upon my start date.

22       Q.    What did you do to move the sales process

23   along with Northwell?

24       A.    So I had a number of executive meetings.

25   There were at least three, perhaps more.  I was the

1    one that drafted the early communication to the

2    primary point of contact -- his name was John Silva --

3    to articulate the solution and provide, you know,

4    clinical evidence and so forth.  So I was the conduit

5    initially.  Once we had some momentum there, that's

6    when Mr. Bold ingratiated himself.

7          Q.    Are you aware of whether or not Mr. Bold

8    had existing contacts at Northwell?

9          A.    He did not.

10         Q.    Earlier we talked about -- I think one of

11   your responsibilities was in addition to the

12   institutional sales to hospitals, to try and sign up

13   agreements with these group purchasing organizations;

14   is that right?

15         A.    That generally falls under the

16   responsibility of a sales leader.

17         Q.    Okay.  And while you were there, Vestagen

18   signed an agreement with one group purchasing

19   organization; correct?

20         A.    Correct.

21         Q.    What was the name of that?

22         A.    Premier.

23         Q.    Okay.  Who was your primary contact at

24   Premier?

25         A.    I have a number of them.  But Mike

1    McGuire was one of the key contacts there as well as
2    Andy Brailo, who Bill Bold knew from a previous life
3    as well.
4           Q.    Okay.  And I remember from your -- when
5    we discussed this earlier in your deposition, you were
6    involved with Premier and then Mr. Bold got involved
7    with Premier; correct?
8           A.    Unbeknownst to me.
9           Q.    Well, you had email communications with
10   him that he was involved; correct?
11          A.    After the fact.
12          Q.    Okay.  And ultimately it was not until
13   Mr. Bold got involved that the contract was signed;
14   correct?
15          A.    Yes, but I've got -- he gave me very
16   clear direction to stay out of it.  This was his.  He
17   wanted to do it.
18          Q.    Are you aware with either Northwell or
19   Premier of any concerns expressed by the customer with
20   your interactions with those customers?
21          A.    Not one.
22          Q.    I believe you were not satisfied with
23   Mr. Deutscher as a sales rep; is that right?
24          A.    That is correct.
25          Q.    Why?

 1        A.    He didn't have any experience.  He's
 2   never been a salesperson.
 3        Q.    Did it have anything to do with his age?
 4        A.    Had nothing to do with his age.
 5        Q.    Can you tell me why you describe him as
 6   elderly and cantankerous?
 7        A.    Well, he was -- I could have probably
 8   chosen better words, but he was near -- he was about
 9   80 years old, and he was -- I inherited him, and he'd
10   been on board for a month prior to me joining.  And so
11   to characterize him, I had a gentleman who was 80
12   years old, who was now a sales rep, and he had been a
13   hospital administrator his whole career, so he was
14   used to being in authority.  It was challenging for
15   him.
16        Q.    So you were also concerned that he was
17   out sick much of the time that you worked at Vestagen;
18   correct?
19        A.    Well, concerned, yeah, I had some -- a
20   resource that was out of pocket for over four months.
21        Q.    Did that contribute at all to your desire
22   to terminate him?
23        A.    No.
24        Q.    Okay.  Did you ever tell anyone at
25   Vestagen that you thought Mr. Deutscher suffered from

1    dementia because of his age?

2          A.    No.  I did express to Mr. Bold that I saw

3    a lot of forgetfulness, but I never characterized it

4    as dementia.

5          Q.    Okay.  You and Mr. Deutscher had a

6    disagreement over how to sell to the -- to a customer

7    known as Hill Country Memorial, didn't you?

8                THE COURT:  Customer named what?

9                MR. RUTCHOW:  Hill Country Memorial.

10   BY MR. RUTCHOW:

11         Q.    You-all had a disagreement over how to

12   sell that customer, didn't you?

13         A.    No, I wouldn't characterize it as

14   disagreement at all.

15         Q.    Okay.  How would you characterize it,

16   then?

17         A.    He -- I think for the first time, they

18   had -- this Hill Country was a customer that they

19   could not get them to buy.  It was out in the middle

20   of the hill country in Texas.  They were spending

21   thousands of dollars traveling and visiting this

22   customer for a total of $12,000-a-year sale.

23                But it was a strategically important one

24   in Texas.  And so I flew out there, met with the

25   material manager and the powers that be.  And I

1   attempted to get this thing moved along, because

2   nothing had happened there for over a year.

3          And the comment I made to the material

4   manager that now's an opportunity to lock in these

5   prices.  Because of the demand of the technology,

6   there could be a price increase.  And I was really

7   trying to get them to move on the ball, basically.

8   And Mr. Deutscher did not like that.

9          Q.    So he disagreed with your style?

10         A.    Yes.

11         Q.    Okay.  Thought it was too aggressive?

12         A.    He's not a professional salesperson.

13   He's never been in this before, so I think he was a

14   fish out of water.  He didn't understand.

15         Q.    Did he think your approach was too

16   aggressive?

17         A.    He never use the those terms too

18   aggressive.  He was not in favor of that.

19         Q.    Okay.  And ultimately Mr. Deutscher

20   requested that he no longer report to you; correct?

21         A.    That's what I understand.

22         Q.    Okay.  He made that request to Mr. Bold;

23   is that right?

24         A.    Apparently, yes.

25         Q.    And so for the remainder of your

1    employment at Vestagen, Mr. Deutscher reported

2    directly to Mr. Bold?

3         A.    Yes.

4         Q.    Are you aware of any other of your sales

5    reps that moved from reporting to you to Mr. Bold

6    during your employment?

7         A.    Yes, this was all behind my back.  So I

8    wasn't aware that Brain Crawford was reporting to Bill

9    Bold.  This was sort of the divisive nature of this

10   organization.

11        Q.    Do you know why Brain Crawford was

12   reporting to Mr. Bold?

13        A.    My suspicion is that he felt that he was

14   the chief business development officer, and reporting

15   to a VP of sales was beneath him.

16        Q.    Do you think it had anything to do with

17   you denigrating him and demeaning him?

18        A.    Never.

19        Q.    So you never did that?

20        A.    I responded in email curtly to him

21   because he did not understand what his sales region

22   was, and this was several months in.  And I was

23   frustrated.

24        Q.    What does curtly mean?  What did you tell

25   him?

 1          A.     I'm sorry?

 2          Q.     What does curtly mean?  What did you say

 3     to him?

 4          A.     I don't recall specifically.

 5          Q.     Okay.

 6          A.     I challenged him on some of the comments

 7     he made.

 8          Q.     And isn't it true that in March of 2016

 9     you sent an email to the founder of the company, Ben

10     Favret, that he took as a threat?

11          A.     Yes.

12          Q.     So I'm clear, your testimony is is that

13     Mr. Bold never discussed with you the issue that led

14     both Mr. Deutscher and Mr. Crawford to report directly

15     to Mr. Bold instead of to you?

16          A.     So with Mr. Deutscher, yes.  And it was

17     let him report to me, we'll get everything out of him

18     and we'll terminate him.  That was Mr. Bold's comments

19     to me.  We were both on the same page about his lack

20     of experience and productivity in that field.

21               We both agreed on that and we felt that

22     this was the best option for him to report to Bill,

23     get what we can, and then Bill would terminate him.

24          Q.     So this wasn't done behind your back?

25          A.     Not with Gene Deutscher, but with Brain I

1    had no idea.

2         Q.    And Mr. Bold didn't have any

3    communications with you about why Mr. Crawford was

4    reporting to him?

5         A.    No.  I didn't know.

6         Q.    Any communications with you at all about

7    Mr. Crawford being upset with the way you treated him?

8         A.    Not that I recall.

9         Q.    So is it possible that it occurred, that

10   you just don't remember?

11        A.    No.

12        Q.    Okay.

13             MR. RUTCHOW:  I think that's the

14   original.  We did those in color, so they're all...

15             Your Honor, I've passed up to the witness

16   documents marked as Exhibit 18 from our original list.

17             THE COURT:  Okay.

18   BY MR. RUTCHOW:

19        Q.    Mr. Beyer, this is an email string.  Last

20   email in the string is an email from you to Ben Favret

21   dated March 22, 2016.  Do you see that?

22        A.    Yes.

23        Q.    And your email to Mr. Favret says, these

24   communications defy even basic courtesy, much less

25   professionalism.  I am stumped.  I will ensure that

1    changes occur so I'm allowed to do my job as

2    effectively as possible.  Thanks, Jim.

3              Did I read that correctly?

4         A.    You did.

5         Q.    And this is the email that Mr. Favret,

6    the founder of the company, took as a threat; correct?

7         A.    That is the one, yes.

8         Q.    At this time in March of 2016, what was

9    Mr. Favret's position with the company?

10        A.    Unknown, frankly.  He was founder, but he

11   had been fired from the board earlier in the previous

12   year.  So he was allowed to operate with impunity, and

13   that was the challenge.  He traveled where he wanted,

14   met with customers.  And I was trying to put together

15   a very defined sales process, and he wasn't

16   communicating.  He would send FYI after they were down

17   the road or what have you.

18        Q.    So to make sure I understand, your

19   testimony is is that at the time this occurred,

20   Mr. Favret was no longer on the board?

21        A.    He was on the board.

22        Q.    So he was on the board --

23              THE COURT:  You said he'd been fired from

24   the board.

25              THE WITNESS:  I'm sorry, fired from CEO.

1   BY MR. RUTCHOW:

2         Q.    So as of March 2016, Mr. Favret was still

3   on the board of directors?

4         A.    He was on the board.  In terms of his

5   roles and responsibility, I think it was yet defined

6   at that point.

7         Q.    All right.  And after receiving this

8   email, Mr. Favret indicated to you that he thought

9   your email constituted a threat; correct?

10        A.    He sent me a text and he asked me, he

11  said, are you threatening me.  And I said, absolutely

12  not.  We -- we talked on the phone.  I said, listen,

13  this is -- my intent of this email is we got to figure

14  out a better process of communication.  I can't not

15  know what's going on in the field.

16        Q.    Okay.

17              THE COURT:  Are you moving that into

18  evidence?

19              MR. RUTCHOW:  I was just about to,

20  Your Honor.  And I think I moved 16 and 17.

21              THE COURT:  You haven't moved 17 in.

22              MR. RUTCHOW:  I will move 17 and 18,

23  Your Honor.

24              THE COURT:  Any objection to 17 or 18?

25              MR. ZENNER:  No, Your Honor.

1          THE COURT:  Both received.

2          (Defense Exhibits Nos. 17 and 18 were

3     admitted.)

4          MR. RUTCHOW:  Your Honor, I'm going to

5     hand up to the witness a document that was originally

6     marked as Defendant's Exhibit 5 on our exhibit list.

7     BY MR. RUTCHOW:

8          Q.    Mr. Beyer, do you recognize this as an

9     email that you sent on June 30, 2016, to Marc Lessem?

10          A.    Yes.

11          Q.    I believe earlier you testified that

12     Mr. Lessem was the marketing lead for Vestagen; is

13     that right?

14          A.    Correct.

15          Q.    And in this email you accused Mr. Lessem

16     of having emotional issues for which he needed

17     professional help, didn't you?

18          A.    That's correct.

19          Q.    And you agree with me that it was

20     inappropriate for you to have sent that email?

21          A.    Not my finest moment.  In context it was

22     late at night, I was in New York, and if you read the

23     email prior to that, it elicited a response.

24          Q.    Did Mr. Bold have any discussion with you

25     about the inappropriateness of the -- of your language

1    with Mr. Lessem?

2         A.    No.

3         Q.    Okay.

4              MR. RUTCHOW:  We would move to admit

5    Defendant's 5, Your Honor.

6              THE COURT:  Any objection?

7              MR. ZENNER:  No, Your Honor.

8              THE COURT:  Received.

9              (Defense Exhibit No. 5 was admitted.)

10             MR. RUTCHOW:  Your Honor, I'm handing up

11   what's been marked as Defendant's Exhibit 4.

12   BY MR. RUTCHOW:

13        Q.    Mr. Beyer, earlier in your direct there

14   was some testimony about you sending some confidential

15   Vestagen information to -- and I believe you said Lisa

16   Dolan, but it's, in fact, Susan Dolan at Colorado

17   Children's; is that right?

18        A.    If I did, I apologize.  Yes, it's Susan

19   Dolan.

20        Q.    There's a Lisa Dolan that works for

21   somebody else in the medical field; correct?

22        A.    There is, yes.  Yes.

23        Q.    All right.  And do you recognize this as

24   the email that you attached a bunch of literature to

25   and sent to her?

 1          A.     Correct.

 2          Q.     Did you read any of the stuff that you

 3     were attaching and sending to her?

 4          A.     Yes.  So there was a folder of clinical

 5     literature, and I -- I read through some of them,

 6     certainly, but our marketing person kept putting files

 7     into this one folder.  And so the one in question, it

 8     was attached is called Vestagen Literature Library,

 9     not Confidential Vestagen Literature Library, just

10     Vestagen Literature Library.  And I attached that on

11     the email.

12          Q.     Did you read it before you attached it

13     and sent it?

14          A.     No.

15          Q.     Is that a no?

16          A.     That's correct, that's a no.

17                 MR. RUTCHOW:  Your Honor, we would move

18     to admit Exhibit 4.

19                 THE COURT:  Any objection?

20                 MR. ZENNER:  No, Your Honor.

21                 THE COURT:  D4 is admitted.

22                 (Defense Exhibit No. 4 was admitted.)

23     BY MR. RUTCHOW:

24          Q.     You said you had a side bar discussion

25     with Mr. Lessem about confidential information.  Why

1     did you have that side bar with him?

2          A.    I recall -- because I think it was

3     brought to my attention after I sent it to him, and

4     then we discussed ways in which to prevent that from

5     happening in the future.  In other words, create

6     another folder that has confidential information so

7     the reps don't duplicate that.

8          Q.    So I understand what was brought to your

9     attention, the fact that the document that you

10    attached but hadn't read was, in fact, confidential

11    document was brought to your attention that you

12    shouldn't do that anymore?

13         A.    No.  It was --

14         Q.    What was brought to your attention, then?

15         A.    It was so -- it was trivial at the time.

16         Q.    Trivial to whom?

17         A.    To both Marc and I, right.

18         Q.    And how did you know it was trivial to

19    Marc?

20         A.    Because this was -- even though it was

21    marked confidential, it was not truly confidential

22    information.  It was here's the literature and here's

23    how to articulate it to a customer.

24               MR. RUTCHOW:  Your Honor, this is a

25    document that was marked as Exhibit 4b on defendant's

1    exhibit list.

2    BY MR. RUTCHOW:

3         Q.    And, Mr. Beyer, would you agree with me

4    that this Vestagen Reference Library summary is the

5    Vestagen Literature Library you were just talking

6    about?

7         A.    Yes.  This is where all the various

8    literature related to the industry of antimicrobial,

9    food repellent scrubs.

10        Q.    What you're talking about is what's at

11   the bottom of each of the -- what appear to be

12   PowerPoint slides in red are instructions to a sales

13   rep as to how and when to use that document when

14   meeting with a customer; is that right?

15        A.    Correct.

16        Q.    And make sure I understand your

17   testimony, you're saying that that's not really

18   confidential?

19        A.    It's marked confidential, for sure, but

20   at the time it was, hey, we got to prohibit this from

21   happening in the future.  It was a -- clearly it was

22   an error.  And the solution was take anything that's

23   deemed confidential and put it in a folder by itself

24   as opposed to in with all the other reference

25   literature we had access to.

1          THE COURT:  How about just renaming the

2    document?  What does that mean, reference library

3    summary?  Sounds pretty milquetoast to me and doesn't

4    say confidential on the front -- well, I guess, it

5    does right there on the left side.

6    BY MR. RUTCHOW:

7          Q.    And in the future did you send out any

8    information that had been marked confidential?

9          A.    No.  Not that I'm aware of.

10          THE COURT:  Are you moving that in

11    evidence?

12          MR. RUTCHOW:  Yes, Your Honor.

13          THE COURT:  Any objection to 4b?

14          MR. ZENNER:  No, Your Honor.

15          THE COURT:  Received.

16          (Defense Exhibit No. 4b was admitted.)

17    BY MR. RUTCHOW:

18          Q.    Mr. Beyer, I want to go back and ask you

19    some questions about some of the exhibits that

20    Mr. Zenner had asked you about.  First I want to talk

21    to you about Exhibit P5.  So Plaintiff's 5, which is

22    the May 9, 2016, email from Mr. Pruna to various

23    individuals, including yourself, that attaches a sales

24    by salesperson year to date, January to May 9, 2016,

25    do you see that exhibit?

1          A.    Yes.

2          Q.    I believe you testified that at this

3     point in time -- make sure I understand.  In May of

4     2016 who was -- was Northwell yet an institutional

5     customer?

6          A.    They had started to purchase.

7          Q.    At that point in time was Baptist still

8     the primary institutional customer?

9          A.    That was certainly the focus.

10         Q.    And can you tell by looking at this

11    Exhibit 5 which of these sales by these various sales

12    reps were to institutional customers and which ones

13    were, as you said before, the onesies and the twosies?

14         A.    Can I tell from this document here?

15         Q.    Yes.

16         A.    I would -- I would think that the type

17    that says invoice would lead me to believe those are

18    purchased from the hospital as opposed to others that

19    say -- I think I saw something -- they're all

20    invoices, so that doesn't make a lot of sense.  No, I

21    can't tell.

22         Q.    Okay.  And I think you testified that the

23    2016 revenue goal for Vestagen was $2.2 million?

24         A.    Yes.

25         Q.    So if we go and we look at -- I think

1　it's -- make sure I get the right one.　Exhibit 11.

2　This is -- appears to be a similar-type report sent by

3　Mr. Pruna on September 19, 2016, for sales January to

4　September 19, 2016.　Is that right?

5　　　　　A.　　Yes.

6　　　　　Q.　　Okay.　And on this one it does list the

7　customer.　Appears to me, the majority of those are

8　either North Shore or Baptist.　My question is, if I

9　go all the way to the back and I've got total revenue,

10　that bottom number, that's a little over a million

11　dollars; is that right?　So that would be a little

12　over a million dollars in revenue for January through

13　September 19, 2016; correct?　If that's what the date

14　of this document is?

15　　　　　A.　　Correct.

16　　　　　Q.　　Okay.　So you're into the third quarter

17　and you're still -- and you're less than halfway to

18　your goal for revenue for the year.　Would you

19　consider that to be on target to meet the revenue goal

20　for the year?

21　　　　　A.　　Absolutely.

22　　　　　Q.　　And why would you say that?

23　　　　　A.　　We're just starting the implementation of

24　some of these customers.　It's -- if you've got a

25　customer -- it's not like buying a widget.　You have

1    to deploy and implement the scrubs, so it takes time.

2    It's one hospital at a time.  It's -- et cetera.  So

3    it takes a -- takes a long time.

4        Q.    You had talked with Mr. Zenner about some

5    PowerPoint slides.  I believe they are Exhibit 9.  I

6    believe you said that Mr. Bold approved these slides;

7    is that right?

8        A.    Yes, they were presented to the board.

9        Q.    Did Mr. Bold have anything else to do

10   with putting together the slides besides approving

11   them?

12       A.    He was -- he compiled it from all the

13   department heads, so, in other words, marketing,

14   sales, finance would complete our slide, sent it to

15   him.  He would compile, review and approve.

16       Q.    When you say compile and review, would he

17   make changes to the slides before he approved them?

18       A.    I can't speak to that.

19       Q.    Well, did he ever ask you to revise

20   slides that you had presented to him because he needed

21   them to be changed in some way?

22       A.    He did.

23       Q.    So it went beyond just approving them.

24   He had some involvement in what -- what the slides

25   would look like before he approved them?

1          A.      No, just the last couple days before he

2     terminated me, he was hyperfocused on those slides,

3     but not prior to that.

4          Q.      Okay.  So prior to September -- late

5     September he was not focused on any of the slides,

6     what the slides would look like that you were

7     presenting to the board.  Is that your testimony?

8          A.      It's a -- it's a vague question.  I don't

9     recall him making any changes to my slides.  I don't

10    know if he did that prior to the board.  I don't

11    recall.

12         Q.      Okay.  And if you would look at

13    exhibit -- Plaintiff's Exhibit 15.  And it appears, if

14    you go to the last page of that exhibit, that this

15    email string starts with an email from you to Bill

16    Bold saying that you had modified the slides; is that

17    right?

18         A.      Yes.

19         Q.      So was this a situation in which Mr. Bold

20    had made changes or asked you to make changes to the

21    slides he was going to present to the board?

22         A.      Not that I recall.  It could have just

23    been a conversation about sales activity that may have

24    occurred over the last couple days.

25              MR. RUTCHOW:  Your Honor, I'm handing up

1   what was marked as Defendant's Exhibit 20.

2   BY MR. RUTCHOW:

3        Q.    Mr. Beyer, I would direct your attention

4   on Exhibit 20 to the bottom of first page and then to

5   the second page which is an email from Bill Bold to

6   you dated Tuesday, September 20, 2016, subject:  Board

7   slides.  And then the second page he's raising five

8   comments about those slides.

9            That's a little more than just some

10  questions about sales over the last couple days, isn't

11  it?

12       A.    This is his opinion.

13       Q.    And, in fact, isn't this the email you

14  were responding to when you sent him the slides that

15  you had revised?

16       A.    Could be.

17            MR. RUTCHOW:  Your Honor, I'm going to

18  hold admitting Exhibit 20 into evidence until Mr. Bold

19  testifies.

20            THE COURT:  Okay.

21            MR. RUTCHOW:  Because I don't think

22  Mr. Beyer was party to the first email in that chain,

23  so.

24            THE COURT:  Well, the first email looks

25  like it's from Bold to Mr. Beyer.

```
 1              MR. RUTCHOW:  Right.  And then the
 2   subsequent email I don't think Mr. Beyer was copied
 3   on.
 4              THE COURT:  Oh, okay.
 5              MR. RUTCHOW:  So I'm just going to wait
 6   for the person who was on all of them to be able to --
 7              THE COURT:  Okay, that's fine.
 8              MR. ZENNER:  I'm not going to object to
 9   it when he does.
10              MR. RUTCHOW:  Okay, then that's fine,
11   Your Honor.  I'll go ahead and admit it now.
12              THE COURT:  Okay.  We'll go ahead and --
13   this is D20 is received.
14              MR. RUTCHOW:  Yes.
15              THE COURT:  Okay.
16              (Defense Exhibit No. 20 was admitted.)
17              MR. RUTCHOW:  If I could have just a
18   minute, Your Honor.
19              THE COURT:  Yes.
20              (Pause in proceedings.)
21              MR. RUTCHOW:  Your Honor, that's all I
22   have at this time.
23              THE COURT:  Any redirect?
24              MR. ZENNER:  No, Your Honor.
25              THE COURT:  Okay.  We'll take a lunch
```

1   break.  How about if we are back by 1:15?  That's 50
2   minutes for lunch.
3           MR. RUTCHOW:  We can make that work.
4           THE COURT:  Okay, 50 minutes for lunch.
5   We're in recess.
6           (Whereupon, a break was taken from
7   12:25 p.m. to 1:19 p.m.)
8           THE COURT:  All right.  Next witness, for
9   the plaintiff.
10          MR. ZENNER:  Call Tony Pruna.
11                      **TONY PRUNA**
12  called as a witness, after having been first duly
13  sworn, testified as follows:
14                  **DIRECT EXAMINATION**
15  BY MR. ZENNER:
16          Q.    Mr. Pruna, you are the former CFO of
17  Vestagen; is that right?
18          A.    That is correct.
19          Q.    Now, let me talk a little bit about your
20  educational background.  Tell me what that is.
21          A.    I have a bachelor's degree in accounting
22  from the University of Texas, an MBA from Wake Forest
23  University, and I'm a certified public accountant in
24  the state of Florida.
25          Q.    During what time period did you work for

1    Vestagen?

2         A.    From 2012 to 2017.  Sorry, 2014 to 2017.

3    Three years.

4         Q.    Did you have a job title?  What was your

5    title there?

6         A.    At Vestagen?

7         Q.    Yes.

8         A.    Director of finance was my corporate

9    title.

10        Q.    Okay.  What were your --

11        A.    And my acting title was CFO.

12        Q.    What were your job responsibilities?

13        A.    Pretty much oversee all the financial

14   activities of the company, the Human Resources

15   activities, and the information technology activities.

16        Q.    So finances, Human Resources --

17        A.    Human Resources and information

18   technology.

19        Q.    What was involved in the Human Resources

20   aspect of it?

21        A.    The basic compliance work that comes

22   from, you know, hiring employees and making sure that

23   we were law-abiding and that personal records were on

24   board, payroll was done and properly set up, all those

25   things, yeah.

1           Q.    Did you maintain personnel files?

2           A.    I did.

3           Q.    Did you have any part in disciplining

4    employees as the HR person?

5           A.    From a responsibility standpoint I did.

6    Doesn't mean that I was involved all the time, but I

7    was, yeah, responsible for it.

8           Q.    When did you leave Vestagen?

9           A.    Late May of this year.

10          Q.    Why did you leave?

11          A.    I found -- or I got another opportunity

12   as a VP of finance with a company called Everything

13   But Water.

14          Q.    Did you leave on good terms, bad terms?

15   I mean, was there any animosity?  You left

16   voluntarily?

17          A.    Not that I'm -- no, I think I left on

18   good terms.

19          Q.    Okay.  You left voluntarily?

20          A.    Yes.

21          Q.    Okay.  And you gave them some notice

22   before you left?

23          A.    Yes.

24          Q.    As the director of finance, are you

25   familiar with Vestagen's revenues or sales revenues?

1        A.    Yes.

2        Q.    Let's talk about 2014.  Do you know what

3 their annual revenues were that year, approximately?

4 I know it's not going to be --

5        A.    I can't remember the exact number, but it

6 was about $2 million.

7        Q.    Okay.  And what about 2015?

8        A.    $790,000, something like that.

9        Q.    So it was a significant drop in 2015?

10       A.    From 2014, yes.

11       Q.    Okay.  And Mr. Beyer came to work the

12 beginning of 2016 and worked through two-thirds of

13 September of that year.  Do you know what the 2016

14 revenues were?

15       A.    About $2.2 million.

16       Q.    What was the goal?  Were there revenue

17 goals for that year?

18       A.    Yes.

19       Q.    How close to it was that?

20       A.    98 percent on goal, something like that.

21       Q.    Okay.  And then 2017, I understand it's

22 not complete and you weren't there for all of it, but

23 at the time you left five months into 2017, what did

24 the revenues look like?

25       A.    Half a million dollars or so.

1       Q.      Were they down significantly from the

2   prior year?

3       A.      Yes.

4       Q.      Are you familiar with Mr. Beyer's

5   employment agreement?

6       A.      Yes.

7       Q.      If you will look to Exhibit 2,

8   Plaintiff's Exhibit 2.  Exhibit 2 has been entered as

9   the employment agreement for Mr. Beyer.  Have you ever

10  seen that before, I take it?

11      A.      Yes.

12      Q.      Did you have any role in drafting it?

13      A.      My role was limited to maybe circulating

14  the draft documents of this offer letter to different

15  parties within the company.

16      Q.      Okay.  So you maybe didn't write it, but

17  you were -- you were viewing it as drafts were being

18  circulated?

19      A.      That is correct.

20      Q.      Okay.  And are you familiar with the

21  definitions section of the agreement?

22      A.      Yes.

23      Q.      Okay.  What is required under that cause

24  definition section to affect a termination for cause?

25  What are the steps that need to be taken?

1          MR. RUTCHOW:  Your Honor, I'm going to

2    object to the extent that he's offering any parol

3    evidence beyond the actual words of the documents.

4          THE COURT:  It does sound like parol

5    evidence interpretation.  That's what the Court's

6    supposed to do.

7          MR. ZENNER:  Okay.

8    BY MR. ZENNER:

9          Q.    When you were working at Vestagen, did

10   Mr. Bolds ever speak to you -- let me back up.  There

11   was a period of time that you were responsible for

12   taking minutes and notes for board of directors

13   meetings; is that right?

14         A.    That's correct.

15         Q.    And during what time period was that?

16         A.    From the time I joined the company in

17   January of 2014 through the summer of 2016.  I can't

18   remember exactly when it ended.  And we started using

19   the corporate attorneys to take the minutes to the

20   meetings of the board of directors.

21         Q.    Okay.  So through probably, what, June or

22   so of 2016?

23         A.    It was the summer of 2016.

24         Q.    Okay.

25         A.    June or July.

1      Q.    So during that time period, 2016, were

2  there ever any discussions that you recall during the

3  board of director meetings about Mr. Beyer's lack of

4  performance?

5      A.    I don't remember, no.  I don't think so.

6      Q.    Were there any notes that you took or

7  discussions that you recall hearing that had to do

8  with terminating Mr. Beyer for cause?

9      A.    Not that I can recall.  No.

10     Q.    Were there any discussions or notes that

11  you took during these meetings where -- the mention of

12  giving Mr. Beyers ten days' notice of a for cause

13  termination?  Was anything like that ever spoken of?

14     A.    No.

15     Q.    Did you ever have any conversations with

16  Bill Bolds regarding the performance of Mr. Beyers?

17     A.    Yes.

18     Q.    Tell me how many conversations you had

19  that you recall and approximately when they occurred.

20     A.    I recall just a couple of conversations

21  where Mr. Bold expressed that he wasn't happy with

22  Mr. Beyer.  And that was about it.

23     Q.    And when --

24     A.    When, exactly?  July, August of 2016

25  sometime.

1      Q.    Did he mention terminating Mr. Beyer?

2      A.    Not that I remember.

3      Q.    Did he talk to you at all about giving

4    Mr. Beyer notice that they have cause for termination?

5      A.    No.

6      Q.    Did he ever document anywhere that he had

7    given Mr. Beyers notice of a for cause termination for

8    you to put in his personnel file?

9      A.    No.  Otherwise I would have put it in his

10   personnel file.  I never came across any

11   documentation.

12     Q.    Now for my next question.  Was there any

13   documentation of any notice of a for cause termination

14   and ten days' opportunity to cure as being given to

15   Mr. Beyer?

16     A.    No, sir.

17     Q.    When is the first time that you even knew

18   that Mr. Beyers had been terminated?

19     A.    That day he was terminated.

20     Q.    Was it a surprise to you?

21     A.    Yes.  It was a little bit of a surprise.

22     Q.    Let me ask you this:  How would you

23   describe the temperament of Mr. Bold?

24     A.    How would I describe his temperament?

25     Q.    Yes.  Yes.

1          A.     I don't know, just a regular guy, I

2      guess.  I'm not sure --

3          Q.     Was he pretty steady across the board or

4      was it sort of up and down?

5          A.     Yeah, Bill can go up and down sometimes,

6      sure.

7          Q.     So you first learned as the CFO and the

8      person who's responsible for Human Resources at

9      Vestagen that Mr. Beyer was being terminated the day

10     it happened?

11         A.     Yes.

12         Q.     Tell me how you even learned that it

13     happened.

14         A.     Mr. Bold informed me that Mr. Beyer was

15     terminated following their phone conversation,

16     whenever that happened.

17         Q.     Did he tell you why he was terminated?

18         A.     For performance.

19         Q.     Did he specify anything in particular?

20         A.     No.

21         Q.     Did you have any discussion about

22     Mr. Beyer's severance payments under the terms of his

23     agreement?

24         A.     Yes.

25         Q.     What were those?

1           MR. RUTCHOW:  Your Honor, again, I'm not

2    sure where we're going, but in the time frame after

3    Mr. Beyer was terminated, Mr. Pruna was in a position,

4    an executive-level position.  And I know from having

5    seen correspondence before I got involved that there

6    was communications with attorneys regarding severance

7    issues.

8           So to the extent that Mr. Pruna is going

9    to talk about things that during a time frame when he

10   would have been an executive of the company, of the

11   defendant, there would be attorney/client privilege

12   attaching to these communications when he -- during a

13   time when he was an agent.

14          THE COURT:  He can certainly tell us

15   anything that Mr. Bold said.

16          MR. RUTCHOW:  I agree, Your Honor.

17          THE COURT:  I think that's all he's

18   asking for.

19          MR. ZENNER:  I'm really limited to a day

20   or two after this.  There wouldn't have been

21   litigation ongoing yet.

22   BY MR. ZENNER:

23        Q.   Did you have a discussion with Mr. Bold

24   regarding the severance payment?

25        A.   Yes.

1      Q.    And what was that discussion?

2      A.    When we discussed the fact that Mr. Beyer

3 was terminated, I -- I brought up the severance.  And

4 Mr. Bold instructed me to hold back on that, because

5 he believed that the termination was for cause.  And

6 that's where we left it.  Then we proceeded to cut off

7 the health insurance, and that was it.  That's all we

8 talked about.

9      Q.    Did you tell him whether or not you

10 thought the severance should be paid?

11      A.    I remember saying, yes, that it was -- in

12 my professional opinion, it would have been better to

13 pay Mr. Beyer the severance on his employment letter.

14 I did say that.

15      Q.    Based upon what you know about the

16 employment agreement and the steps that have to be

17 taken for cause as the CFO and the person in charge of

18 HR at Vestagen, do you think those steps were taken?

19      A.    No.

20      MR. ZENNER:  Your Honor, I'm going to ask

21 him about a couple of exhibits that were on the

22 defendant's exhibit list, D14 and D15.

23      THE COURT:  That's fine.

24      MR. ZENNER:  I'm not going to enter them.

25 Actually, those are two different exhibits.

1          THE COURT:  These are -- I don't see a

2     number anyway.

3     BY MR. ZENNER:

4          Q.   I'm just going to ask you this.  Those

5     were identified on the exhibit list of the defendant

6     as some memos regarding Gene Deutscher.  Have you ever

7     seen those before?

8          A.   No.

9          Q.   At the time you left, were you familiar

10     with the contents of Mr. Beyer's personnel file?

11          A.   Yes, I was.

12          Q.   Were those documents included in his

13     personnel file?

14          A.   No.

15          Q.   Did you ever put any written

16     documentation in any -- in Mr. Beyer's personnel file

17     of a disciplinary action?

18          A.   No.

19          Q.   Was there anything in his file that

20     indicated any discipline whatsoever?

21          A.   No.

22          MR. ZENNER:  Okay.  I'm going to mark

23     those for ID purposes.

24          THE COURT:  These are D14 and D15; right?

25          MR. ZENNER:  Yes.

1  BY MR. ZENNER:

2         Q.    Does the employee manual -- you're

3  familiar with that; right?

4         A.    Yes, sir.

5         Q.    That provided for the opportunity to

6  engage in a performance improvement plan?

7         A.    Yes.

8         Q.    Okay.  Was Mr. Beyer ever put on a

9  performance improvement plan?

10        A.    Not formally, which will be what I will

11 be concerned with as VP of finance or HR.

12        Q.    I mean, there's a procedure in place to

13 put someone on a formal performance improvement plan;

14 right?

15        A.    That is correct.

16        Q.    And that was never done in this case for

17 Mr. Beyer?

18        A.    No, sir.

19              MR. ZENNER:  I believe that's all I have.

20 Thank you.

21              THE COURT:  Cross?

22                    **CROSS-EXAMINATION**

23 BY MR. RUTCHOW:

24        Q.    Mr. Pruna, who did you report to?

25        A.    I reported to Mr. Bill Bold.

1       Q.    And who did Mr. Beyer report to?

2       A.    Bill Bold as well.

3       Q.    So he was both of yours bosses?

4       A.    Yes, sir.

5       Q.    You just said that Mr. Beyer was never

6 formally put on a performance improvement plan.  Was

7 he ever informally put on a performance improvement

8 plan that you're aware of?

9       A.    No, not that I'm aware of.

10      Q.    Okay.  You said that sometime in July or

11 August you had a couple of conversations with Mr. Bold

12 in which he expressed to you that he was not happy

13 with Mr. Beyer; is that right?

14      A.    Yes.

15      Q.    Did he tell you why he was not happy with

16 Mr. Beyer?

17      A.    Sales performance.

18      Q.    Anything else?

19      A.    That I remember, maybe some disagreements

20 with some of his salespeople.

21      Q.    Did he give you any -- do you recall

22 anything that he told you about what those

23 disagreements were?

24      A.    Yeah, I mean, I don't recall the specific

25 verbiage of the conversation, but -- but at the time I

```
1   knew that there were a couple of sales reps, for lack
2   of a better term, that were not happy with Mr. Beyer.
3   And they had expressed unhappiness to -- I'm assuming
4   to Mr. Bold, and maybe some other people, I don't
5   know.
6         Q.    Who were those sales reps that were not
7   happy with Mr. Beyer?
8               MR. ZENNER:  Object to the hearsay,
9   Your Honor.
10              THE COURT:  Well, this is something that
11  Mr. Bold told you, that there were two sales reps that
12  were not happy?
13              THE WITNESS:  Yeah.
14              THE COURT:  Overruled.
15              THE WITNESS:  That I can recall, yeah.
16              THE COURT:  Overruled.
17  BY MR. RUTCHOW:
18        Q.    Who were the two sales reps?
19        A.    Brain Crawford.
20        Q.    Okay.
21        A.    And Gene Deutscher.  I can never say
22  his --
23        Q.    Deutscher?
24        A.    Right.  I can never say his name right.
25        Q.    I understand.  Do you have any
```

 1    understanding as to why these two were not happy with

 2    Mr. Bold?

 3            THE COURT:  Now, are we asking for

 4    hearsay at this point?  Anything that Mr. Bold told

 5    you is okay, but anything else is not okay.

 6            THE WITNESS:  Well, based on what

 7    Mr. Bold told me, it sounded to me like

 8    personality-type conflicts.

 9            MR. ZENNER:  Your Honor, I think that

10    anything that Mr. Bold is telling him, he had to have

11    gotten from Crawford or Deutscher.

12            THE COURT:  True.  We've got two layers

13    of hearsay here.

14            MR. RUTCHOW:  So then, Your Honor, I'm

15    done with that.

16            THE COURT:  Okay, move on.

17    BY MR. RUTCHOW:

18        Q.    I believe you earlier testified, just so

19    I'm clear, that your involvement with Mr. Beyer's

20    employment agreement or the drafting of that agreement

21    was limited to circulating the various drafts among

22    the people involved; is that right?

23        A.    That is correct.

24        Q.    Do you know who signed the employment

25    agreement for Vestagen?

1      A.    Dale Pfost, who was acting CEO at the

2   time, and he's the executive chairman of the company.

3      Q.    Okay.  Did you ever have any concerns

4   with Mr. Beyer's performance?

5      A.    Not any more than I had any other -- you

6   know, any concerns with the company's sales

7   performance as a whole.

8      Q.    Did you ever express any frustration to

9   Mr. Bold about Mr. Beyer's inability to get his

10  expense reports in in a timely manner?

11     A.    Yeah.

12     Q.    Was that unusual among the sales reps or

13  was he about the same as everybody else?

14     A.    About the same as everybody else.

15           MR. RUTCHOW:  Your Honor, that's all I

16  have.

17           THE COURT:  Any redirect?

18                **REDIRECT EXAMINATION**

19  BY MR. ZENNER:

20     Q.    Did Mr. Bolds ever talk about firing Gene

21  Deutscher?

22     A.    Yes, we discussed it a couple of times.

23     Q.    Did he ever talk about firing Brain

24  Crawford?

25     A.    Yes.

1          MR. ZENNER:  That's all.

2          THE COURT:  Anything else?

3          MR. RUTCHOW:  Not from the defendant,

4    Your Honor.

5          THE COURT:  All right.  You may step

6    down.  Thank you.

7               *****WITNESS EXCUSED*****

8          THE COURT:  Any other proof?

9          MR. ZENNER:  That's it from the

10   plaintiff.

11         THE COURT:  Okay, plaintiff rests.

12

13         (Plaintiff rests.)

14

15         THE COURT:  Okay.  Let's hear the defense

16   proof.

17         MR. RUTCHOW:  Your Honor, we would call

18   Bill Bold.

19         THE COURT:  Okay.  Bill Bold.

20                    **BILL BOLD**

21   called as a witness, after having been first duly

22   sworn, testified as follows:

23                 **DIRECT EXAMINATION**

24   BY MR. RUTCHOW:

25         Q.   We used a lot of the same exhibits.  I'm

1    just making sure I don't double up.

2              Good afternoon, Mr. Bold.

3         A.    Good afternoon.

4         Q.    Could you give your full name for the

5    record.

6         A.    William Mark Bold, B-o-l-d.

7         Q.    And by whom are you presently employed?

8         A.    Vestagen Protective Technologies.

9         Q.    And what's your job title?

10        A.    CEO.  Chief executive officer.

11        Q.    How long have you held that position?

12        A.    Since January 4, 2016 --

13        Q.    Okay.  Give me a brief summary of your

14   educational background and your work history before

15   you got to Vestagen.

16        A.    Sure.  I have a four-year degree in

17   marketing from West Chester University outside of

18   Philadelphia.  I started working for C.R. Bard in the

19   mid '80s as a sales rep in New York City in the

20   operating room.  I worked my way up to vice-president

21   of sales for the Bard Urological Group in the mid

22   '90s.

23              I then left and helped start the

24   e-commerce company for Premier in the late '90s.  We

25   were acquired by medibuy.com.  I then left and in 2001

1   helped start another company called Venetec

2   International.  Grew that organization for four years.

3   Sold that company to C.R. Bard in 2006.

4          I then started another company called

5   Access Scientific as president and CEO in 2008.  Sold

6   that company to Empath Health in 2012.  And then

7   started another company called Vascular Pathways in

8   2012 and sold that company back to C.R. Bard in 2015.

9          Q.   Okay.  The Premier that you just

10  mentioned that you had started the e-commerce

11  division, is that the same Premier that was talked

12  about earlier today that is a group purchasing

13  organization or GPO that Vestagen at some point had an

14  agreement with?

15         A.   Correct.

16         Q.   Okay.  Tell me about the process of you

17  becoming employed by Vestagen.

18         A.   After I sold Vascular Pathways in July of

19  2015, I took a few months off.  I walked the Camino de

20  Santiago across 500 miles in Spain.  And during that

21  time period I received several calls from Tom Callaway

22  who is a recruiter for Health Quest.  And took a call

23  from Spain and agreed to meet with Tom and the board

24  when I got back.  October 8 is when I returned, but I

25  met with them probably a week later.

1          Q.    Okay.  And was Mr. Beyer being recruited

2     in the same time period as you were?

3          A.    He was.

4          Q.    And you were being recruited for what

5     position?

6          A.    CEO.

7          Q.    And what position was Mr. Beyer being

8     recruited for?

9          A.    VP of sales.

10          Q.    Tell me what, if any, involvement you had

11     in the negotiation of the employment agreement between

12     Mr. Beyer and Vestagen.

13          A.    So I had the opportunity to speak with

14     Jim several times before we had the opportunity to

15     meet.  We met sometime in early November.  At that

16     point we had a good conversation, and I thought this

17     was a solid guy that I would like to work with and

18     bring on board.

19               I asked him about his severance

20     agreement, and he didn't have one.  I asked him about

21     antidilution as it relates to options.  He didn't know

22     what that meant.  I asked him about accelerated

23     vesting as it relates to options, if, in fact, the

24     company was purchased.  He didn't know what that

25     meant.

1    I said, well, Jim, let me help you.

2  We're going to be a team here.  Let's get together and

3  I'll help -- I'll help suggest to the board that you

4  have -- you're on par with me in terms of the benefits

5  that you're going to get.

6    And basically at that point the board

7  agreed to include certain language in the agreement

8  based on my request.  But I was not employed at the

9  time that was recommended to Dale Pfost and the board,

10  which they accepted, and then drafted the employment

11  agreement.

12    I didn't -- I didn't sign my agreement or

13  I didn't accept the position until Jim accepted the

14  position himself.  So that I was guaranteed that he

15  got what he deserved or what he needed.

16    Q.    So you were not -- make sure I

17  understand.  Were you representing Vestagen in these

18  negotiations with Mr. Beyer?

19    A.    No, I was representing Jim Beyer.

20    Q.    And the severance language, the

21  antidilution language and the acceleration on vesting

22  of options language, make sure I understand, you have

23  the same language in your agreement?

24    A.    I do.  Except I have a longer period of

25  severance, but, yes, I do.

 1          Q.    Okay.  Who did Mr. Beyer report to once
 2    you were both employed?
 3          A.    To me.
 4          Q.    Were you a member of the board of
 5    directors during Mr. Beyer's employment?
 6          A.    I was.
 7          Q.    Did you have discussions -- who were the
 8    other board members while you were -- while Mr. Beyer
 9    was employed?
10          A.    Ben Favret, Dale Pfost, Randy Scott,
11    David Nash and Jim Karities (phonetic).
12          Q.    Did you have discussions with any of
13    these other board members regarding Mr. Beyer or his
14    performance while Mr. Beyer was employed?
15          A.    I did.  Usually outside of the board
16    meetings where we would have informal conversations,
17    one-on-one conversations or just me.
18                MR. ZENNER:  Objection, Your Honor,
19    hearsay.  He's talking about things that he told other
20    board members.
21                MR. RUTCHOW:  I'm just asking if he had
22    the conversations, not the substance of those
23    conversations, Your Honor.
24                THE COURT:  Okay.
25                THE WITNESS:  I did.

1                THE COURT:  All right.

2    BY MR. RUTCHOW:

3         Q.    Who made the decision to terminate

4    Mr. Beyer?

5         A.    I did.

6         Q.    Did you run that by anybody before you

7    did that?

8         A.    I did.

9         Q.    Who did you run it by?

10        A.    Dale Pfost and Randy Scott.

11        Q.    These were two board members?

12        A.    Correct.  They were our lead investors.

13        Q.    And why did you terminate Mr. Beyer?

14        A.    Several reasons.  Lack of sales

15   performance, No. 1.  No. 2, he had very much a

16   confrontational relationship with I'd say at least

17   half of the employees in the company and was creating

18   a real culture of mistrust and dissatisfaction.

19             Mainly -- mainly due to his inability to

20   understand the sales executive's responsibilities and

21   put in place methods, protocols and methodologies in

22   order to run a sales organization effectively.

23        Q.    Okay.  Did you have any discussions with

24   Mr. Beyer about these problems you've just discussed

25   with his inability to fill the sales executive role?

1          A.     At least every two weeks.

2          Q.     Why would you say every two weeks?

3          A.     Because there were different issues that

4     would surround Jim as it relates to personnel or

5     account feedback, customer feedback, lack of progress,

6     my need for information that never was provided, that

7     I always had to go back to Jim and say, Jim, do you

8     remember about this.  You can't say this to these

9     people.  You need to -- you know, you need to conduct

10    yourself at a much higher level.

11         Q.     All right.  There was -- you've been in

12    the courtroom throughout the trial; correct?

13         A.     Pardon?  Yes, yes.

14         Q.     Do you recall some testimony from

15    Mr. Beyer in which he testified that the two primary

16    institutional customers during his employment were

17    Baptist Health Systems and Northwell?

18         A.     Correct.

19         Q.     Okay.  And is it correct that Baptist was

20    a customer of Vestagen before Mr. Beyer was hired;

21    correct?

22         A.     That resulted in the $2 million sales in

23    2014, yes.

24         Q.     That Mr. Pruna just testified to?

25         A.     Mr. Pruna just talked about, yes.

```
1          Q.    Gotcha, okay.  Tell me what you know
2     about the process for Northwell becoming a customer of
3     the company.
4          A.    Sure.  So Brain Crawford worked on
5     Northwell for I'd say a year and a half.  He made some
6     progress and was getting to a point where some
7     decisions were going to be made.  He did have an
8     opportunity to meet with Kerri Scanlon.  Kerri is the
9     chief nursing officer for North Shore.
10               He conducted that meeting.  He brought
11    Jim along with him because Jim was still learning in
12    the process and -- I'd say in the February time
13    period.  At that point they were still determining
14    which way to go in terms of what company to utilize.
15               And Brain said -- came back to me and
16    said, the meeting went well.  Jim was a little bit
17    more aggressive than I would expect --
18               MR. ZENNER:  Objection, hearsay.
19               THE COURT:  Excuse me?
20               MR. ZENNER:  Objection, hearsay.
21               THE COURT:  Sounds like hearsay to me.
22               MR. RUTCHOW:  Well, Your Honor, I think
23    that -- I mean, I can -- can match it up.  To me it
24    would be an exception to the hearsay rule because it's
25    not going to the truth of the matter asserted.
```

1          THE COURT:  It is going to the truth of

2    the matter asserted.  You want me to believe it.  You

3    want me to believe he was too aggressive.  That sounds

4    like you want me to -- it's going to the truth.

5          MR. RUTCHOW:  It goes to Mr. Bold's state

6    of mind and to the information that was reported to

7    him and the actions he took as a result of that

8    information being reported to him.

9          No different than if an employer were to

10   terminate an employee for sexual harassment after that

11   sexual harassment was reported to them, whether it was

12   true or not.  If that was the good -- basis of his

13   good-faith belief for taking a subsequent action, that

14   would be an exception to the hearsay rule.

15          THE COURT:  Sounds like a good argument,

16   Mr. Zenner.

17          MR. ZENNER:  I think Your Honor nailed it

18   the first time.  The reason he's offering this

19   testimony is because he wants the Court to believe

20   that Mr. --

21          THE COURT:  Well, it's hearsay because

22   it's being offered for the truth of the matter

23   asserted.  But it's also being offered as notice to

24   him and his state of mind for terminating the

25   plaintiff.  So it's an exception to the hearsay rule.

1          MR. ZENNER:  I think the proper way would

2     be to call Mr. Crawford in and say, here's what I told

3     him.

4          THE COURT:  Overruled.  Go ahead.

5     BY MR. RUTCHOW:

6          Q.    You were telling me about the process --

7     my question was the process by which Northwell became

8     a customer.

9          A.    Right.  So that meeting took place and

10    Kerri is a significant individual within the Northwell

11    system, but she wasn't the final decision-maker.

12    There was a -- a very formidable lady by the name of

13    Phyllis McCready, who was the chief supply chain

14    officer.

15          And at the time Jim always talked about

16    the relationships that he had and how he knows

17    everybody in the industry and he knows Phyllis very,

18    very well.  I said, great, go.  Get an appointment,

19    sit down, let's talk with her, see what we need to do

20    in order to get the business.  He tried for two or

21    three or four weeks and never got the appointment.

22          I've known Phyllis for 25 years.  I made

23    a phone call, and we were sitting in front of each

24    other a week later.  She didn't know who Jim was and

25    never took the meeting because she wasn't aware of him

1   even being a part of the organization.

2          So Phyllis and I sat down.  Brain

3   Crawford was in the room, John Silva was in the room.

4   And Donnie -- I can't remember -- John's boss as well.

5   We talked about the initial order for Northwell, which

6   was for the patient care associates.  It was $150,000

7   order for the thousand employees --

8          MR. ZENNER:  Objection, hearsay,

9   Your Honor.  Again, we're just talking about --

10         THE COURT:  Overruled.

11         THE WITNESS:  We talked about the first

12   order that was to be placed for the patient care

13   associates.  It was $150,000 order.  They had the PO

14   cut for 125,000, and they said to me, can you give us

15   the deal for 125,000 and we'll pay the $30,000 off as

16   we continue to do business with you.

17          So we drafted an agreement over the next

18   week or so.  Phyllis signed it, I signed it, and we

19   ended up getting the business at Northwell.  And

20   because of that relationship that I had with her, I

21   stayed very much involved.

22         In addition to that, they were looking to

23   invest in startup companies, and they invested in

24   Vestagen as well.  And that's the reason I also stayed

25   involved in the business because I was also not only

 1    on the clinical side, but on the investment side as

 2    well.

 3    BY MR. RUTCHOW:

 4         Q.    So as far as you were concerned, did

 5    Mr. Beyer have anything to do with you -- with

 6    Vestagen obtaining business from Northwell?

 7         A.    Nothing.

 8              I'll take it a step further --

 9              THE COURT:  There's no question pending.

10              THE WITNESS:  Sorry, Your Honor.

11    BY MR. RUTCHOW:

12         Q.    You mentioned that you had issues with

13    Mr. Beyer's ability to act in the sales executive role

14    and that you had discussed that with Mr. Beyer.  Did

15    you ever put any of your concerns regarding

16    Mr. Beyer's performance in writing?

17         A.    I did.  I would continuously ask him to

18    improve upon the work that he provided me and give him

19    guidance, direction, and even examples of what I

20    needed him to do along the way in order for him to at

21    least, at a nominal level, play a role in that

22    position.

23              MR. RUTCHOW:  Your Honor, I'm going to

24    provide the witness with a document that was marked as

25    Defendant's Exhibit 6.

BY MR. RUTCHOW:

     Q.    Mr. Beyer, do you recognize -- or
Mr. Bold, do you recognize this document?

     A.    I do.

     Q.    And the date on this document is
August 1, 2016; is that correct?

     A.    Correct.

     Q.    And what was the purpose of this email
communication with Mr. Beyer?

     A.    To notify Jim that he has had very little
effect on the productivity and the sales or revenue
being generated for the Vestagen organization.  These
four accounts, North Shore and HCA and Kindred
Denver -- three accounts, I should say, were in
process when he got there.  And there was absolutely
zero new business that was brought on since Jim's
inception with the company.

     Q.    All right.  Second sentence of this email
that you said -- you will need to make certain next
week that accounts targeted under your leadership will
allow us -- I think you meant us, it says up -- to hit
our 2016 and 2017 numbers with some concrete data to
back it up.  Just a headsup.

          What was happening next week that he
would need to provide this information?

1          A.     I believe there was a board meeting.

2          Q.     So this was information that the board

3     was going to want from Mr. Beyer, is that what you're

4     saying?

5          A.     Correct.

6          Q.     And did Mr. Beyer ever provide you with

7     the concrete data regarding how that you were going to

8     hit your 2016 and '17 numbers?

9          A.     He did not with any degree of confidence.

10         Q.     What do you mean by that?

11         A.     Basically throughout Jim's tenure I would

12    get highly inflated numbers, and he would always say,

13    hey, back of the napkin, we're going to do a million

14    dollars with this customer, and nothing ever happened.

15    Nothing ever came to fruition.

16              And that was the reason I notified him

17    that the only accounts that have closed are accounts

18    that had been under my management with North Shore,

19    HCA and Kindred Denver, and that he has not

20    contributed to what we were trying to accomplish.

21         Q.     All right.

22              MR. RUTCHOW:  Your Honor, we would move

23    for the admission of Exhibit 6.

24              THE COURT:  Any objection?

25              MR. ZENNER:  No, Your Honor.

1          THE COURT:  Received.

2          (Defense Exhibit No. 6 was admitted.)

3          MR. RUTCHOW:  Mr. Bold, there was an

4    exhibit of original plaintiff's exhibits and I wanted

5    to refer him to some of the plaintiff's exhibits.

6          THE COURT:  Is there a notebook still --

7    the notebook that was up at the witness stand, do we

8    very that, the plaintiff's exhibits?

9          MR. ZENNER:  He walked off with it.

10   BY MR. RUTCHOW:

11        Q.    Mr. Bold, I want to refer you to

12   Exhibit 10, which is your email dated August 23, 2016.

13        A.    Yes.

14        Q.    Going back just for a second, on that

15   email you sent him on August 1, were you acting on

16   behalf of the board when you sent that email?

17        A.    Yes, as I was the representation from the

18   board to the Vestagen organization.

19        Q.    This email attaches a Quick Base funnel.

20   There was some questions earlier that I asked

21   Mr. Beyer about that confidence column.  Did you have

22   any concerns about that confidence column?

23        A.    Absolutely.

24        Q.    What were they?

25        A.    Well, first of all, these columns were

1    designated to be very specific, in that if an account

2    was in the discovery phase, there was a 50 percent

3    probability that that customer would close in 90 days.

4    This is a typical 90, 60, 30-day sales funnel.

5              If the customer was in the qualifying

6    stage, there's a 75 percent chance that they would

7    close in two months.  And then finally the VNOW stage

8    was a 90 percent degree of confidence that they would

9    close within 30 days.

10             There was also another tab that was in

11   front of this before discovery that was called the

12   targeting phase.  And there wasn't a percentage

13   associated with that because that's where they were

14   determining if the account was even worth putting into

15   the funnel process.

16             And once it was and qualified to a

17   certain degree where there's some level of confidence

18   at 50 percent, that's when it got put into discovery.

19        Q.   So these -- when I'm looking at this

20   discovery phase, from Milton Bugg there's a 90 percent

21   confidence phase, should that -- is that accurate?

22        A.   Of course not, no.

23        Q.   That should be 50 percent?

24        A.   That should be 50 percent.

25        Q.   Who put together this Quick Base sales

1    funnel?

2         A.    The person that actually designed it was

3    Milton Bugg.

4         Q.    Okay.

5         A.    Milton Bugg worked with me at a previous

6    company.  We implemented Quick Base at that previous

7    company, Venetec International.  He then went on to

8    manage the Quick Base program for C.R. Bard, the

9    company that we sold -- the company that we sold to.

10              And I asked Jim -- or I implored Jim for

11   months and months and months to put together some kind

12   of funnel process, which he did not do or could not

13   do.  So Milton and I spoke.  Milton said, hey, I have

14   great expertise with Quick Base.

15              I said, let's do it.  We'll call Jim and

16   let him know and get his buy-in that we're doing it,

17   which is exactly what we did.  And he was thrilled

18   that we put in place a funnel or a tracker that we can

19   potentially forecast new business.

20        Q.    So putting a funnel in place, was that

21   Mr. Beyer's job responsibility?

22        A.    It was.

23        Q.    Did he complete that job?

24        A.    He did not.

25        Q.    And you and Milton Bugg did that instead?

1          A.    Absolutely.

2          Q.    I believe you said that that column on

3     the VNOW -- what does VNOW stand for again?

4          A.    VESTEX NOW.

5          Q.    And you said that that 90 percent is a

6     90 percent probability -- accounts should only be in

7     there if the forecast is that there's a 90 percent

8     probability that the account will close in 30 days; is

9     that right?

10         A.    Correct.

11         Q.    Okay.  And this Quick Base that is

12    funneled is dated 8-23-16.  Are you aware of any of

13    the accounts that are listed in the VNOW section that

14    closed within 30 days of August 23, 2016?

15         A.    The only accounts that closed were the

16    Northwell accounts.

17         Q.    The Northwell accounts?

18         A.    Brain Crawford with the Northwell

19    accounts, correct.

20         Q.    And at this point in time in August 2016,

21    Brain Crawford was reporting to you; is that right?

22         A.    Correct.

23         Q.    So...

24               MR. RUTCHOW:  Your Honor, I'm providing

25    Defendant's Exhibit 7.

1    BY MR. RUTCHOW:

2         Q.    Mr. Bold, do you recognize the document

3    that's been marked as Exhibit 7?

4         A.    I do.

5         Q.    What is that document?

6         A.    It's an email from me to Jim discussing

7    the need for a formal sales process to support the

8    sales funnel that was devised by myself and Milton

9    Bugg, meaning how does a customer get put into the

10   targeting category.

11              Once they check off the boxes in the

12   targeting category, what are those boxes and then how

13   do they move to the discovery phase.  And then when

14   they're in the discovery phase, what are the five or

15   six things that need to happen in order to move them

16   to the qualifying stage.

17              I continuously asked Jim to put those

18   metrics in place, and that never happened until I sent

19   him suggested metrics to put in place, and then

20   finally a document came back to me basically with what

21   I provided him.

22        Q.    The subject of this mail says board deck.

23   Were you -- was this a request, again, for information

24   to be provided to the board?

25        A.    Absolutely.

1          Q.    All right.  And I believe you said he

2    didn't provide you with the information that you had

3    requested in here until you had provided him with some

4    type of template or some type of document for him to

5    use as an example and then you got something back?

6          A.    Correct.

7          Q.    All right.  And is this the first time

8    you'd asked him for this type of information?

9          A.    No.  I asked him since January 4 when he

10   was hired.

11         Q.    All right.

12               MR. RUTCHOW:  We'd move to admit

13   Exhibit 7.

14               THE COURT:  Any objection?

15               MR. ZENNER:  No objection.

16               THE COURT:  Received.

17               MR. RUTCHOW:  I think I moved for 6, but

18   if I didn't --

19               THE COURT:  You did.

20               MR. RUTCHOW:  Okay.

21               (Defense Exhibit No. 7 was admitted.)

22               MR. RUTCHOW:  Passing to the witness

23   Defendant's Exhibit 8.

24   BY MR. RUTCHOW:

25         Q.    Mr. Bold, you've been handed Exhibit 8.

1    Can you tell me what the purpose of this document was?

2          A.    Yes.  Jim and the sales reps that were in

3    the field, the four sales reps, had a very, very

4    difficult time understanding this relatively simple

5    sales concept and process.  So I knew that Jim didn't

6    understand the tracker and, therefore, wasn't able to

7    educate the people that worked for him on how to

8    utilize the tracker or funnel.

9               So what I did was I wrote an email after

10   having many conversations with Jim about this topic, I

11   wrote an email to Jim and to the team saying, here is

12   exactly how it needs to work.  Please put forth the

13   best effort to have exact detail, viable data because

14   it's what we're building the organization on and we

15   need to be able to forecast how much money we need to

16   continue running the company, based on the amount of

17   revenue that we expect to bring in.

18         Q.    And this has got that -- what you

19   explained earlier about the discovery being 90 days

20   out and qualified 60 days out and the VNOW being 30

21   days out from close; is that right?

22         A.    Correct.

23         Q.    Okay.  And going back to

24   Plaintiff's Exhibit 10, which was the August 23 email.

25         A.    Yes.

1        Q.    The second sentence in your email, the

2  cover email is asking the team to do a gut check to

3  ensure you still believe the numbers in the current

4  year revenue column next to your accounts are still

5  accurate.  Why were you asking them to check their

6  numbers to see if they were accurate?

7        A.    Because I was being held accountable by

8  the board to ensure that we had accurate data on which

9  we were making very, very important companywide

10  decisions on.  And, therefore, I was holding Jim and

11  the team accountable for providing accurate data based

12  on those individuals being the commercial organization

13  representing Vestagen.

14              MR. RUTCHOW:  I'd move to admit

15  Exhibit 8, Your Honor.

16                 THE COURT:  Any objection?

17                 MR. ZENNER:  No objection.

18                 THE COURT:  Received.

19                 (Defense Exhibit No. 8 was admitted.)

20              MR. RUTCHOW:  Handing up to the witness,

21  Your Honor, Defendant's Exhibit 9.

22  BY MR. RUTCHOW:

23        Q.    Mr. Bold, you've been handed a document,

24  the top of it is an August 8, 2016, email.  Below that

25  appears to be a copy of your August 5 email.  Can you

1  tell me why you sent out this email on August 8?

2      A.    Because I got inflated, inaccurate

3  information back again after I sent this email to the

4  team, which I expected Jim to manage and to police and

5  to vet in order for me to get back accurate data and

6  information.

7          And it simply came back incorrect once

8  again.  So I said, Jim, do you need me to do your job

9  for you or can you do your job?  And I'll certainly

10  help if I possibly can.

11      Q.    And did Mr. Beyer ever correct the

12  situation and ensure that his sales team were

13  providing you with accurate, uninflated information?

14      A.    He did not.  Based on the funnel review

15  that you did previously, the accounts didn't close.

16  So there was very inaccurate information always

17  provided.

18          MR. RUTCHOW:  We would move to admit

19  Exhibit 9, Your Honor.

20          THE COURT:  Any objection?

21          MR. ZENNER:  No objection.

22          THE COURT:  Received.

23          (Defense Exhibit No. 9 was admitted.)

24          MR. RUTCHOW:  Your Honor, we're providing

25  the witness with Defendant's Exhibit 10.

1    BY MR. RUTCHOW:

2         Q.    Mr. Bolds, you've been handed Defendant's

3    Exhibit 10, which is an August 17 email from you to

4    Mr. Beyer.  What was the purpose of sending this

5    email?

6         A.    Because, once again, I got back

7    inaccurate information, which I hold myself

8    accountable to the board and expected Jim to hold

9    himself and his team accountable.  But that did not

10   occur.

11              And, again, I had to go back to Jim and

12   explain where all the mistakes were in the funnel,

13   make suggestions to him on how to fix them.  And then

14   again ask if he knows what he's doing as it relates to

15   managing this extremely important tool.

16        Q.    And what was Mr. Beyer's primary job

17   responsibility for Vestagen?

18        A.    He was senior VP of sales, who was

19   responsible for developing the sales protocol,

20   developing the sales process, developing the call

21   point strategy, developing the forecasting tool,

22   hiring personnel, training personnel, creating an

23   environment of accountability.  And also appreciation

24   for the employees so that you can get as much out of

25   them as possible by making them feel good and making

1   them feel like they have the ability to win and
2   accomplish what they need to.
3        Q.    And Mr. Beyer was hired by the board of
4   directors; is that right?
5        A.    Correct.
6        Q.    So these were duties assigned to him by
7   the board of directors?
8        A.    Correct.
9             MR. RUTCHOW:  Your Honor, we would move
10  to admit Exhibit 10.
11            THE COURT:  Any objection?
12            MR. ZENNER:  No objection.
13            THE COURT:  Received.
14            (Defense Exhibit No. 10 was admitted.)
15            MR. RUTCHOW:  Your Honor, this is
16  Defendant's Exhibit 11.
17  BY MR. RUTCHOW:
18       Q.    Mr. Bold, can you identify Defendant's
19  Exhibit 11?
20       A.    Yes.  This is just a snapshot, a summary
21  of each of those categories and how much business was
22  being targeted and then how much business was expected
23  to close in 2016 based on each of the categories.
24       Q.    Okay.  And what was the purpose in you
25  sending this mail to Mr. Beyer?

1      A.    Once again, I was going to -- let me read

2   here.  I think I was presenting to an investment

3   group.  And investment groups -- or investors are very

4   detail-oriented and want to know everything about your

5   process and targeting strategy.  And it looks like

6   this information was, again, inaccurate and

7   overstated.

8      Q.    And this is information that Mr. Beyer

9   provided to you?

10      A.    Correct.

11           MR. RUTCHOW:  Your Honor, we would move

12   to admit Defendant's Exhibit 11.

13              THE COURT:  Any objection?

14              MR. ZENNER:  No objection.

15              THE COURT:  Received.

16              (Defense Exhibit No. 11 was admitted.)

17              MR. RUTCHOW:  Your Honor, we are passing

18   up Defendant's Exhibit 12.

19   BY MR. RUTCHOW:

20      Q.    Mr. Bold, you've been handed Defendant's

21   Exhibit 12, which is an email from you to Mr. Beyer

22   dated August 21, 2016.  Can you tell me what the

23   purpose of sending this email was?

24      A.    Yes.  This is related back to the much

25   earlier email where I asked Mr. Beyer for the steps

1    that were involved in the funnel process in terms of

2    what were the threshold or metrics that a customer had

3    to go through in order to move from the targeting to

4    the discovery to the qualified stage.

5              And, again, as of August 21 I did not

6    receive the information I requested.  And he was

7    solely responsible for developing this protocol to

8    support the funnel process that we implemented.

9         Q.   Okay.  If you look back at Defendant's

10   Exhibit 10, second paragraph of your email in

11   Defendant's Exhibit 10 says, also any idea when you

12   will have the ten or so criteria for each category to

13   move from targeting through close by stage.

14             Is that the same criteria or categories

15   that you're referring to in this August 21 email?

16        A.   It is.

17        Q.   Okay.

18             MR. RUTCHOW:  Your Honor, we would move

19   to admit Exhibit 12.

20             THE COURT:  Objection?

21             MR. ZENNER:  No objection.

22             THE COURT:  Received.

23             (Defense Exhibit No. 12 was admitted.)

24             MR. RUTCHOW:  This is Defendant's

25   Exhibit 13, Your Honor.

1   BY MR. RUTCHOW:

2          Q.    Mr. Bold, earlier you had testified that

3   you had -- I believe it was in the August 3 email that

4   you had requested that Mr. Beyer put together the

5   various criteria and that you didn't get that back

6   from him until you had provided him with a template

7   for how to do it?

8          A.    Correct.

9          Q.    Is this -- what's been marked as

10  Defendant's Exhibit 13, which is an August 22 email,

11  is that where you sent -- the subject is Vestagen

12  Sales Road Map.  Is that you sending to him that

13  template for how to do it?

14         A.    It is.

15         Q.    Could you speak a little closer to the

16  mic?

17         A.    Sorry.  Yes.  Yes, it is.

18         Q.    And then it was after this that he sent

19  you back a funnel based on the information you'd

20  provided him; is that right?

21         A.    Not a funnel, but the criteria that needs

22  to be included in the funnel to track the progress of

23  each account.

24         Q.    Okay.  And was what he sent back to you

25  same as or different than what -- this template that

1    you'd sent him?

2         A.    Very similar to the steps that were

3    required in that process.

4              MR. RUTCHOW:  Your Honor, we would move

5    to admit Defendant's 13.

6              THE COURT:  Any objection?

7              MR. ZENNER:  No, Your Honor.

8              THE COURT:  Received.

9              (Defense Exhibit No. 13 was admitted.)

10             MR. RUTCHOW:  Earlier we had admitted

11   Defendant's 20, and I'd like to have the witness -- a

12   copy put back in front of the witness.

13   BY MR. RUTCHOW:

14        Q.    Mr. Bold, in looking at Defendant's

15   Exhibit 20, at the bottom of the first page is an

16   email dated September 20 from you to Mr. Beyer and

17   then it continues on to the top of the second page

18   with five comments.

19             Did you send this email to Mr. Beyer?

20        A.    The one on the bottom?

21        Q.    Yeah, the one on the bottom.

22        A.    Yes.

23        Q.    What was the purpose of providing these

24   comments to him?  What was going on right now?

25        A.    Because, again, I think this was the

1    fifth board meeting that he attended throughout the

2    course of the nine months.  And as you can see, there

3    were -- again, he was supposed to put together slides

4    and put together forecasts and put together

5    expectations around accounts closing, and it simply

6    wasn't there.  So I had to, again, instruct him on how

7    to do it and what was required for the fifth board

8    meeting that year so far.

9            Q.    So was this the same information you'd

10   been asking him for for the August board meeting that

11   were the subject of the earlier emails?

12           A.    Yes.

13                 MR. ZENNER:  Objection, leading.

14                 THE COURT:  Leading.  Don't lead.

15   BY MR. RUTCHOW:

16           Q.    So the comments that you raised in this

17   September 20 email, had you had discussions with

18   Mr. Beyer about these types of issues before?

19           A.    Yes.  For nine months.  And I even say it

20   here, and after nine months it's going to be viewed as

21   a very concerning situation by the board.

22                 MR. RUTCHOW:  That one's already in,

23   Your Honor.

24                 THE COURT:  Excuse me?

25                 MR. RUTCHOW:  I was about to move it into

1    evidence, but it's already in.

2              THE COURT:  It's already in.

3    BY MR. RUTCHOW:

4         Q.    Other than these sales process and

5    performance issues, did you have any other issues with

6    Mr. Beyer's conduct?

7         A.    I did.  He treated the people that worked

8    for him and around him unlike anybody I would ever

9    treat.  He would belittle people and condemn them and

10   basically just let them know that he didn't think

11   highly of them and didn't respect them.

12              And even an individual like Brain

13   Crawford, who was the guy that was driving all the

14   sales within the organization, who also closed

15   Baptist, he would demean him and belittle him on

16   emails and just in person as well.

17        Q.    Did you have -- ever have any discussions

18   with Mr. Beyer about his treatment of other employees?

19        A.    I did, on many occasions.  With the Gene

20   Deutscher situation, not only did I speak with him,

21   but I put Gene, Jim and myself on a conference call

22   because I wanted to see if Gene was making these

23   things up.  Because I didn't know Gene at the time and

24   he worked for Jim, and I only knew of him based on

25   what Jim would tell me about Gene.  Because it was two

1    or three months into the organization.

2              And the three of us got on a call, and

3    Gene was very articulate in terms of his

4    dissatisfaction with Jim on several different levels.

5    And Jim agreed with him and apologized and said I'll

6    try to do better.  And it ended up that Gene still

7    said, no, I don't -- I can't work for a person like

8    that.  That was one occasion.

9              I remember another occasion, very

10   specific occasion where I was at a meeting in Orlando

11   and Jim was in the office and I think I was at an

12   investor meeting.  And the day before we spoke -- and

13   I said, we got to make -- we have to make sure Brain

14   is, you know, happy here because he's driving all the

15   revenue at Northwell and has great relationships

16   within the organization with customers.

17             And Jim said, okay, okay.  And the next

18   day I was flabbergasted.  The next day he sent Brain a

19   nasty email about how he needs to close business

20   faster at Northwell, but he's not going to allow him

21   to go to New York because he wants him to close

22   business in Florida.  And he needs to review his

23   schedule or his trips a few weeks in advance because

24   he needs to close the business at Northwell, but he's

25   not allowed to go there and he needs to replicate that

1    in the southeast.

2              It was a very bizarre email.  I drove

3    right back to the office again.  I closed the door in

4    his office, I said, Jim, what are you doing?  How can

5    you do this when we just had the conversation

6    yesterday about how we need to embrace Brain because

7    of his productivity.  And he didn't have an answer.

8    He didn't have an answer.

9              He got frustrated about something and

10   fired off a nasty email to him.  And Brain -- that was

11   the point where Brain said, I can't work for this guy.

12   And that's when -- it wasn't -- it wasn't behind

13   anybody's back.

14             Jim was very aware of the confrontational

15   attitude he had with people and the fact that -- the

16   fact that people didn't like working with him.  There

17   were -- I had -- or conversations with Gerry Tighe

18   where he told him he was a pharmaceutical rep and

19   didn't have the ability to sell medical devices; where

20   he asked Gerry to set up a meeting at Hackensack.

21             On a Monday night he called Gerry and

22   said, set up a meeting on Thursday morning.  I'm

23   flying in.  My schedule changed.  Gerry called in a

24   big favor from the chief of patient care at Hackensack

25   University, which is a big title and a big facility.

1         Gerry confirmed with Jim, he had the

2    meeting set up for I think it was 9 o'clock on

3    Thursday morning.  Gerry goes to the meeting.  Jim

4    never shows up.  Gerry called him, he said, oh, I

5    forget.  I forgot that I told you to set the meeting

6    up.

7         There were just many, many, many

8    instances like that that I would speak with Jim about

9    very frankly and just never got better.  And it got to

10   the point where these sequence of events led up to the

11   termination.

12        Q.    Well, did you ever put Mr. Beyer on

13   notice that his conduct could lead to his termination?

14        A.    Absolutely.

15        Q.    Tell me when you did that.

16        A.    I did it -- I did it every time there was

17   a confrontation with an employee.  And these are good

18   people.  And they're talented people.  When he -- when

19   he belittled and called Marc Lessem emotionally

20   disturbed or something like that, when he belittled

21   Gene, when he belittled Brain, I said, Jim, you cannot

22   continue your conduct like this.  You cannot continue

23   to belittle and degrade individuals or your employment

24   will be terminated.  And it needs to improve

25   dramatically or else you won't be working for Vestagen

1   any longer.

2          And that was -- that was for personnel

3   reasons.  And then also -- I mean, you can see how

4   many times I had to talk with him about his lack of

5   ability to -- this is Sales 101 leadership stuff.

6   This is something I did when I was, you know, very

7   young.  To not be able to do this kind of stuff -- I

8   would say to him, Jim, how can you possibly lead an

9   organization if you can't even educate the people on

10  simple technologies that you're supposed to be the

11  leader of.

12         So -- and I would let him know that we

13  can't continue this any longer.  And it needs to

14  improve dramatically.

15     Q.    There was testimony earlier, there was an

16  exhibit that I put in front of Mr. Beyer regarding the

17  email that he sent to Mr. Lessem, telling him that he

18  had emotional problems and needed professional help.

19  Is that the situation with Mr. Lessem you were just

20  referring to?

21     A.    Correct, yes.

22     Q.    So you talked with Mr. Beyer about that

23  situation?

24     A.    I did.  I'd say three or four weeks

25  later, because Marc was embarrassed to tell me that

1    that communication came from Jim Beyer.

2         Q.    What did you tell Mr. Beyer when you

3    talked to him about this situation?

4         A.    I just said, this is just another example

5    of you causing people to want to leave the

6    organization.  And, again, it has to be fixed, it has

7    to improve dramatically or you no longer can be

8    employed with this organization.

9         Q.    Did you have any circumstances in which

10   employees did threaten to quit based on how Mr. Beyer

11   was treating them?

12        A.    Yes.  Gene Deutscher put in writing that

13   he was going to quit.  Brain Crawford said he would

14   not work with him.  You know, we didn't have a whole

15   lot of salespeople, so there were a limited number of

16   people that directly reported in to Jim.

17        Q.    And I believe it was made

18   Plaintiff's Exhibit 3.  Are you familiar with

19   Vestagen's employee handbook?

20        A.    Yes, I am.

21        Q.    Does that handbook have any policies that

22   prohibit employees from threatening or belittling

23   other employees?

24        A.    Absolutely it does.

25        Q.    Did you have any conversations with

1    Mr. Beyer regarding Mr. Deutscher's age or mental

2    faculties?

3          A.    I did.

4          Q.    Tell me about that.

5          A.    I didn't know Gene at all for -- I never

6    met him, other than the one time prior to me joining

7    the organization, there was the sales meeting that Jim

8    talked about and I had the opportunity to speak with

9    Gene.

10          Seemed like a very competent hospital

11    executive who actually was a salesperson who worked

12    for a company called Relamatrix, which is where we

13    hired him from, which actually sold services into

14    hospitals.  So he was a salesperson that provided us

15    leads into facilities in order to try and generate new

16    business.

17          So I -- that's all I knew of Gene.  And

18    then Jim talked to me and I remember where I was, I

19    was in my -- my back office, and he said -- and it

20    struck me very odd.  He said, Bill, he forgets all --

21    everything.  He's senile, he's got dementia.  He's

22    sick all the time.  I've got to fire him.  I said,

23    maybe that's the case, I said, but I don't know the

24    guy.

25          So, you know, after he starts reporting

1   in to me, let's determine if, in fact, we should fire

2   him.  That could be a very distinct possibility if it

3   was for business reasons.  And it turned out that we

4   never did, because after reporting in to me he was a

5   very competent, well-spoken, had great relationships

6   in the field, and he continued on with us.

7           Q.    There was some testimony earlier from

8   Mr. Beyer that prior to his formal start date of

9   January 4 that he attended a Vestagen sales meeting in

10  December 2015.  Did you hear that testimony?

11          A.    I did.

12          Q.    Were you at that same sales meeting?

13          A.    I was.

14          Q.    Did Mr. Beyer do anything at that meeting

15  that caused you concern with regard to his

16  performance?

17          A.    He did, something relatively significant,

18  in that the entire company was in a two-day meeting

19  because they were implementing a new sales strategy --

20  which eventually got tweaked anyway, but they were

21  implementing a new sales strategy.  We were having the

22  opportunity to meet some of the Relamatrix folks that

23  were the liaisons into high-level executive accounts.

24          And on Day One things were pretty much

25  normal, Jim was relatively quiet, learning, and I

was -- I was just simply asking questions.  On Day Two
I think we had dinner that night, and I went to bed, I
don't know, 11 o'clock or so.  Jim was still up.

On Day Two -- and, again, we're meeting
our team.  So I'm the CEO of the company and all 20
people in the room report to me.  At least four or
five of the people report to Jim, so first impressions
are everything.

So during Day Two, he literally fell
asleep five, ten times during the meeting.  Literally
nodding off in the chair.  And when he wasn't nodding
off, he was playing -- on Facebook because there were
people sitting next to him that --

MR. ZENNER:  Objection, Your Honor.  I
don't think he has firsthand knowledge of any of this.

THE COURT:  Sustained.  Sustained.  Not
what other people told you, only what you witnessed
yourself.

THE WITNESS:  Okay.  I witnessed Jim
falling asleep consistently throughout Day Two.  I
had -- I had four or five of the executives and the
board -- I had Dale Pfost, the executive chairman, I
had Ben Favret the founder, I had Marc Lessem, the
chief marketing officer, and one or two of the sales
people come up to me three-quarters of the way through

1    that day --

2                MR. ZENNER:  Same objection, Your Honor.

3                THE COURT:  Response?

4                MR. RUTCHOW:  Your Honor -- and I can

5    connect this up.  I think he's about to testify as to

6    information that was provided to him that led him to

7    have a discussion with Mr. Beyer about Mr. Beyer's

8    conduct.  So it forms the basis for Mr. Bold's

9    understanding --

10               THE COURT:  This is before he even

11   started working for the company.

12               MR. RUTCHOW:  Yes, it is, Your Honor.

13               THE COURT:  So why is this -- why is this

14   relevant?

15               MR. RUTCHOW:  Because, Your Honor,

16   Mr. Bold's going to testify that he verbally

17   reprimanded Mr. Beyer at this meeting.  And I believe

18   he's going to testify that similar instances of

19   disinterest and lack of attention to meetings with

20   customers and employees occurred throughout his

21   employment.  So this was a pattern.

22               MR. ZENNER:  He's not going to have any

23   firsthand knowledge of any of these meetings either

24   because he didn't attend any of them.

25               THE COURT:  You can testify to -- to your

1    reprimands of Mr. Beyer to his -- what you said to

2    him.  You can --

3                 MR. RUTCHOW:  That's fine, Your Honor.

4                 THE COURT:  -- testify to that.

5                 MR. RUTCHOW:  That's fine, Your Honor.

6                 THE WITNESS:  Okay.  Yes, ma'am.

7    BY MR. RUTCHOW:

8         Q.    As a result of this meeting did you

9    reprimand Mr. Beyer?

10        A.    I did.  At the break, roughly around

11   3 o'clock in the afternoon I took Jim into the lobby

12   of the hotel.  I said, Jim, what are you doing?  This

13   is -- this is our opportunity to make the first

14   impression.

15            These individuals are looking to us to

16   turn this company around and to lead this organization

17   into something greater than what it is today.  You

18   can't conduct yourself where you're falling asleep and

19   you're completely disinterested in what is going on

20   throughout the day.

21            And he apologized.  He said, I'm sorry.

22   I won't do it again.  And for the next hour or so he

23   did wake up and ask more questions and got a little

24   bit more engaged.  But it did quite significant damage

25   with the team.

1      Q.    During the remainder of Mr. Beyer's
2    employment with the company, did you ever have
3    occasion to reprimand him again for being
4    disinterested in either company meetings or customer
5    meetings?
6      A.    Well, based on what I heard when he
7    attended --
8            MR. ZENNER:  Objection, Your Honor.
9            THE WITNESS:  -- meetings --
10           THE COURT:  Again, this is --
11           MR. RUTCHOW:  Again, I think this is
12   notice to him that forms the basis for the reprimand.
13           MR. ZENNER:  This is the classic
14   end-around for every hearsay objection.  Well, it's
15   really just proving what was said.  It's proof he's
16   introducing it under --
17           THE COURT:  It's proving his state of
18   mind, and that is an exception.  So go ahead.  Not
19   what other people told you.
20           THE WITNESS:  Sure.
21   BY MR. RUTCHOW:
22     Q.    The basis of your reprimand, why you
23   reprimanded him, what you said to Mr. Beyer.
24     A.    Because Jim was not focused on his job
25   responsibilities.  He was focused on -- for some

1    reason, Facebook and being aloof in front of customers
2    to the point where -- to the point where it was
3    embarrassing for certain people to be in meetings
4    because of the way he conducted himself.
5         Q.    And what is the reprimand that you gave
6    to Mr. Beyer as a result?
7         A.    The reprimand is that you have to be a
8    leader within the organization and be the person
9    responsible for driving those meetings and being
10   passionate and engaged when you're with a customer as
11   opposed to the complete opposite.
12        Q.    Did you ever attend any prospective
13   customer meetings with Mr. Beyer in which he did
14   anything that you had to reprimand him for?
15        A.    I did.  We went to a meeting, both of us
16   were a little bit cautious about it.  It was a meeting
17   in St. Louis with a company called Scrubs & Beyond.
18   They have 130 stores across the US.  They are very
19   much tied into the Strategic Partner Organization,
20   which is the biggest retailer out there.
21             So Jim had access or got access to the
22   CEO of that organization, I think it was the chief
23   marketing executive as well.  We talked prior to going
24   into that meeting about holding things close to our
25   vest, because we thought very much so that they would

1  take that information back to our competitor, which

2  ultimately they did, and try to -- try to use the

3  words that were used in that meeting against us.

4                And we were very specific about using

5  words like killing bacteria in the hospital

6  environment or reducing hospital-acquired infections

7  and making grandiose statements like that that were

8  untrue, because we don't do that.

9                But if you embellish a little bit during

10  a meeting, it makes it sound even better, the

11  technology, than what we have to offer.  And Jim fell

12  into that trap and made some comments about us having

13  a 99.99 percent kill rate of bacteria and

14  microorganisms and correlating that back to

15  hospital-acquired infection reduction.

16                And the CEO even said to Jim, are you

17  sure you want to say that?  And I cringed.  And then

18  we went outside and I said, why did you say that?  We

19  talked about not saying that.  We talked about holding

20  it close to our vest because that information would

21  probably flow back to our biggest competitor.  And it

22  occurred.

23         Q.    There was some testimony earlier about

24  Mr. Beyer, a March 10 email that Mr. Beyer sent to

25  Susan Dolan at Colorado Children's where he attached a

1   copy of the Vestagen Literary Library?

2       A.    Correct.

3       Q.    Do you remember that testimony?

4       A.    Yes, I do.

5       Q.    Did you ever have any discussion with

6   Mr. Beyer about that incident?

7       A.    Jim -- Jim is accurate in that Marc

8   Lessem was -- let me back up.  Marc Lessem was very

9   upset over that and had the conversation with Jim.  I

10   had a following conversation with Jim, and I wasn't

11   as -- I didn't convict Jim because I thought

12   possibly -- he should have opened up the email and

13   read it -- or opened up the attachment and read it.

14   Didn't do that.  But I'm not sure he did it

15   maliciously.

16       Q.    And there was also some testimony

17   regarding an email that he sent to a Sharon Holmes at

18   Dallas Children's Hospital two days after he'd just

19   had a meeting at Dallas Children's where her response

20   was that he was insulting her intelligence.  Did you

21   get involved in that situation at all?

22       A.    I did.

23       Q.    There was also some testimony that

24   Mr. Beyer had sent an apology to Ms. Holmes, and he

25   says he did that on his own.  Is that true?

1    A.    He did -- he did because I didn't know

2    the extent of the email that he originally sent.  I

3    asked for it, but then I just got a copy of the

4    apology.  And then I subsequently got a copy of the

5    original email that he sent.  And he was apologetic.

6              And I made a comment like, well, you

7    know, passion is good, but make sure that -- you know,

8    make sure that you think your way through things like

9    this going forward.

10   Q.    Mr. Beyer testified that in his opinion

11   you wanted to take over the sales organization.  Is

12   that true?

13   A.    Last thing I wanted to do was to take

14   over the sales organization.  I had so many

15   responsibilities, I was trying to raise $15 million

16   with a company that was, you know, on the verge of

17   running out of money.

18             And my job was to go out there and meet

19   with venture capitalists, tell them how important --

20   or how successful we were being from a field

21   perspective.  Tell them all the processes and plans

22   that we had in place so that we're going to be able to

23   grow this company to a 40 or $50 million company in

24   order to acquire their investment.

25             So it would have been -- it would have

1    been the greatest thing in the world for me for Jim

2    Beyer to be wildly successful and I could have focused

3    on supply chain and manufacturing and R&D and FDA

4    requirements and mostly venture capital and

5    fundraising.

6         Q.    Are you aware of any other -- strike

7    that.  There's been some testimony that you terminated

8    Mr. Beyer on September 22, 2016, and at the time you

9    also offered him a demotion to a sales rep position.

10   Why did you make that offer?

11        A.    I don't think it was exactly called a

12   sales rep.  I think it was a regional vice-president.

13   As Jim said earlier, John Black left, who was hired by

14   Jim, he left about a month earlier.  So there was a

15   void in the Midwest in terms of where John Brown --

16   John Black was covering.

17             Jim lives here in Nashville, so he had

18   access to the Midwest.  And I knew for a fact that he

19   had -- he had -- did not have the capabilities,

20   talent, experience, to be a sales leader, but that

21   doesn't mean that he can't be an individual

22   contributor.  And there are a lot of great salespeople

23   that can't become great managers.

24             And, therefore, I thought if Jim had just

25   the responsibility for himself, and not for other

1   people, that he would be able to focus and be more
2   organized in his approach with my help and guidance
3   and possibly make an impact from a pure sales
4   perspective as opposed to a leadership perspective.
5           Q.    Why didn't you just terminate him for
6   cause?
7           A.    In hindsight, I should have, but I was
8   benevolent and I thought that I would give him an
9   opportunity to continue with the company.  Most
10  importantly, because of the shares.  I told him that
11  his shares would not change.
12          So he had ownership in the company.  He
13  had significant ownership in the company.  And if he
14  was demoted to a regional vice-president, as opposed
15  to senior VP of sales, he would maintain those
16  options, which eventually hopefully some day would be
17  worth significant dollars.
18          He also would maintain his severance
19  because I wasn't planning on taking that away if he
20  accepted the regional vice-president job as well.  So
21  I -- I was empathetic and benevolent and wanted to try
22  and give him another opportunity.
23          Q.    And so when he didn't accept this
24  demotion, what was your response?
25          A.    I said that, Jim, I have the ability to

1    fire you for cause based on all of these different

2    things, your interaction with your -- your

3    confrontational interaction with the internal

4    personnel, with customers, your lack of performance,

5    your inability to develop metrics for the sales

6    forecast.

7              You know, I just named all the time that

8    he was not able to do during his nine months.  And I

9    said, I can fire you for cause, but I'm willing to

10   work with you, Jim.  I know you have a family.

11   I'll -- I'll offer you a three-month severance instead

12   of the six months.  We'll both parts ways amicably and

13   we'll move on.  And his response was no.

14             MR. RUTCHOW:  Your Honor, if I could just

15   have a minute.

16             THE COURT:  Okay.

17             (Pause in proceedings.)

18             MR. RUTCHOW:  Your Honor, that's all I

19   have at this time.

20             THE COURT:  Okay.  Any cross?

21             MR. ZENNER:  Your Honor, could we take a

22   five-minute break?

23             THE COURT:  Yeah, why don't we take a --

24   we'll take a 15-minute break.

25             (Whereupon, a break was taken from

1    2:50 p.m. to 3:10 p.m.)

2              THE COURT:  All right.

3    Cross-examination.

**CROSS-EXAMINATION**

5    BY MR. ZENNER:

6         Q.    Mr. Bolds, you and I have spoken once

7    before in a deposition.  You were speaking about you

8    would have loved Mr. Beyers to have been wildly

9    successful in the sales process.  Do you recall that?

10        A.    Correct, yes.

11        Q.    Now, you terminated him with the intent

12   of taking over the sales process yourself; correct?

13        A.    No.  I didn't know if I would ultimately

14   take over the sales process as the leader of the sales

15   organization or if I would hire somebody else to take

16   over that role.

17        Q.    Your initial plan was to, quote/unquote,

18   whip the sales process into place in about 30 days.

19   Remember that?

20        A.    Correct, that was my statement.

21        Q.    All right.  Now, you're still doing the

22   sales; right?  You've never replaced him?

23        A.    I did two things.  I put Brain in charge

24   of the direct organization and I put Milton Bugg in

25   charge of a -- a very unique distribution channel that

1    we're undertaking at this point.

2         Q.    And do you disagree with Mr. Pruna's

3    testimony about revenues being down in 2017?

4         A.    Compared to 2016?

5         Q.    Yes.

6         A.    No, I -- I did disagree with that.  We

7    have bookings now through November, which will allow

8    us to hit roughly $3.2 million this year.

9         Q.    When were those bookings put into place?

10        A.    Over the last -- throughout the year.

11        Q.    Who are they?

12        A.    Basically Northwell, continue -- we went

13   from two hospitals at Northwell to approximately eight

14   hospitals at Northwell.  And things have changed

15   dramatically in that the strategy, based on some

16   recent changes, we signed a deal with a strategic

17   partner that is the largest medical textile company in

18   the world with 60 salespeople that are very much

19   focused on selling clinical textiles; and, therefore,

20   we believe that we can leverage that relationship to

21   expand our sales at a faster rate.

22        Q.    Now, there was some testimony about this

23   December sales meeting of 2015.  I don't want to spend

24   much time on that, but that was before Mr. Beyers

25   actually started with the company; correct?

1          A.    Before his actions started with the
2    company?
3          Q.    Yes.
4                THE COURT:  Before he actually started.
5                THE WITNESS:  Oh, actually started with
6    the company.  He signed his employment agreement prior
7    to that, but, yeah, he did not start until January 4.
8    BY MR. ZENNER:
9          Q.    He was still employed with his former
10   employee at that point, wasn't he?
11         A.    I don't know that.
12         Q.    Okay.  And that wasn't the basis --
13   you're not telling this Court that that was the basis
14   of terminating him, are you?
15         A.    No, absolutely not.
16         Q.    Okay.  Well, the same thing with respect
17   to this March 10 email, which is Defendant's
18   Exhibit 4.  That is the email where Mr. Beyers sent
19   some information to Susan Dolan.  You remember that;
20   right?
21         A.    I do.
22         Q.    Now, that happened more than six months
23   before his termination; right?
24         A.    Correct, yes.
25         Q.    Okay.  And he wasn't given a written

1    reprimand as a result of it --

2         A.    Correct.

3         Q.    -- correct?  Nothing placed in his

4    personnel file as a result of it; correct?

5         A.    Correct.

6         Q.    Wasn't told he was going to be

7    terminated; correct?

8         A.    Correct.

9         Q.    And it did not form the basis of the

10   decision to terminate him in September, did it?

11        A.    It did not.

12        Q.    Then why is that included in your

13   discovery answers as one of the reasons for his

14   termination?

15        A.    Well, I think it was part of a sequence

16   of events where you have to be concerned about an

17   individual's judgment along the way.

18        Q.    Did you ever see the initial case

19   management order submitted by your attorney in this

20   case?

21        A.    I did.

22        Q.    You know that the disclosure of

23   confidential information was nowhere mentioned in the

24   initial case management order as a reason for

25   termination?

1          A.    I don't recall.

2          Q.    Isn't it true that that was just an

3     after-the-fact attempt to justify this termination?

4     Revisiting the history?

5          A.    I don't recall, to be honest with you.  I

6     just admitted that it wasn't a part of it.

7          Q.    Well, let's talk a little bit about some

8     of these exhibits that you've gone over.  Let's look

9     at D6.

10         A.    Yes, I have it.

11         Q.    D6.

12         A.    Oh, D?  D6?

13              THE COURT:  D6.  Are the defense exhibits

14    up here?  They're not in the notebook.

15              THE WITNESS:  I have P6.

16              THE COURT:  No, we're talking about D.

17              MR. ZENNER:  Thought I'd move things

18    along.

19              THE COURT:  Do you want him to have all

20    of them?

21              MR. ZENNER:  Yes.

22              THE COURT:  All right.  Let's just give

23    him all the defense exhibits.  Are they in numerical

24    order?  No, they're not.  Sorry.

25

1  BY MR. ZENNER:

2       Q.    This was an email dated August 1.

3       A.    Just give me a second.  I'm going to try

4  and find it.

5             I have it.

6       Q.    Now, this is an email dated August 1.

7  Now, tell me, is there anywhere in this email where it

8  mentions having cause for termination?  Are the words

9  cause for termination, cause or termination, used in

10 this document?

11      A.    No.

12      Q.    Is the language ten business days to cure

13 used in this document?

14      A.    No.

15      Q.    And you said this document was sent by

16 you as a representative of the board.  Now, was this

17 even copied to the other board members?

18      A.    It was based on the expectations of

19 myself and Jim Beyer from the board in terms of what

20 they would say.

21      Q.    But this was you as the CEO.  This wasn't

22 you acting as a representative of the board.  If you

23 would have done that, you would have said, on behalf

24 of the board of directors, this is what we expect.

25      A.    I am the representative of the board.

```
 1    I'm the liaison between Vestagen and the board and
 2    from the board to Vestagen.
 3         Q.    How does --
 4         A.    That's my job --
 5         Q.    -- that --
 6               COURT REPORTER:  Hold on.
 7               THE WITNESS:  That's my job as a CEO.
 8    BY MR. ZENNER:
 9         Q.    How does anyone know when a communication
10    comes from you whether or not it's coming from you as
11    the CEO or whether or not it's coming from the board?
12         A.    Like I said, if it's related to
13    board-related information and activity, it's coming
14    from the board.  And that's what this is related to.
15         Q.    And you didn't even copy the board on
16    this.
17         A.    I did not.
18         Q.    Let's go to D7.  Do you have that in
19    front of you?
20         A.    Not yet.  Give me a second.
21         Q.    August 3?
22         A.    Give me a second.
23               I got it.
24         Q.    Now, again, there's nothing in this email
25    that indicates notice of cause for termination, is
```

1    there?  The language is not used.

2            A.    The language is not used.

3            Q.    And there's no language in this document

4    with respect to ten business days to cure, is there?

5            A.    Correct.

6            Q.    And this document is signed by Bill Bold,

7    chief executive officer.  It doesn't say Bill Bold,

8    chief executive officer and board member, does it?

9            A.    Well, that's implied.

10           Q.    Implied?

11           A.    I am a board member.

12           Q.    So any communication from you comes from

13   the board?  It's from you as a board member?

14           A.    No, but board-related requests are from

15   myself and the board.

16           Q.    Again, no one else on the board is copied

17   on this email, are they?

18           A.    It's not required that I copy the board

19   on communications.

20           Q.    If you're speaking on their behalf --

21           A.    I certainly do not --

22           Q.    -- wouldn't you copy them on it?

23           A.    Absolutely not.

24                 THE COURT:  Let me just ask, on either of

25   these emails, did the board acting as a body tell you

1  to send these emails?

2            THE WITNESS:  The board told me what the

3  requirements were and what their expectations were,

4  and as a result of that I communicated that to Jim

5  Beyer.

6            THE COURT:  When did they tell you these

7  things?

8            THE WITNESS:  They would tell me this --

9  we would have a call a week or two prior to board

10  meetings and we would talk about what the expectations

11  were for the upcoming board meeting.  And then I would

12  try to gather all the data that they were interested

13  in so that we would have an efficient meeting and, you

14  know, be able to provide them with as much data as

15  they were looking for.

16  BY MR. ZENNER:

17       Q.    Okay.  But there was never an instance

18  where the board said, send him an email that talks

19  about his performance and give him notice that we

20  expect better; correct?

21       A.    Correct.

22       Q.    All right.  So same thing with respect to

23  D8.  Do you have D8?

24       A.    These aren't in order, so...  I have it.

25       Q.    You have it?

```
 1          A.     Yeah, I do.

 2          Q.     Okay.  Now, again, nothing about

 3   termination in this email; right?

 4          A.     Correct.

 5          Q.     Nothing about notice of having cause for

 6   termination; correct?

 7          A.     Correct.

 8          Q.     Nothing about ten days' notice?

 9          A.     Correct.

10          Q.     In fact, this one is addressed to the

11   team.  Were you also speaking to the team on behalf of

12   the board of directors or was this you as Bill Bold,

13   CEO?

14          A.     This was based on information required by

15   the board, which was extremely crucial for us to make

16   decisions going forward in terms of how much money

17   needed to be raised, how much time we had in terms of

18   cash flow.  So this information was something that the

19   board needed desperately.  And they needed accurate

20   information.  And they needed it throughout Jim

21   Beyer's tenure as well.

22          Q.     No board members copied on this email

23   either?

24          A.     I don't copy board members unless it's

25   something extremely --
```

1      Q.    Important?

2      A.    -- important to them as it relates to an

3  action that needs to take place in immediate term.

4      Q.    Important like notice that someone's

5  about to be terminated for cause and you have an

6  opportunity to cure, something important like that?

7      A.    That's not the reason for this email in

8  terms of notification and a ten-day cure.  This is an

9  email stating that I need accurate information from

10  Jim Beyer and I haven't been able to get it.

11      Q.    Okay.  The same is true with D -- let me

12  look at 9.  D9.  Do you see D9?

13      A.    I have it.

14      Q.    And, again, nothing about termination,

15  nothing about notice, nothing about ten days.  And is

16  your testimony with respect to this email the same as

17  yours was with respect to the prior email but that

18  wasn't the intent of it?

19      A.    Can you repeat that?

20      Q.    I think you just testified about the

21  prior email that wasn't the intent to give notice of a

22  for cause termination and an opportunity to cure.

23      A.    The reason for the email previously was

24  to ensure that Jim Beyer conducted his duties

25  accurately and effectively in order for me to have

1    information to make decisions with the board going

2    forward.

3            Q.    Okay.  And D10, is that the same thing

4    for D10.  Same kind of email you're wanting?

5            A.    It's basically putting Jim on notice that

6    I continually get bad information that needs to be

7    corrected.

8            Q.    No notice or no language of termination

9    in this email either?

10           A.    Correct.

11           Q.    No mention of notice; correct?  Right?

12   No mention of for cause?

13           A.    Correct.

14           Q.    No ten days mentioned; correct?

15           A.    Correct.

16           Q.    Go to D10.

17           A.    That was 10.

18           Q.    Or D11, I'm sorry.  D11.  Again, this was

19   entered as an exhibit, but there's no mention of

20   termination in it; correct?

21           A.    Correct.

22           Q.    There's no mention of notice?

23           A.    Correct.

24           Q.    There's no mention of for cause?

25           A.    Correct.

1      Q.     There's no mention of ten days?

2      A.     Correct.

3      Q.     And, in fact, you'd agree that Vestagen

4  has never given Mr. Beyer written notice that it had

5  cause for termination and that he had ten days to

6  cure?

7      A.     I had verbal -- many verbal conversations

8  with him.

9      Q.     Stick to the question.  Listen.  You'll

10 agree that Vestagen never gave Mr. Beyer written

11 notice that it had cause for termination and that he

12 had ten days to cure?

13     A.     I agree.

14     Q.     And isn't it true that you mentioned --

15 you kind of made vague reference in your direct

16 examination to having conversations with Mr. Beyers.

17 I take it you don't know the exact dates of those

18 conversations, do you?

19     A.     All I heard was Mr. Beyers.  Direct

20 conversation with Mr. Beyer?

21     Q.     Yeah.  When you had these conversations

22 with Mr. Beyers where you were warning them about his

23 job, do you know the dates of those?

24     A.     I do.  I remember specifically April 27,

25 which is the day that -- yeah, April 27, which is the

1    day that he sent Brain Crawford that nasty email after

2    Jim and I agreed that we need to embrace Brain in

3    order to ensure he continues to be as productive as he

4    was.

5         Q.    Anything a little closer than five months

6    out from his termination?

7         A.    Sure.  I have --

8         Q.    Do you have any dates?

9         A.    Here's what I do have.  I've usually had

10   those conversations with Jim every week on a Friday

11   because there were team calls.  And Jim would lead the

12   team call and I would listen in, and then the sales

13   funnel would get updated and it would get updated

14   inaccurately.

15        And then those calls would take place

16   prior to the board meeting -- or those conversations,

17   I should say, would take place prior to the board

18   meeting because of the information that was requested

19   by the board from the commercial organization.  And,

20   therefore, I would have those conversations with Jim

21   quite consistently.

22        Q.    On these calls was there anyone else on

23   the call besides you and Jim that overheard these

24   conversations?  Can anyone come in and confirm it?

25        A.    Let me give you an example and you tell

```
 1    me if it's appropriate.  I'd say March -- March 30,
 2    there was a meeting the following day scheduled at the
 3    VA in Gainesville.  Jim was not out on his own
 4    literally after two and a half months in the field.
 5    He always rode with a rep.
 6              Q.    Are they really going back to March 30?
 7              A.    Well, let me --
 8              MR. RUTCHOW:  Objection, Your Honor.  He
 9    should be given the opportunity to answer the
10    question.
11    BY MR. ZENNER:
12              Q.    Go ahead, go ahead.
13              A.    Give me the opportunity to speak.  So I
14    had a -- a very distinct conversation with Jim and
15    said, Jim, you are -- you're out to lunch, you're not
16    engaged.  You're aloof.  And he acknowledged that and
17    said, Bill, I've been on auto pilot with Masimo for
18    the last two or three years, I'm very uncomfortable
19    stepping into this position because there's a lot of
20    moving parts.  There's a lot of demand.
21                   And he then -- and I said, okay.  He
22    said -- he then went upstairs and met with Ben Favret
23    and told Ben he was going to resign because he
24    wasn't -- wasn't cut out for the position.  So there
25    was corroborating...
```

1        Q.    Okay.  You're not saying he did resign?

2        A.    He did not resign.  He told Ben that he

3   wasn't -- he wasn't able to do the job, and Ben said,

4   well, then resign or you have a meeting tomorrow, so

5   let me train you after two and a half months on what

6   to say during the meeting.

7        Q.    Was there any documentation of this?  Do

8   you have anything to put in the file?

9        A.    I do.  I have an email from Ben.

10       Q.    Have you produced it?

11       A.    I have not.

12       Q.    Why not?  Why not?

13       A.    I don't have an answer for that.

14       Q.    Okay.  Well, we've got something in

15   April, we've got something in March.  And we've got

16   these weekly sales calls you've talked about.  Anyone

17   actually participate in these conversations besides

18   the two of you?

19       A.    No, I would prefer not to bring other

20   individuals in the organization into conversations I'm

21   having with my VP of sales as it relates to his lack

22   of performance and the lack of, I guess, lack of

23   appreciation for his fellow employees.

24       Q.    And Mr. Pruna testified accurately that

25   there's absolutely nothing in his personnel file

```
 1   documenting any of these verbal warnings to Mr. Beyer;
 2   correct?
 3        A.    Agreed.  My -- my goal was not to fire
 4   Jim Beyer.  My goal was to help him become successful.
 5        Q.    If you will please pick up D20.  Maybe
 6   it's not D20.  Yeah, it is D20.
 7        A.    I have it.
 8        Q.    That is the email from you to Randy Scott
 9   and Dale Pfost?
10        A.    Pfost.
11        Q.    Again, that's dated two days before the
12   termination; right?
13        A.    Correct.
14        Q.    And that's referencing an email exchange
15   that you had with Mr. Beyer that morning about some
16   slides; correct?
17        A.    Correct.
18        Q.    And you say in the second line, I've
19   reached the point where it is evident that he's not
20   the sales leader we need.  This is the day you decided
21   to terminate him.
22        A.    Correct.
23        Q.    And you did it two days later?
24        A.    My goal was to have Jim invest and agree
25   on a mutually beneficial outcome.  I didn't call Jim
```

1    and say I'm going to terminate you.  I said, Jim -- I

2    said, Jim, I know you're not happy.

3              I know you don't feel good about what

4    you're doing.  He agreed.  I know this is a

5    challenging marketplace.  He agreed.  I said, let's

6    figure out a way for you to exit gracefully and we'll

7    agree to provide three months' severance and we'll

8    part friends.

9         Q.    After you made this decision on the 20th,

10   you never gave him notice that, hey, we've decided

11   that we've got cause for termination here and you've

12   got ten days to cure this thing?

13        A.    I told Jim that on the 22nd, and I said,

14   let's work this out, Jim.  And he said, no, I don't

15   want to.

16        Q.    After you made the decision on the 20th

17   that you had cause to terminate him, you never gave

18   him another ten days' notice, did you?

19        A.    I gave him the opportunity to have

20   another ten days' notice.  And basically said, no, I

21   don't want to work here anymore.  So that's -- that's

22   the way it went down.

23        Q.    You told him that he was no longer going

24   to be employed as the senior vice-president of sales?

25        A.    I didn't -- I didn't say that starting on

1    the 22nd.  I said, Jim, let's figure out how to

2    transition you out of here.  You can either do this,

3    meaning you can either stay on for a week or two or

4    three and let's figure out how to make this work

5    amicably or --

6         Q.    And end amicably.

7         A.    Pardon?

8         Q.    You were not going to keep him in?

9         A.    No, end it amicably at some point.  Or

10    maybe you don't want to be the VP of sales.  Maybe

11    you're not interested in that position anymore because

12    you're not being productive, you don't feel good about

13    what you're doing, you don't have a relationship with

14    your customers or your people.

15         Maybe you want to become an individual

16    contributor, and you have that opportunity as well,

17    Jim.  You can keep your equity.  You can keep your --

18    everything within your employment agreement.  Why

19    don't you give that -- why don't you think about that.

20         Q.    Just so we're clear, you told him on

21    September 22 that he was no longer going to be the

22    senior vice-president of sales?

23         A.    I told him that, yes, he was no longer

24    going to be the senior VP of sales.  We can do this in

25    one of two ways.  We can transition out and allow him

1    to spend a little time potentially looking for an

2    opportunity and then I would also provide him

3    severance.  Or if he's interested, he can take on the

4    individual contributor role and I would be able to

5    support that.

6            Q.    And senior VP of sales is a position that

7    he had been hired for; correct?

8            A.    He was.

9            Q.    Right.  And the offer to take on -- to be

10   an individual contributor would have involved a

11   significant pay cut, wouldn't it?

12           A.    I was thinking of $50,000 at that point,

13   which could have been negotiated with Jim.

14           Q.    A significant reduction in status and

15   responsibilities in the company?

16           A.    It wasn't -- it wasn't final at that

17   point.  I was willing to have a conversation with Jim

18   as it relates to that.

19           Q.    Now, you've accused him of disclosing

20   confidential information, falling asleep at meetings,

21   being disengaged, falsifying information in the sales

22   funnel, berating employees, belittling employees,

23   disrespecting employees, being completely ineffectual

24   in sales meetings.  And that's the guy you offer

25   another position?

1      A.   Like I said, you can be an individual

2  contributor and not be a great sales leader.  You

3  can -- you can run a store effectively as a GM, and if

4  you can't do that, that doesn't mean that you can't

5  pump gas at the gas station.

6      Q.   If you move down Exhibit 20, D20, the

7  second paragraph says here's my plan.  Do you see

8  that?  D20?

9      A.   Yes.

10      Q.   Here's my plan.  I need to run the sales

11  org.  I can do it easily and whip the process into

12  shape literally in 30 days.

13         So you're still the salesperson; right?

14  Or not?

15      A.   I'm the CEO.

16      Q.   Okay.  Who did you -- who did you put in

17  there after you whipped it into place in 30 days?

18      A.   Well, the first thing I did was I purged

19  all the false information that was in there.  So now

20  we have targets that are actually realistic and

21  closeable as opposed to targets that were never even

22  possible.  Pardon?

23      Q.   The question was:  Who did you put in

24  there after you'd whip this into place in 30 days?

25      A.   As I said, I put Brain Crawford in as the

1    individual responsible for direct sales.  And then
2    Milton Bugg for this secondary distribution channel
3    that we created.
4         Q.   And when did Brain Crawford start that
5    position?
6         A.   Brain probably started four or five
7    months ago.
8         Q.   Little bit longer than 30 days, wasn't
9    it?
10        A.   I didn't say I was going to put somebody
11   in place in 30 days.  I said I was going to basically
12   whip the process in place, which is what I did.  And
13   what that meant was to get a foundation of realism so
14   that we can determine where, in fact, we can or should
15   go.
16        Q.   And then the next paragraph reads -- and
17   this is what we talked about already.  In light of
18   John leaving, I have a void in the central US and was
19   going to offer it to Jim as an individual contributor,
20   as I do believe he can be managed, if he is only
21   managing himself.
22             He may or may not take it, but he does
23   have the knowledge so we don't have to retrain another
24   FTE.  Salary will be dialed back by 50K per year.  And
25   then you write:  I will not pay his six-month

 1    severance and this can be a way not -- to not have to.

 2    Or to negotiate that back to a few months.

 3              You threw this offer of another sales

 4    position out there as a chip, a bargaining chip to try

 5    to get him to negotiate back the severance that you

 6    knew he was entitled to.

 7         A.    Is that a question?

 8         Q.    Isn't that true?

 9         A.    The answer is absolutely not.

10         Q.    Wasn't that what it says?

11         A.    I told Jim, while we were having that

12    cordial conversation of Jim, you're not happy, Bill,

13    you're right, I'm not happy, I'm not being productive,

14    Bill, I don't like this industry, I said, Jim, I have

15    the ability to terminate you for cause based on all of

16    these things.

17              Let's -- let's negotiate this and part

18    amicably and go with three months.  That was one

19    option.  Or you can continue on if, in fact, you don't

20    like what you're doing as a sales leader, and you can

21    become a regional vice-president as opposed to the

22    vice-president and take on this Midwest

23    responsibility.

24         Q.    This says I will not pay his six-month

25    severance, and this can be a way to not have to or to

1   negotiate that back to a few months.  You don't write

2   in this email, I have cause to terminate him and I've

3   given him notice and ten days to cure, so I'm not

4   going to pay his severance.

5          A.    That's why I said that.  I said, I will

6   not pay his six months' severance because we were very

7   aware that I could have fired him for cause, the board

8   was.

9          Q.    And then you say --

10         A.    This is to the board.

11         Q.    Am I reading this right?  You're saying

12  that the offering of another position is a way to not

13  have to pay the severance or to negotiate it back.

14  That's inconsistent with you saying, we don't have to

15  pay severance, period, because we have cause to

16  terminate.

17         A.    We did have to pay --

18              MR. RUTCHOW:  Your Honor, is there a

19  question pending?

20              THE COURT:  Make it into a question,

21  Mr. Zenner.

22  BY MR. ZENNER:

23         Q.    Isn't that inconsistent with position

24  that we had cause to terminate him anyway?  We don't

25  have to pay him a severance?

1          A.    We did, but I was -- I was hoping that

2     maybe he would -- he would consider the individual

3     contributor role since we wouldn't have to train

4     somebody new.  He had the knowledge, and if he was

5     only focused on himself, he may take that on.  And if

6     not, I'm not going to pay the six-month severance

7     because I have cause to terminate him.

8          Q.    If we go to the end of this, you talk

9     about spinning this to investors.  How are you going

10    to spin this to investors?

11         A.    Yeah, that's a very good question.  Part

12    of my hesitancy to move on Jim when I could have even

13    earlier, and should have even earlier, is that when

14    you're in the middle of the fundraising and you're

15    meeting many different venture capitalists that are

16    very, very detail oriented, there's a significant red

17    flag that gets put up if, in fact, you fire your

18    senior VP of sales during the fundraising process.

19              So I had the ability to terminate Jim

20    earlier, but kept him on longer because of my need to

21    not cause ruffles within the investor community.  Or I

22    should say ripples instead of ruffles.

23         Q.    We can have a discussion about why this

24    is, but the last sentence is true, that you believe

25    that you were going to hit the 2016 numbers and that,

1  in fact, happened, didn't it?

2          A.     We were about $45,000 short.

3          Q.     Okay.

4          A.     As I said, based on --

5          Q.     So --

6          A.     As I said --

7          Q.     So the sales process --

8                 COURT REPORTER:  One at a time.

9                 THE WITNESS:  As I said, based on what

10  Brain was doing in that sentence.

11  BY MR. ZENNER:

12         Q.     The sales process takes how long?

13         A.     It varies.  It could take a month.  It

14  could take a year.  It could take 18 months.  It

15  depends on the timing of when the customer is

16  interested in buying.

17         Q.     And the last three months, then, looks

18  like, what, a little over a million came in the door?

19  The last three months of the year and you're telling

20  me that that had nothing to do with the efforts of Jim

21  Beyer?

22         A.     It didn't.  It all came in from

23  Northwell.

24         Q.     The sales process takes three to six

25  months, sometimes a year?

1          A.     Can you restate that?

2          Q.     No.

3                 Just so we're clear, we know that this is

4    accurate to say with respect to written

5    communications, but even when you had these verbal

6    communications with Mr. Beyer, you never told him that

7    you've got ten days to cure from this date.  You never

8    used that language; right?

9          A.     I gave him more than ten days.

10                THE COURT:  Answer the question, please.

11   Did you ever use those words?

12                THE WITNESS:  Did I ever use the words

13   ten days?  No.  I used the words immediately or as

14   soon as possible.

15   BY MR. ZENNER:

16         Q.     And you never used the words notice of a

17   condition that gives me cause for termination?

18         A.     I did say that if, in fact, he continued

19   with the activity in terms of what he was doing or the

20   lack of activity in terms of what he was doing, he

21   would no longer be employed by Vestagen.  And it

22   needed to be improved upon immediately to continue

23   your employment.

24                MR. ZENNER:  Your Honor, that's all I

25   have.

1                    THE COURT:  Okay.  Any redirect?

2                    MR. RUTCHOW:  No, Your Honor.

3                    THE COURT:  All right.  You may step

4     down.

5                    THE WITNESS:  Thank you.

6                     *****WITNESS EXCUSED*****

7                    THE COURT:  Next witness?

8                    MR. RUTCHOW:  Defense rests, Your Honor.

9

10                   (Defense rests.)

11

12                   THE COURT:  Any rebuttal from the

13    plaintiff?

14                   MR. ZENNER:  Can I have five or ten

15    minutes to talk to my client?

16                   THE COURT:  Sure.  I'll give you 15

17    minutes to talk to your client.

18                   MR. ZENNER:  Thank you.

19                   (Whereupon, a break was taken from

20    3:45 p.m. to 4:03 p.m.)

21                   MR. ZENNER:  Your Honor, the plaintiff

22    rests.  There will be no rebuttal proof.

23                   THE COURT:  Okay.  I'll hear argument.

24                   MR. ZENNER:  Mr. Rutchow and I were

25    debating, Your Honor, whether or not argument was

1   truly necessary, but I will keep this very, very

2   short.  We've fully briefed these issues already to

3   Your Honor.

4                THE COURT:  I don't think there were too

5   many surprises.

6                MR. ZENNER:  As Your Honor can tell,

7   there are many, many disputes between the parties

8   about performance and whether or not Mr. Beyers was

9   good at his job, bad at his job.  That's really not

10  the important issue for this case.  Mr. Beyer is

11  adamant that he was performing fully and Mr. Bolds is

12  adamant that he wasn't.

13               But what's important in this case is that

14  we look to the terms of the agreement and look to

15  whether or not this was a termination for cause or was

16  it an involuntary termination.

17               One of them entitles him to severance,

18  one does not.  In order for him not to be entitled to

19  his severance, it has to be a termination for cause as

20  that term is defined in the employment agreement.

21               And the evidence has been very clear with

22  respect to subpart A, the disclosure of confidential

23  information.  If there was any disclosure in March of

24  2016, it was admitted on the stand that that formed no

25  basis for the decision to terminate.

1           THE COURT:  So A's out.

2           MR. ZENNER:  You can rule that out.  So

3      we're talking about the rest of these.

4           And Mr. Bolds admitted on the stand that

5      there has been no written notification to Mr. Beyer

6      giving him notice of a condition that would give rise

7      to a for cause termination and ten days to cure.  So

8      we know that that wasn't done.

9           And then we've got some nebulous

10     testimony about these oral conversations.  But we

11     don't have anyone ever saying the magic words, we are

12     giving you notice that we have cause to terminate you

13     and you have ten days to cure it.

14          In fact, we know from the proof that the

15     decision was finally arrived at on September 20 that

16     he finally did feel like he had cause to terminate and

17     then he terminated him two days later without any

18     further communication.

19          So it might be a harsh result,

20     Your Honor, but the job of this Court is to enforce

21     the agreement as it's written, and the agreement as

22     it's written requires them to give notice --

23          THE COURT:  Why do you say it might be a

24     harsh result --

25          MR. ZENNER:  You're right.

1          THE COURT:  -- for you to win?

2          MR. ZENNER:  I think I read that in a

3     case, Your Honor.  I guess it's not a harsh result.

4     Poor phraseology on my part.  You're absolutely

5     correct, Your Honor.

6          But if -- if the Court enforces the

7     agreement as written, Mr. Beyers is entitled to his

8     severance payment.  They have breached the agreement.

9     And I would ask that judgment be entered accordingly.

10    Thank you.

11         MR. RUTCHOW:  Your Honor, just because it

12    was belatedly brought up at the final pretrial

13    conference, and it was a very little bit of testimony

14    on that, start with something that Mr. Zenner did not

15    address, which is the belatedly readded claim of

16    promissory fraud.

17         Quite frankly, the testimony was that

18    Mr. Bold, who suggested the severance clause be

19    included, was not even an employee of Vestagen.  He

20    was on the other side of the table at the time that

21    clause was suggested, clause that he also suggested

22    for his own agreement.

23         Promissory fraud claim has been made

24    against Vestagen.  There's been no testimony that

25    Vestagen, the individuals who were responsible at

1    Vestagen for approving this agreement at the time it

2    was entered into, had an actual present intent at that

3    time to not pay the severance.  The fact that the

4    severance wasn't paid at Mr. Beyer's subjective

5    surmise from the witness stand, cases are clear,

6    that's not enough.  It is a clear and convincing

7    standard for promissory fraud --

8            THE COURT:  Where's your case law

9    supporting clear and convincing standard for --

10           MR. RUTCHOW:  It is, Your Honor -- if I

11    had it pulled up --

12           THE COURT:  It's when you are trying to

13    reform the agreement, I believe, there might be a

14    clear and convincing standard.  But Mr. Zenner and his

15    client are not trying to reform the agreement.  I

16    believe that's a limitation on that higher level of

17    proof.

18           MR. RUTCHOW:  Fair enough, Your Honor.

19           In either case, quite frankly, in this

20    case, again, the defendant, who's being accused of

21    promissory fraud, is Vestagen.  There has been no

22    testimony that the decision-makers at Vestagen who

23    agreed to the contract on behalf of Vestagen at that

24    time didn't include Mr. Bold.

25           He was not yet employed, that those

 1   individuals had an actual present intent not to pay

 2   the severance.  There's just no evidence of that,

 3   Your Honor.  And so we would submit that that claim

 4   has no basis.

 5            With regard to the breach of contract

 6   claim, I think it's important that Mr. Zenner used the

 7   words "magic words" because the contract doesn't

 8   require magic words.  There's a lot of things that

 9   Mr. Zenner talked about aren't required by the

10   language of the contract.

11            Among them, Your Honor, is is that the

12   contract requires written notice in only one

13   circumstance, and that written notice is not a written

14   notice of termination.  It's not a written notice that

15   you have ten days to cure.  It is written notice of

16   his failure to perform his assigned duties.

17            Mr. Beyer testified that the board is the

18   one that assigned him all of these duties of being the

19   sales leader, the sales executive, the senior

20   vice-president of sales.

21            And starting particularly with that

22   August 1 email, Mr. Bold is telling Mr. Beyer exactly

23   what the board's concerns are with regard to his lack

24   of new sales, his job responsibility assigned by the

25   board, when he first started.

1          That's the written notice, Your Honor.

2   Doesn't say we then have to terminate him immediately

3   after the ten days have gone by.  We have to give

4   him -- it doesn't even say we have to give him notice

5   of the ten days.  It says you failed to cure within

6   ten days.  If he doesn't cure within ten days, we can

7   terminate him.

8          In this case he repeated that failure of

9   providing the board with the information that they

10  needed to make decisions in September, as shown by the

11  emails between Mr. Bold and Mr. Beyer where they had

12  to redo the slides to provide the accurate information

13  to the board.

14         So we think that that written notice for

15  that particular cause condition, which is a failure to

16  perform assigned duties, exists.

17         THE COURT:  I think you have a real

18  stretch to convince me that Mr. Bold is speaking as

19  the board in these emails.  He is the CEO.  He also

20  answers to the board.  He may be on the board, but he

21  also answers to the board.

22         He is trying to get one of his

23  subordinates to make him look good, among other

24  things, but just because he's on the board, I think

25  it's a very -- a real stretch to say that he is

1   speaking for the board in these emails.

2               MR. RUTCHOW:  Well, Your Honor, I would

3   agree with that, except that the subject matter of

4   these emails is the board's request for information.

5               THE COURT:  Well, but one -- one thing --

6   and I didn't follow up on it, but at sort of the end

7   of this string of emails, Mr. Bold said that this was

8   leading up to a meeting with investors.

9               MR. RUTCHOW:  One of the meetings.

10              THE COURT:  Said this was a meeting with

11  investors.

12              MR. RUTCHOW:  One of the meetings.  The

13  meeting later -- if you read the emails, the August 1

14  email and the August 3 email are talking about the

15  board meeting the next week.  The August 17 and 21

16  emails are talking about a different meeting.

17              But the August 1 and August 3 emails,

18  which are to me the key emails because they're the two

19  that say, you know, this is the information that they

20  are requesting.  It's obvious that they're getting

21  ready for the board meeting.  Mr. Bold testified they

22  were getting ready for the August board meeting.

23              THE COURT:  But the email doesn't make it

24  clear that it's board members that are seeking this

25  information.  Investors are going to be seeking

1    information as well; correct?

2              MR. RUTCHOW:  Your Honor, I think it's

3    clear from the context of the emails that this was an

4    email that was requesting -- that they -- that the

5    information that was being requested was to put

6    together to provide -- Mr. Bold testified that it was

7    for a board meeting the next week.

8              And that there was a pattern of having --

9    making these requests for this information about a

10   week before the board meetings.  Mr. Beyer and

11   Mr. Bold both knew when the board meetings were.  It

12   would be in the context of where they worked and the

13   context of the pattern that they had established that

14   Mr. Beyer -- or Mr. Bold testified to, that that

15   context showed that that's clearly information he's

16   requesting for the board.

17             THE COURT:  Okay.

18             MR. RUTCHOW:  In fact, I think even one

19   of the emails talks about board slides, so from that

20   perspective...

21             Your Honor, the other two I wanted to

22   concentrate on are the willful misconduct and the

23   violation of company policies.  The employee handbook

24   that Mr. Beyer signed the acknowledgment for has two

25   particularly relevant provisions.  In Section 2.13 of

1  the employee handbook there is a prohibition on

2  threatening, harassing or coercing employees.  And

3  then in Section 5.1 there's a provision prohibiting

4  sending threatening emails.

5                Your Honor, Mr. Bold testified about

6  numerous times that Mr. Beyer belittled, harassed,

7  threatened the people that he worked with.  Both

8  Mr. Beyer and Mr. Bold, in some of the emails that we

9  provided, provided specific examples of when that

10 occurred.

11                THE COURT:  Now, tell me what -- you

12 introduced a lot of hearsay as state of mind.  But to

13 establish willful misconduct as a for cause grounds

14 for termination, you have to establish willful

15 misconduct, not just that he thought that there was

16 willful misconduct and that that willful misconduct is

17 based on hearsay.  It's based on other employees

18 telling me.  There is one -- the one email about the

19 mental health --

20                MR. RUTCHOW:  There are two -- there are

21 two --

22                THE COURT:  Let me -- let me finish.

23                MR. RUTCHOW:  I apologize, Your Honor.

24                THE COURT:  Let me finish.

25                But other employees telling him that they

 1    were belittled and all that sort of thing, that is

 2    definitely hearsay.  And it contributed to his

 3    decision, but it cannot form the basis for this Court

 4    to rule that that misconduct was established.  You

 5    didn't have any firsthand evidence of that, other than

 6    one email I remember, you may be telling me about

 7    another email.

 8              MR. RUTCHOW:  Your Honor, there were at

 9    least two emails that we introduced.  One was the

10    email that he sent to the founder of the company that

11    the founder of the company took as a threat.  We

12    actually introduced that email.

13              The other email was the one that you're

14    talking about, the one from late June that he sent to

15    Mr. Lessem about his emotional state.  And in

16    particular, Mr. Beyer -- Mr. Bold having, you know,

17    reprimanded Mr. Bold -- excuse me, Mr. Beyer for that

18    conduct.

19              I think the context of those emails show

20    that that was willful misconduct.  On top of that,

21    Your Honor, as I said, it also would be clear

22    violations of the company policy.

23              THE COURT:  Let me -- let me unpack this

24    a little bit.

25              MR. RUTCHOW:  Sure.

1          THE COURT:  What is the direct evidence

2     that is nonhearsay that Mr. Favret took that as a

3     threat?

4          MR. RUTCHOW:  There's no direct evidence

5     that he took -- well, yes -- well, Your Honor,

6     Mr. Beyer admitted on the stand that Mr. Favret

7     considered it a threat.  Mr. Beyer testified to that.

8          THE COURT:  Okay.

9          MR. RUTCHOW:  That he -- that he

10    considered it a threat.  And that came in without any

11    hearsay objection, Your Honor.

12         And then, Your Honor, again -- and this

13    goes back to -- this goes back to my analogy to the

14    sexual harassment cases.  In terms of -- Mr. Bold can

15    rely on hearsay evidence to make a decision, a

16    reasonable good-faith belief that conduct has violated

17    a company policy.

18         And if he's made a decision that it

19    violates company policy, then he can make a -- he can

20    take action based on that.  And so it's not so much

21    whether or not the underlying conduct occurred, but if

22    he had a reasonable good faith belief that a company

23    policy was violated, he can take action based on it.

24    In this case he can determine that that's a cause

25    reason for termination.

1           THE COURT:  I don't think you can

2  analogize a sexual harassment case to a breach of

3  contract case.  You must establish that he was

4  terminated for cause --

5           MR. RUTCHOW:  Correct.

6           THE COURT:  -- under this contract

7  provision.  Whether he thought he was right or not, it

8  doesn't matter.  If he wasn't right, then he -- then

9  Mr. Beyer was not lawfully terminated for cause.

10          He may have thought there was a violation

11  of a policy, but for you not to have breached the

12  contract, you have to establish to my satisfaction

13  that there was a breach of the policy.  Am I being too

14  obscure here?

15           MR. RUTCHOW:  No, I don't think so.

16           THE COURT:  Or am I wrong?

17           MR. RUTCHOW:  No, I don't think -- I

18  don't think you're --

19           THE COURT:  I don't think intent the way

20  you're using it for sexual harassment purposes -- I

21  mean, the analogy of a sexual harassment case, I just

22  don't think it's the proper analogy.

23           MR. RUTCHOW:  I guess -- my analogy --

24  Your Honor, my analogy is that to -- for the company

25  to establish a violation of a company policy, they can

1    rely on hearsay to make that determination, that he's

2    violated company policy.  And I guess that -- that's

3    the argument I'm making, Your Honor, with regard to

4    that, is the decision is the company's to make as to

5    whether or not -- it's the company's decision that you

6    have violated company policy; and, therefore, we have

7    cause to terminate you.

8            The company makes that determination.

9    And it doesn't say, and we have to prove it to a

10    particular standard to be able to have cause to

11    determine that in our -- in our view you have violated

12    company policy.

13            So the -- the discretion to decide

14    whether or not it is a violation of company policy is

15    the company's discretion, I believe, the way that this

16    language is written.

17            In any event, Your Honor, there's clear

18    nonhearsay testimony threatening -- sending

19    threatening emails, sending harassing emails, sending

20    emails that damage the reputation of the company,

21    which, again, is a violation of company policy.  It's

22    not just to the employees.

23            We've got the clear evidence of the email

24    to the customer that Mr. Beyer ultimately had to

25    apologize for.  Even Mr. Beyer admits that he should

1   not have sent that email.  He doesn't think he should

2   have used that tone, but in either case, it was an

3   inappropriate email.  And the policy about sending --

4   of sending emails that could damage the company is not

5   limited to just sending an email internally to another

6   employee.

7           So you've got the email to Ben Favret.

8   You've got the email to Sharon Holmes.  You've got the

9   email to Marc Lessem.  You've also got the testimony

10  that Mr. Beyer made the comments about Mr. Deutscher

11  regarding being senile and dementia and he's too old

12  and so he wants to terminate him for that.

13          That Mr. Bold testified to -- again, not

14  hearsay because it was an admission of a party

15  opponent, he was saying what Mr. Beyer said directly

16  to him.

17          THE COURT:  Where is the -- where does

18  the email to the hospital employee in Dallas who was

19  just basically insulted because she thought it had

20  been condescending --

21          MR. RUTCHOW:  I think that's --

22          THE COURT:  -- where does that fit?

23  Which for cause does that fit?

24          MR. RUTCHOW:  That would be a violation

25  of company policy, Your Honor.

1          THE COURT:  And what company policy?

2    We're not talking about belittling employees.  We're

3    talking about relationships with -- give me the

4    exact -- give me chapter and verse.

5          MR. RUTCHOW:  Let me get that specific

6    one, Your Honor.  The specific one here that we would

7    say -- and I'm not sure it would be considered a

8    threatening message, but there is policy 5.10 that

9    prohibits sending a threatening messages, sending

10   message that could damage the image or reputation of

11   Vestagen.

12          And clearly having a prospective customer

13   feel insulted and condescended to could result in the

14   damage to the image or reputation of Vestagen.  So

15   that would be --

16          THE COURT:  Read it to me.  5.13 -- or

17   10.

18          MR. RUTCHOW:  It's 5.10 -- and it's a

19   fairly long policy, but about halfway through there's

20   a prohibition -- this is the email policy.

21          THE COURT:  Okay.

22          MR. RUTCHOW:  And there is a prohibition

23   on sending messages that could damage the image or

24   reputation of Vestagen.  There's another one about

25   prohibiting the sending of threatening messages, but

1  given what message that was sent, I think that one
2  would apply more to the messages that he sent
3  internally to employees than necessarily the insulting
4  email that he sent.
5          THE COURT:  Okay.
6          MR. RUTCHOW:  Your Honor, and although
7  Mr. Zenner talked a great deal about it, there's
8  nothing in the contract that requires that we give him
9  notice that he has ten days to cure.  The contract
10 says you failed to cure in ten days.
11         It doesn't say we've got to give you
12 notice of those ten days or we've got to give you
13 notice of ten days that you haven't cured.  It also
14 doesn't require that we make the decision to terminate
15 and then give him ten days.
16         We have to give him notice that
17 conditions exist.  If he has failed to do something,
18 if he's engaged in willful conduct.  And Mr. Bold has
19 testified that he gave notice of the underlying
20 conditions.
21         I don't think that you can read the
22 language of the contract to say that magic words of
23 termination for cause or magic words of ten days to
24 cure are required, particularly with regard to the
25 oral notice that is allowed for all but the board

1    written notice provision.

2            So for those reasons, Your Honor, we

3    think that the company did have appropriate grounds to

4    terminate him for cause and, therefore, not pay him

5    the six months' severance.

6            THE COURT:  Thank you.

7            Any rebuttal, Mr. Zenner?

8            MR. ZENNER:  Yes.  With respect to that

9    6-30 email that he was just talking about that

10   violated the company policy because it damages the

11   reputation of the company, I'm sure Your Honor has

12   already, but just read the email.  And draw your own

13   conclusion whether or not that email damaged the

14   company's reputation.  It may have been taken wrong by

15   a customer, but it certainly wasn't intended that way.

16   And he apologized.

17           THE COURT:  Okay.  All right, folks.  I

18   will issue an opinion shortly.  Hopefully shortly.

19           MR. RUTCHOW:  Thank you, Your Honor.

20           THE COURT:  I'll try shortly, how about

21   that.

22           MR. ZENNER:  Thank you, Your Honor.

23           THE COURT:  Okay.  We're in recess.

24

25

1          (Which were all of the proceedings had in

2    the above-captioned cause on the above-captioned

3    date.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                **REPORTER'S CERTIFICATE PAGE**

2

3         I, Roxann Harkins, Official Court Reporter

4 for the United States District Court for the Middle

5 District of Tennessee, in Nashville, do hereby

6 certify:

7         That I reported on the stenographic machine

8 the proceedings held in open court on November 28,

9 2017, in the matter of BEYER v. VESTAGEN, Case No.

10 3:16-cv-02736; that said proceedings were reduced to

11 typewritten form by me; and that the foregoing

12 transcript is a true and accurate transcript of said

13 proceedings.

14

15         This is the 12th day of February, 2018.

16

17                 s/ Roxann Harkins_____
                  ROXANN HARKINS, RPR, CRR

18                   Official Court Reporter

19

20

21

22

23

24

25